IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ADWOWA JACOBS, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| ELECTRONIC DATA SYSTEMS | § | 2:05-CV-925-MHT-SRW |
| CORPORATION AND JEFF | § | |
| WILLIAMS, | § | |
| Defendants. | § | |

## DECLARATION OF TONYA A. JACOBS

1.　　　My name is Tonya A. Jacobs. I am over the age of twenty-one years. I reside in Houston, Texas. I have never been convicted of a felony or a crime of moral turpitude. I am an attorney with Baker & Hostetler LLP and one of the attorneys handling this matter for Electronic Data Systems Corporation ("EDS"). As such, I have personal knowledge of the facts stated herein and they are true and correct.

2.　　　Attached hereto as Exhibit "1" is a true and correct copy of Adwowa Jacobs' Deposition taken on October 4, 2006.

3.　　　Attached hereto as Exhibit "2" is a true and correct copy Defendant EDS' Requests for Admission to Plaintiff, Adwowa Jacobs.

4.　　　Attached hereto as Exhibit "3" is a true and correct of the Court's July 12, 2006 Order deeming the Admissions admitted.



EXHIBIT
A

I declare under the penalty of perjury of the laws of the United States of America (28 U.S.C. §1746) that the foregoing is true and correct.

Executed this day of October ___30___ , 2006.


_____
TONYA A. JACOBS

# FREEDOM COURT REPORTING

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT FOR
2  THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  CASE NUMBER: 2:05-CV-925-MHT-SRW
6
7  ADWOWA JACOBS,
8      Plaintiff,
9      vs.
10
11  ELECTRONIC DATA SYSTEMS CORPORATION
12  and JEFF WILLIAMS,
13      Defendants.
14
15      S T I P U L A T I O N
16      IT IS STIPULATED AND AGREED by
17  and between the parties through their
18  respective counsel, that the video
19  deposition of ADWOWA JACOBS may be taken
20  before Leslie K. Hartsfield, at the
21  Frank M. Johnson, Jr. Federal Building,
22  15 Lee Street, Courtroom 5B, Montgomery,
23  Alabama,

**Page 3**

1      INDEX
2  EXAMINATION BY:      PAGE NUMBER:
3  Ms. Jacobs              7
4  Mr. Williams            222
5  Ms. Jacobs continued    273
6
7
8  DEFENDANTS' EXHIBITS:
9  1 - EDS Code of Conduct        30
10  2 - Sexual Harassment Policy  33
11  3 - Driver's license          38
12  4 - E-mail 2-10-05            77
13  5 - E-mail 2-10-05            79
14  6 - Statement 2-23-05         88
15  7 - E-mail 6-28-05            108
16  8 - EEOC 3-8-05               145
17  9 - Complaint                 169
18  10- Letter 3-14-05            199
19  11- Rite Aid 2005             203
20
21
22
23

**Page 2**

1      VIDEO DEPOSITION OF ADWOWA JACOBS
2  taken on the 4th day of October, 2006.
3      IT IS FURTHER STIPULATED AND
4  AGREED that the signature to and the
5  reading of the deposition by the witness
6  is waived, the deposition to have the
7  same force and effect as if full
8  compliance had been had with all laws
9  and rules of Court relating to the
10  taking of the deposition.
11      IT IS FURTHER STIPULATED AND
12  AGREED that it shall not be necessary
13  for any objections to be made by counsel
14  to any questions except as to the form
15  or leading questions, and that counsel
16  for the parties may make objections and
17  assign grounds at the time of the trial,
18  or at the time said deposition is
19  offered in evidence, or prior thereto.
20      IT IS FURTHER STIPULATED AND
21  AGREED that the notice of filing of the
22  deposition by the Commissioner is
23  waived.

**Page 4**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  CASE NUMBER: 2:05-CV-925-MHT-SRW
6
7  ADWOWA JACOBS,
8      Plaintiff,
9      vs.
10
11  ELECTRONIC DATA SYSTEMS CORPORATION
12  and JEFF WILLIAMS,
13      Defendants.
14
15  BEFORE:
16      LESLIE K. HARTSFIELD,
17      Commissioner.
18
19  APPEARANCES:
20      BAKER, HOSTETLER, by Ms. Tonya A.
21  Jacobs, 1000 Louisiana, Suite 2000,
22  Houston, Texas, 77002-5009, appearing on
23  behalf of the Defendant Electronic Data

EXHIBIT "1"

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

Page 5

1 Systems Corporation.
2     MELTON, ESPY & WILLIAMS, by Mr.
3 James E. Williams, 301 Adams Avenue,
4 Montgomery, Alabama, 36103, appearing on
5 behalf of the Defendant Mr. Jeff
6 Williams.
7     L.D. WALKER, III, ESQUIRE, 8650
8 Minnie Brown Road, Suite 160,
9 Montgomery, Alabama, 36117, appearing on
10 behalf of the Plaintiff.
11
12 ALSO PRESENT:
13     Jeff Williams
14     Melissa Keicher, videographer
15
16         ********
17
18     I, LESLIE K. HARTSFIELD, a Court
19 Reporter of Prattville, Alabama, acting
20 as Commissioner, certify that on this
21 date, as provided by the Federal Rules
22 of Civil Procedure and the foregoing
23 stipulation of counsel, there came

Page 6

1 before me at the Frank M. Johnson, Jr.
2 Federal Building, 15 Lee Street,
3 Courtroom 5B, Montgomery, Alabama,
4 beginning at 10:04 a.m., ADWOWA JACOBS,
5 witness in the above cause, for oral
6 examination, whereupon, the following
7 proceedings were had:
8
9     MS. VIDEOGRAPHER:  We now
10 commence the deposition in the matter of
11 Adwowa Jacobs versus Electronic Data
12 Systems Corporation and Jeff Williams.
13 Videotaping is provided by Video
14 Visions. Melissa Keicher, videographer.
15 The date is Wednesday, October 4, 2006,
16 The time is 10:04 a.m. The location is
17 Frank M. Johnson, Jr. Federal Building
18 and U.S. Courthouse, 15 Lee Street,
19 Montgomery, Alabama. The deponent is
20 Adwowa Jacobs. The deponent will now be
21 sworn and the attorneys will then
22 introduce themselves.
23

Page 7

1     ADWOWA JACOBS
2 being first, duly sworn, was examined
3     and testified as follows:
4
5     THE REPORTER:  Usual
6 stipulations?
7     MS. JACOBS:  Yes, that's
8 fine.  Tonya Jacobs for defendant
9 Electronic Data Systems.
10     MR. WILLIAMS:  Jim Williams
11 for defendant Jeff Williams.
12     MR. WALKER:  Dee Walker for
13 plaintiff Adwowa Jacobs.
14
15 EXAMINATION BY MS. JACOBS:
16     Q.  Ms. Jacobs, could you please
17 state your full name for the record?
18     A.  Adwowa Jacobs.
19     Q.  Is that the only name you've
20 gone by?
21     A.  My initial A.J.
22     Q.  Okay.  Is that your maiden
23 name?

Page 8

1     A.  Jacobs?
2     Q.  Yes.
3     A.  Yes.
4     Q.  You don't have a married
5 name?
6     A.  No.
7     Q.  Ever gone by a married
8 name?
9     A.  No.
10     Q.  Where do you currently
11 reside?
12     A.
13     THE REPORTER:  I'm sorry?
14     A.
15     Q.  Is that here in Montgomery?
16     A.  Yes, Montgomery, Alabama.
17     Q.  How long have you lived at
18 that address?
19     A.  Since '99, June '99.
20     Q.  Does anyone live with you at
21 that address?
22     A.  My two sons.
23     Q.  What are their names and

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1 ages?
2     A.     12; A     7.
3     Q.    Anyone else live with you at
4 that address?
5     A.    No.
6     Q.    Have you ever had your
7 deposition taken before?
8     A.    No.
9     Q.    I'm certain that your
10 attorney has gone over some of the
11 ground rules but I want to make sure you
12 and I understand each other.
13     A.    Okay.
14     Q.    And make it easier for the
15 court reporter and videographer as well.
16 We have a court reporter here.  She's
17 typing down everything you and I say.
18 So it's going to be important that I let
19 you finish an answer before I ask my
20 next question and important for you to
21 do the same for me, okay?
22     A.    Okay.
23     Q.    Even if you know what my

Page 10

1 question is, you need to wait till I get
2 it fully out, okay?
3     A.    Okay.
4     Q.    And you're doing fine right
5 now.  You need to be certain that you
6 answer verbally as opposed to a nod of
7 the head.
8     A.    Okay.
9     Q.    She can't really get down a
10 nod of the head.
11     A.    Okay.
12     Q.    Also, we're going to be here
13 for a while today, but it's by no means
14 a marathon session.  So if you need to
15 take a break, just let me know, we'll
16 take periodic breaks throughout the day.
17     A.    Okay.
18     Q.    All I ask is that if there
19 is a question on the table, you answer
20 that question.
21     A.    Okay.
22     Q.    Okay.  Also if you don't
23 understand one of my questions, just let

Page 11

1 me know and I'll rephrase it until you
2 do understand, okay?
3     A.    Okay.
4     Q.    I am going to assume if you
5 answer my question that you fully
6 understand it.
7     A.    Okay.
8     Q.    Is that all right?
9     A.    That's okay.
10     Q.    Okay.  Are you currently
11 taking any medication?
12     A.    Yes.
13     Q.    What medications?
14     A.    Lexapro and occasionally
15 Ambien.
16     Q.    What is Lexapro?
17     A.    Anti-depressants.
18     Q.    How long have you been on
19 it?
20     A.    Off and on because of the
21 side effects probably over a year.
22     Q.    Who prescribed that for
23 you?

Page 12

1     A.    Dr. Smith initially
2 prescribed it.  My -- I got off and
3 primary physician prescribed it back in
4 August of this year.
5     Q.    Who's your primary
6 physician?
7     A.    Forgive me.  He's out of --
8 Bernard Hale is one of them at American
9 Family Care.
10     Q.    Is he the one that
11 prescribed it for you in August?
12     A.    Yes.  And as well as the
13 Ambien.  And Ms. Smith -- Dr. Smith
14 prescribed the Ambien as well.
15     Q.    And the Ambien is for
16 sleeping?
17     A.    Yes.
18     Q.    How often do you take it?
19     A.    I take it probably twice --
20 twice a week.
21     Q.    What about the Lexapro?
22     A.    I have to take that daily.
23     Q.    Are you on any other

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1  medication currently?
2      A.   For hormonal things.
3      Q.   Okay.  Prescribed by an
4  OB/GYN?
5      A.   Yes.
6      Q.   Okay.  Anything else?
7      A.   No.
8      Q.   Would any of these
9  medications make it difficult for you to
10  understand my questions today?
11      A.   No.
12      Q.   Or difficult to tell the
13  truth today?
14      A.   No.
15      Q.   Have you ever -- let me back
16  up.  Have you reviewed any documents to
17  prepare for this deposition today?
18      A.   Such as?
19      Q.   Anything.  What did you do
20  to prepare to come to your deposition
21  today, if anything?
22      A.   Just read over some
23  information that I had from my files.

Page 14

1      Q.   Okay.  Is that information
2  you provided to your attorney?
3      A.   Yes.
4      Q.   Anything else?
5      A.   No.
6      Q.   Do you recall what
7  information that was that you
8  reviewed?
9      A.   Basically, the e-mail
10  correspondence from the human resource
11  person in Virginia, I think.
12      Q.   Would that be Leslie
13  Liebman?
14      A.   Yes.
15      Q.   Anything else that you
16  recall?
17      A.   No.
18      Q.   Have you created any tape
19  recordings or video recordings that
20  would be relevant to this lawsuit?
21      A.   Tape recording, yes.
22      Q.   What tape recordings?
23      A.   A conversation that I had

Page 15

1  with Leslie Liebman.
2      Q.   When was that?
3      A.   I think it was June '05.
4      Q.   Was that over the phone or
5  in person?
6      A.   Over the phone.
7      Q.   Did she know she was being
8  taped?
9      A.   I don't think so.
10      Q.   What was that conversation
11  about?
12      A.   If I -- if I'm not mistaken,
13  it was -- she was basically inquiring
14  about some accusations stated that I
15  said or done and -- basically some
16  accusation that was said or done, that I
17  so-called said and done.  I was like I
18  don't know what you're referring to.
19  She stated that I was faking my trauma,
20  so forth, and I stated to her no, I
21  wasn't faking.  And she just kept on
22  pushing and pushing, say well, she heard
23  someone told her or she had information

Page 16

1  that I was trying to get some money
2  out -- out of the lawsuit to pay off
3  some bills.  And I stated to her that I
4  was offended by that.  And I said any --
5  any more conversation please contact my
6  attorney.  I don't want to have anything
7  else to do with this conversation.
8          MR. WALKER:  Tonya, if I
9  might interject, if we've not given you
10  a copy of that tape, we'll provide one
11  for you.
12          MS. JACOBS:  Yes, we haven't
13  been given a copy of that tape.
14          MR. WALKER:  We'll provide
15  you.
16      Q.   (By Ms. Jacobs)  Do you
17  still have a copy of that tape?
18      A.   No.
19      Q.   Have you provided it to your
20  counsel?
21      A.   Yes.
22      Q.   When did you provide it to
23  your counsel?

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1    A.    Probably shortly after.
2         MR. WALKER:  I'll tell you I
3  think we had it --
4    Q.    Shortly after when?
5    A.    After the conversation.
6    Q.    Any other tape recordings --
7    A.    No.
8    Q.    -- or video tape
9  recordings?
10   A.    No.
11   Q.    Have you ever filed a
12  lawsuit before this one?
13   A.    No.
14   Q.    Have you ever been a party
15  so either a plaintiff or a defendant --
16   A.    No.
17   Q.    -- in a lawsuit?
18   A.    I'm sorry.  No.
19   Q.    You haven't been sued for
20  debts or anything like that?
21   A.    No.
22   Q.    Have you ever been convicted
23  of a crime?

Page 18

1    A.    No.
2    Q.    Ever arrested?
3    A.    No.
4    Q.    Where did you go to high
5  school?
6    A.    Carver Senior High here in
7  Montgomery.
8    Q.    Could you say that --
9    A.    Carver.
10   Q.    Carver.  When did you
11  graduate?
12   A.    '89, 1989.
13   Q.    Did you go to college?
14   A.    Yes.
15   Q.    Where?
16   A.    Alabama A&M University in
17  Normal, Alabama.
18   Q.    Did you graduate?
19   A.    Yes.
20   Q.    What year?
21   A.    '94.
22   Q.    What did you have a degree
23  in?

Page 19

1    A.    Telecommunication.
2    Q.    When did you start at EDS?
3    A.    1997, August.
4    Q.    Where did you work prior to
5  EDS?
6    A.    Air Force Quality Institute
7  on Maxwell Air Force Base.
8    Q.    How long did you work
9  there?
10   A.    Six months.
11   Q.    Were you an employee or a
12  temporary?
13   A.    Temporary.
14   Q.    What did you do?
15   A.    Audio visual technician.
16   Q.    And what time period was
17  that that you were employed there?
18   A.    From March -- I'm sorry.
19  From November to March.
20   Q.    Of what year?
21   A.    I'm sorry.  November '96 to
22  March '97.
23   Q.    And before that, where were

Page 20

1  you employed?
2    A.    Kelly Temporary Service.
3    Q.    How long were you employed
4  there?
5    A.    Approximately six months.
6    Q.    What time period?
7    A.    Had to be April up until
8  that November.
9    Q.    So April of '96?
10   A.    Yes.
11   Q.    Through November of '96?
12   A.    Yes.
13   Q.    Prior to that, where were
14  you employed?
15   A.    C Con Pest Control.  It was
16  in Huntsville, was a subcontractor in
17  Hunts -- Huntsville.
18   Q.    C Com?
19   A.    C Con.
20   Q.    Oh, okay.  Pest Control?
21   A.    Yes.
22   Q.    How long were you there?
23   A.    Two years.

5 (Pages 17 to 20)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

```
1    Q.   What time period?
2    A.   Wait a minute.  It's a year,
3  year and a half, 18 months.
4    Q.   What time period,
5  approximately?
6    A.   From April of '95 up until
7  March of '96.
8    Q.   That was where?
9    A.   C Con.  It was in
10 Huntsville.
11   Q.   Huntsville.  Prior to that,
12 where were you employed?
13   A.   I wasn't employed.
14   Q.   You were going to school?
15   A.   Yes.  Well, just had a
16 baby.
17   Q.   Have you been terminated
18 from any position?
19   A.   No.
20   Q.   Any warnings or disciplinary
21 actions?
22   A.   No.
23   Q.   Prior to the charge that you
```

Page 22

```
1  filed in this case, have you filed a
2  charge of discrimination before?
3    A.   No.
4    Q.   You said you started in
5  August of 1997 with EDS?
6    A.   Uh-huh (affirmative
7  response).  Yes.
8    Q.   How did you find out about
9  the position?
10   A.   A friend of mine that
11 attended church with me.
12   Q.   Who is that?
13   A.   Shonda Robinson.
14   Q.   Was she employed by EDS?
15   A.   Yes.
16   Q.   She currently employed by
17 EDS?
18   A.   No.
19   Q.   Did you have to interview
20 for the position?
21   A.   Yes.
22   Q.   Who did you interview
23 with?
```

Page 23

```
1    A.   Shelton Hamilton, Brook; I
2  don't recall her last name.
3    Q.   Anyone else?
4    A.   No.
5    Q.   Who offered you the
6  position?
7    A.   They did.
8    Q.   Both?
9    A.   Yes.
10   Q.   And what was the position
11 when you first started?
12   A.   Customer service rep.
13   Q.   And have you remained in
14 that position since you've been at EDS
15 or that title?
16   A.   That title, yes.
17   Q.   When you first started, what
18 area were you in?
19   A.   On the phone.
20   Q.   So you were what I
21 would call --
22   A.   Customer service, yes.
23   Q.   -- call center?
```

Page 24

```
1    A.   Yes.
2    Q.   Could you tell me a little
3  bit about what EDS does at the
4  Montgomery facility?
5    A.   This -- this particular
6  contract we consolidate student loans.
7    Q.   And is that what it did back
8  in '97?
9    A.   Yes.
10   Q.   And so when you started, you
11 were on the phones talking --
12   A.   Correct.
13   Q.   -- customer service?
14   A.   Yes, ma'am.
15   Q.   How long did you do that?
16   A.   Four months.
17   Q.   Who did you report to?
18   A.   Robert Martin.
19   Q.   Could you spell his last
20 name?
21   A.   M-A-R-T-I-N.
22   Q.   After four months, what did
23 you do?
```

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1    A.    I went to the core edit team
2  as a TDY position.
3    Q.    The core edit team?
4    A.    Yes, correspondence edit,
5  research team basically.
6    Q.    When you were on the
7  customer service on the phone, where
8  were you actually located, what floor?
9    A.    Sixth floor.
10    Q.    Okay.  And the building I
11  understand it has eight floors?
12    A.    Has eight floors.
13    Q.    Okay.  Could you tell me how
14  many floors were occupied at -- by EDS
15  in 1997?
16    A.    Three.
17    Q.    What floors were those?
18    A.    Fourth, fifth, and sixth.
19    Q.    Has that changed throughout
20  the years?
21    A.    Yes.
22    Q.    How?
23    A.    Origination was on the fifth

Page 26

1  floor.  Mailroom was on the fourth
2  floor.  And they expanded out to the
3  tech team on the third floor.  They
4  downsized that on the third floor.
5  Fourth floor moved to the tech and
6  center.  Fifth floor lost its contract,
7  it went away and has remained on the
8  sixth floor.
9    Q.    Okay.  So currently how many
10  floors does EDS --
11    A.    One.
12    Q.    Okay.  And what floor is
13  that?
14    A.    Sixth floor.
15    Q.    When did that occur?
16    A.    Well, they have sixth floor
17  and half of five.  That occurred
18  probably last year sometime.
19    Q.    What about when this
20  incident occurred that you filed the
21  lawsuit about with Mr. Williams, that
22  would have been in February of 2005?
23    A.    Yes.

Page 27

1    Q.    How many floors did EDS have
2  then?
3    A.    Two floors, fifth and sixth
4  floor.
5    Q.    And where were you
6  located?
7    A.    On the sixth floor.
8    Q.    What about Mr. Williams?
9    A.    On the sixth floor.
10    Q.    Now, on the core edit
11  team --
12    A.    Uh-huh (affirmative
13  response).
14    Q.    -- is that where you
15  currently are as well?
16    A.    Yes.
17    Q.    Okay.  Have you been on that
18  team since --
19    A.    Yes.
20    Q.    So sometime in late 1997 or
21  early 1998 you switched to the core
22  team?
23    A.    Correct.

Page 28

1    Q.    Okay.  And have been there
2  ever since?
3    A.    Yes.
4    Q.    Who's your supervisor
5  currently?
6    A.    Tara Relf.
7    Q.    How long has she been your
8  supervisor?
9    A.    I would say for the past
10  four, five years.
11    Q.    How's your relationship with
12  Ms. Relf?
13    A.    Okay.
14    Q.    You've not had any issues
15  with her?
16    A.    Not no personal issues,
17  no.
18    Q.    Who else is in the building,
19  if anybody, other than EDS?
20    A.    I don't know who's currently
21  on the rest of the floor.  But now, I
22  don't -- I'm not familiar who's on other
23  floors.

7  (Pages 25 to 28)

## FREEDOM COURT REPORTING

Page 29

1    Q.    Are there other occupants of
2  the building as far as you're aware?
3    A.    I'm not sure.
4    Q.    What about in early 2005,
5  were there other occupants at that
6  time?
7    A.    Yes.
8    Q.    Who?
9    A.    The Boys and Girls Club of
10  Montgomery.
11    Q.    Anyone else?
12    A.    I'm not sure.  Just know
13  that they were.
14    Q.    What floor did they have?
15    A.    They had the first floor.
16    Q.    Now, EDS has a policy which
17  prohibits harassment; correct?
18    A.    Correct.
19    Q.    And you're aware of that
20  policy?
21    A.    Correct.
22    Q.    In fact it's included in
23  EDS' code of conduct; correct?

Page 30

1    A.    Correct.
2
3        (Defendants' Exhibit No. 1 was
4        marked for identification.)
5
6    Q.    You've been handed what's
7  been marked as Exhibit No. 1.  Do you
8  recognize that document?
9    A.    Yes.
10    Q.    And that's EDS' Code of
11  Conduct?
12    A.    Correct.
13    Q.    The 2005 edition?
14    A.    Correct.
15    Q.    And EDS has an edition each
16  year; correct?
17    A.    Yes.
18    Q.    That you're provided with?
19    A.    Yes.
20    Q.    Okay.  And you actually have
21  to sign some sort of certification that
22  you've received it and read it;
23  correct?

Page 31

1    A.    Correct.
2    Q.    And on Page 8 of the code of
3  conduct, there is the sexual harassment
4  and other unlawful behavior policy;
5  correct?
6    A.    Correct.
7    Q.    Which specifically notes
8  that EDS does not tolerate sexual
9  harassment or other unlawful behavior in
10  the workplace; correct?
11    A.    Correct.
12    Q.    And in addition to having
13  that policy and its code of conduct, EDS
14  has all of its policies on-line; is that
15  correct?
16    A.    Correct.
17    Q.    In something called "the
18  info center"?
19    A.    Yes.
20    Q.    Okay.  And so you can
21  routinely go, if you want to, and look
22  at all EDS' policies on-line?
23    A.    Correct.  Can I ask you a

Page 32

1  question?  You said I was handed this.
2    Q.    No.  You were provided with
3  a copy at some point each year?
4    A.    On-line, yes.
5    Q.    Yes.  Okay.  I -- I didn't
6  mean to imply that you -- somebody
7  physically handed it to you.
8    A.    Okay.
9    Q.    But you were given access
10  to --
11    A.    Right.
12    Q.    -- or provided it somehow?
13    A.    Right.
14    Q.    And you're telling me it was
15  on-line?
16    A.    Correct.
17    Q.    And then did you certify
18  on-line that you received a copy and
19  read it?
20    A.    Correct.
21    Q.    Okay.  So that was all done
22  on-line?
23    A.    Right.

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 33

1      Q.    As all of its other policies
2  are on-line as well?
3      A.    Yes.
4      Q.    Okay.  Is that somewhere
5  different than the info center or is it
6  kept in the info center as well?
7      A.    This is as well as on info
8  center.
9      Q.    Okay.
10
11      (Defendants' Exhibit No. 2 was
12      marked for identification.)
13
14      Q.    You've been handed another
15  exhibit.  It's Exhibit 2.  Do you
16  recognize that document?
17      A.    Yes.
18      Q.    And that is EDS' sexual
19  harassment policy?
20      A.    Correct.
21      Q.    And this is what is actually
22  on-line in the info center?
23      A.    Yes.

Page 34

1      Q.    And you had access to the
2  info center; correct?
3      A.    Yes.
4      Q.    Daily at work?
5      A.    Yes.
6      Q.    Now, EDS also provided
7  training to its employees including you
8  on its harassment policy --
9      A.    Correct.
10      Q.    -- is that true?
11      A.    Yes.
12      Q.    Okay.  They did it both in
13  person training, what I call live
14  training, somebody would come and give
15  you training every once in a while,
16  would that be correct?
17      A.    On this?
18      Q.    On harassment policy?
19      A.    I don't --
20      Q.    You don't remember that?
21      A.    No.
22      Q.    But you had web base
23  training?

Page 35

1      A.    Yes.
2      Q.    Okay.  How often did you
3  have web base training?
4      A.    Once a year.
5      Q.    And by web base, you mean
6  you would get on the computer and take a
7  course regarding harassment?
8      A.    Info center, correct.
9      Q.    Okay.  Now, if we look at
10  Exhibit No. 2 which is entitled, Sexual
11  Harassment and Other Unlawful Behavior
12  Policy, which is the policy that was in
13  the info center, if you turn to Page
14  2 --
15
16      (There was a brief interruption.)
17
18      Q.    (By Ms. Jacobs)  Pursuant to
19  the harassment policy which is Exhibit
20  No. 2, it requires employees who feels
21  that they've been subjected to
22  harassment to report such conduct to
23  EDS; correct?

Page 36

1      A.    Correct.
2      Q.    Okay.  And it in fact
3  provides a number of avenues or
4  different ways or different people you
5  can report to, would that be true?
6      A.    Correct.
7      Q.    Okay.  It specifically says
8  you can report it to your immediate
9  leader or any other EDS leader with whom
10  you feel comfortable; correct?
11      A.    Correct.
12      Q.    Either inside or outside
13  your leadership chain?
14      A.    Correct.
15      Q.    It also says you can report
16  it to employee relations; correct?
17      A.    Correct.
18      Q.    The office of ethics and
19  compliance?
20      A.    Correct.
21      Q.    Legal affairs?
22      A.    Correct.
23      Q.    And human resources?

9 (Pages 33 to 36)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1    A.   Correct.
2    Q.   Okay.  The policy also
3  specifically notes that an employee will
4  not be retaliated against in -- for any
5  way in making good faith complaint;
6  correct?
7    A.   Correct.
8    Q.   Now, the code of conduct
9  also includes a policy which
10  specifically prohibits violence in the
11  workplace; is that correct?
12    A.   Correct.
13    Q.   And if you look back at
14  Exhibit No. 1 on Page 9, do you see the
15  violence in the workplace policy?
16    A.   Correct.
17    Q.   And the code of conduct?
18    A.   Uh-huh (affirmative
19  response).  Yes, ma'am.
20    Q.   It basically says that EDS
21  does not tolerate violent acts or
22  threats of violence made by an employee
23  against another person; correct?

Page 38

1    A.   Correct.
2    Q.   And you were aware of that
3  policy?
4    A.   Yes.
5    Q.   And that's also a policy
6  that's on the Internet or info center;
7  correct?
8    A.   Correct.
9    Q.   The policy specifically
10  prohibits an employee from carrying a
11  gun on EDS premises; is that true?
12    A.   That's true.
13    Q.   Okay.  Even if you've got a
14  registration or if you're licensed to
15  carry a gun --
16    A.   Correct.
17    Q.   -- that's true?  Now, you
18  are licensed to carry a gun?
19    A.   Yes, I am.
20
21      (Defendants' Exhibit No. 3 was
22      marked for identification.)
23

Page 39

1    Q.   You've been handed Exhibit
2  No. 3.  Do you recognize what that is?
3    A.   Yes.
4    Q.   It's something that you
5  produced to us; correct?
6    A.   Correct.
7    Q.   It's your driver's license
8  and then this pistol license?
9    A.   Correct.
10    Q.   When did you get your pistol
11  license?
12    A.   March of '05.
13    Q.   Is that the first time?
14    A.   Yes.
15    Q.   That you ever had a pistol
16  license?
17    A.   Yes.
18    Q.   Why did you get it in March
19  of '05?
20    A.   Because I felt that I was
21  just nervous and hurt, just felt that I
22  needed one for protection because of the
23  incident that happened in February.  I

Page 40

1  just didn't feel safe.
2    Q.   You said the incident that
3  happened in February.  Do you mean the
4  incident with Mr. Williams at work?
5    A.   Yes.
6    Q.   Even though you couldn't
7  carry a pistol at work?
8    A.   I had this for home.
9    Q.   Okay.  Had Mr. Williams ever
10  been to your house?
11    A.   I don't know but I was --
12  someone was knocking on my window at
13  night.
14    Q.   And you have no idea whether
15  that was Mr. Williams or somebody
16  else?
17    A.   I don't know who it was.
18    Q.   Did you contact the
19  police?
20    A.   Yes.
21    Q.   When?
22    A.   Several occasions.  It was
23  around February and as well as March.

10 (Pages 37 to 40)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  Q.  Of '05?
2  A.  Yes, ma'am.
3  Q.  What did they do?
4  A.  They wrote down the
5  incident, wrote down statements and they
6  told me to actually try to get a
7  videocam and try to record it.
8  Q.  Did you do that?
9  A.  No.  Couldn't afford one.
10  Q.  After February and March,
11  did people keep knock -- or somebody
12  keep knocking on your door --
13  A.  Yes.
14  Q.  -- and your windows?
15  A.  Yes.
16  Q.  How often?
17  A.  It's -- it happened quite
18  often.  Seems like every night around
19  the same time.
20  Q.  What time is that?
21  A.  Two o'clock in the morning,
22  2:10.
23  Q.  Every day?

Page 42

1  A.  Pretty much most of --
2  Q.  For how long did that
3  occur?
4  A.  It occurred for at least
5  until November, December of '05.
6  Q.  Did you report it after
7  February or March of '05?
8  A.  Yes.
9  Q.  Every time it happen did you
10  report it?
11  A.  I reported the incident
12  every -- yes, when I -- it was
13  evidence left back there I called the
14  police and provided them the evidence.
15  Q.  What evidence?
16  A.  Chip bag, Coke, cigarette
17  butt, light bulb was broken.
18  Q.  And you have no idea who
19  that could have been --
20  A.  No.
21  Q.  -- back there?  Had you had
22  any work done on your house?
23  A.  No.

Page 43

1  Q.  Boyfriend at the time?
2  A.  No.  We was living
3  together -- well, we wasn't living
4  together.  He was there.
5  Q.  Who is that?
6  A.          , Senior.
7  MR. WILLIAMS:  Blue you say?
8  A.  Senior, yes.
9  Q.  Is he the father of your
10  children?
11  A.  Yes.
12  Q.  Does he still currently live
13  with you?
14  A.  No.
15  Q.  Does he provide child
16  support?
17  A.  No.
18  Q.  Were y'all ever married?
19  A.  No.
20  Q.  So in November, December of
21  '05, the incidents at your house stopped
22  happening?
23  A.  Yeah.

Page 44

1  Q.  Have you renewed your
2  license?
3  A.  Yes.
4  Q.  When did you renew it?
5  A.  April of '06.
6  Q.  I ask that you provide
7  another photocopy to your counsel to
8  provide --
9  A.  Sure.
10  Q.  -- to us of the renewed
11  license.
12  A.  Yes.
13  MR. WALKER:  We'll get that
14  to you.
15  Q.  Do you actually own a gun?
16  A.  Yes.
17  Q.  What kind?
18  A.  I think it's a .22.
19  Q.  You think.  You don't
20  know?
21  A.  Well, .22.
22  Q.  Did you purchase it?
23  A.  No, it was a gift.

11 (Pages 41 to 44)

## FREEDOM COURT REPORTING

Page 45

| | | |
|---|---|---|
| 1 | Q. | Gift from who? |
| 2 | A. | Brian Woodgett. |
| 3 | Q. | Who is he? |
| 4 | A. | He's my best friend. |
| 5 | Q. | Where does he work? |
| 6 | A. | UPS. |
| 7 | Q. | Do you know where he got the |
| 8 | gun? | |
| 9 | A. | No. |
| 10 | Q. | When did you get it from |
| 11 | him? | |
| 12 | A. | March '05. |
| 13 | Q. | Where do you keep the gun? |
| 14 | A. | In my safe in my closest at |
| 15 | home, my bedroom. | |
| 16 | Q. | Do you ever take it out? |
| 17 | A. | No. |
| 18 | Q. | Since you got it in March of |
| 19 | '05, have you ever taken it out? | |
| 20 | A. | Out the safe? |
| 21 | Q. | Yes. |
| 22 | A. | Yes. |
| 23 | Q. | How often? |

Page 46

| | | |
|---|---|---|
| 1 | A. | Here -- he comes by once |
| 2 | every six months to clean it. | |
| 3 | Q. | When you say he, Brian? |
| 4 | A. | Brian. Sorry. |
| 5 | Q. | You don't clean it? |
| 6 | A. | No. |
| 7 | Q. | And you've never actually |
| 8 | taken it out yourself to go target | |
| 9 | practice or anything like that? | |
| 10 | A. | No. |
| 11 | Q. | Have you learned to shoot |
| 12 | it? | |
| 13 | A. | No. That's why it's still |
| 14 | in the safe. | |
| 15 | Q. | You've never carried it with |
| 16 | you? | |
| 17 | A. | No. |
| 18 | Q. | Have you ever had it in your |
| 19 | truck? | |
| 20 | A. | No. |
| 21 | Q. | Have you ever told anybody |
| 22 | at work that you did carry it in your | |
| 23 | truck? | |

Page 47

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Have you ever shown it to |
| 3 | one of your coworkers? | |
| 4 | A. | No. |
| 5 | Q. | Did you ever even pretend to |
| 6 | have the gun in your truck -- | |
| 7 | A. | No. |
| 8 | Q. | -- while you were at work? |
| 9 | Have you ever told a coworker that you | |
| 10 | had a gun, period? | |
| 11 | A. | No. |
| 12 | Q. | Never? |
| 13 | A. | No. |
| 14 | Q. | You've never discussed the |
| 15 | fact that you have a gun whether you've | |
| 16 | kept it at home or work? | |
| 17 | A. | No. She saw a gun permit in |
| 18 | my car and she asked me about it. | |
| 19 | Q. | Who are we talking about? |
| 20 | A. | Brenda Cheatham. I'm sorry. |
| 21 | Brenda Cheatham. | |
| 22 | Q. | Saw the gun permit in your |
| 23 | car? | |

Page 48

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | When was that? |
| 3 | A. | Had to have been -- I don't |
| 4 | remember the exact time frame. June | |
| 5 | '05, June, July, '05. | |
| 6 | Q. | What did she ask you about |
| 7 | it? | |
| 8 | A. | She just actually saw it |
| 9 | sitting between the cup holder -- we was | |
| 10 | going to lunch. And she saw it between | |
| 11 | the cup holder and asked me what was it. | |
| 12 | And I told her I got a gun permit. And | |
| 13 | she asked me, you know, why. And I just | |
| 14 | told her I just felt threatened and | |
| 15 | uneasy. | |
| 16 | Q. | You didn't show her the |
| 17 | gun? | |
| 18 | A. | No. She saw the permit. |
| 19 | Q. | Have you ever talked about |
| 20 | the gun or the gun permit with anybody | |
| 21 | else at work? | |
| 22 | A. | No. |
| 23 | Q. | No one else at work would |

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1  know from you that you have a gun?
2      A.   Not that I can recall, no.
3      Q.   Have you ever told a
4  coworker that somebody wouldn't want to
5  mess with you because you'd go get your
6  gun?
7      A.   No.
8      Q.   Have you ever threaten to
9  hurt yourself?
10      A.   No.
11      Q.   Have you ever threaten to
12  hurt one of you coworkers?
13      A.   No.
14      Q.   Even in jest?
15      A.   No.
16      Q.   I want to talk to you a
17  little bit about the hierarchy at EDS,
18  okay?
19      A.   Okay.
20      Q.   You work at an EDS facility
21  here in Montgomery?
22      A.   Uh-huh (affirmative
23  response).

Page 50

1      Q.   Correct?
2      A.   Correct.
3      Q.   Who is the person in
4  charge?
5      A.   Jarvis Robinson.
6      Q.   And she's in charge of that
7  facility?
8      A.   Correct.
9      Q.   And I think you said that
10  you report currently to Tara Relf?
11      A.   Yes.
12      Q.   Do you know who she reports
13  to?
14      A.   Scott Arnt.
15      Q.   What's his position, if you
16  know?
17      A.   Manager.
18      Q.   Is he on the same team as
19  you?
20      A.   He's actually not on the
21  same team, but he oversees two teams.
22      Q.   What are those teams?
23      A.   Certification team and --

Page 51

1          THE REPORTER:  And the what?
2      A.   Certification team and the
3  core edit team.
4      Q.   And who does he report to?
5      A.   Jarvis.
6      Q.   Jeff Williams is not your
7  supervisor?
8      A.   No.
9      Q.   And he's never been your
10  supervisor?
11      A.   No.
12      Q.   Have you ever been his
13  supervisor?
14      A.   No.
15      Q.   Y'all have always been peers
16  or the same kind of level as far as
17  you're aware?
18      A.   I was once a team leader.
19      Q.   Okay.  When was that?
20      A.   '04.
21      Q.   What were you a team leader
22  for?
23      A.   Core edit team.

Page 52

1      Q.   And for how long were you a
2  team leader?
3      A.   Only about a year.
4      Q.   What happened, why are you
5  no longer a team leader?
6      A.   The team downsized.
7      Q.   No other reason?
8      A.   No.  Team just downsized.
9  And they actually needed me to do
10  database for both teams.
11      Q.   So you weren't demoted?
12      A.   No.  They just wanted me to
13  do database for the certification team
14  as well as my team.
15      Q.   As far as you're aware, has
16  Mr. -- when you were a team lead, did
17  you supervise Mr. Williams?
18      A.   He was on a different floor
19  at the time.
20      Q.   So different floor and a
21  different team?
22      A.   Different basically account.
23  He was on the origination, fifth

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1 floor.
2    Q.   So I would assume that would
3 be a no, you didn't supervise him?
4    A.   Correct.
5    Q.   Are you aware of
6 Mr. Williams has ever been a
7 supervisor?
8    A.   No, I'm not sure.
9    Q.   Or a team leader?
10   A.   I don't know.
11   Q.   Now, you have filed a
12 lawsuit against EDS as well as
13 Mr. Williams; correct?
14   A.   Correct.
15   Q.   And has alleged a number of
16 causes of action against one or both in
17 that lawsuit, do you understand that?
18   A.   No.
19   Q.   You don't know that --
20   A.   I don't understand.  I'm
21 sorry.
22   Q.   Okay.  You've made an
23 allegation that you were subjected to

Page 54

1 sexual harassment; correct?
2    A.   Correct.
3    Q.   And then you've alleged
4 claims such as negligent hiring?
5    A.   Correct.
6    Q.   Do you understand that?
7 That's what --
8    A.   Yes.
9    Q.   That's what I mean by a
10 cause of action.
11   A.   Okay.
12   Q.   So I apologize for using
13 legalese.  We tend to do it a lot.  But
14 what I'd like to do is talk to you for a
15 few minutes about your causes of action.
16   A.   Okay.
17   Q.   Okay.  And I'm going to
18 start with sexual harassment.
19   A.   Okay.
20   Q.   Who do you believe subjected
21 you to sexual harassment?
22   A.   Jeff Williams.
23   Q.   Okay.  Anyone else?

Page 55

1    A.   EDS.
2    Q.   You understand that EDS can
3 only act through employees?
4    A.   Correct.
5    Q.   Okay.  So I'm asking you
6 what employees do you think subjected
7 you to sexual harassment besides
8 Mr. Williams?
9    A.   I'm confused.  I'm sorry.
10   Q.   Okay.  You've alleged sexual
11 harassment?
12   A.   Correct.
13   Q.   I've asked you who sexually
14 harassed you.  You said Mr. Williams and
15 then you said EDS.
16   A.   Okay.
17   Q.   EDS is a corporation;
18 right?
19   A.   Correct.
20   Q.   And so EDS can't sexual
21 harass you.  It has to be its employees;
22 correct?
23   A.   Okay.

Page 56

1    Q.   Do you understand that?
2    A.   Yes.  Yes.
3    Q.   So I'm asking you besides
4 Mr. Williams, are there any other
5 employees of EDS that you believe
6 sexually harassed you?
7    A.   Physically, no.
8    Q.   Okay.  Any other way besides
9 physically?
10   A.   Remarks, yes.
11   Q.   Who?
12   A.   That's -- I'm kind of
13 confused based off of the incident that
14 happened in March that was made after
15 that incident to me, is that what you're
16 referring to?
17   Q.   Anything that you believe
18 was sexual harassment?
19   A.   I would say Jeff Williams
20 and I guess there's a gray area there
21 because the incident that happened in
22 the elevator, the statement that was
23 made behind that.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1    Q.    Okay. Why don't we do it
2  this way: Prior to the incident in
3  February of '05 that you claim occurred
4  on the elevator --
5    A.    Uh-huh (affirmative
6  response).
7    Q.    -- do you believe you've
8  been sexually harassed --
9    A.    No.
10    Q.    -- at any point before
11  that?
12    A.    No.
13    Q.    Okay. By Mr. Williams or
14  anybody else prior to --
15    A.    The elevator.
16    Q.    -- the elevator incident?
17    A.    He made statements.
18  Mr. Williams made statements prior to
19  the elevator incident that basically
20  were -- were, but I didn't, you know,
21  think it at the time.
22    Q.    You didn't think that it was
23  sexual harassment at the time?

Page 58

1    A.    Well, I knew it was sexual
2  harassment at the time, but it was -- I
3  don't know how to explain it. The
4  statement he made made me very
5  uncomfortable and I reported to another
6  peer. And they was like, well, if he
7  does anything else, then report it.
8    Q.    What is it that you -- that
9  Mr. Williams said?
10    A.    Was in the breakroom and
11  getting some coffee one morning and he
12  came up to me and he said what did
13  you -- we was coming up an elevator that
14  morning and we went to the -- to the
15  breakroom. He made the statement -- the
16  lady was getting off the elevator on
17  four and he's like what's -- what's
18  wrong with her. I said I guess she had
19  woke up on the wrong side of bed this
20  morning. And he said -- that's when he
21  followed me to the breakroom, I was
22  getting coffee. He said what did you
23  say on the elevator. I said, well, I

Page 59

1  just made the statement that I think the
2  young lady may got up on the wrong side
3  of bed. And he said, oh, I thought you
4  wanted me to get up on the side of the
5  bed with you. And I looked at him and I
6  walked off.
7    Q.    When did that happen?
8    A.    January '05.
9    Q.    Prior to that, had he made
10  any statements to you that you thought
11  were inappropriate?
12    A.    No.
13    Q.    And you said you reported it
14  to another peer, whom?
15    A.    Brenda Cheatham.
16    Q.    But you didn't report it to
17  a supervisor?
18    A.    No.
19    Q.    Or to human resources?
20    A.    No.
21    Q.    So you didn't follow the
22  sexual harassment policy at that time?
23    A.    Did I follow it?

Page 60

1    Q.    Right. You didn't report it
2  pursuant to the sexual harassment
3  policy?
4    A.    Yes, I did.
5    Q.    Who did you report it to?
6    A.    It said I can report it to
7  someone who's outside of management
8  to -- to someone else.
9    Q.    Okay. Let's go look at the
10  sexual harassment policy, Exhibit No. 2.
11  Where in Exhibit No. 2 does it say that
12  you can report it to a peer?
13    A.    We have -- I'm sorry. We
14  have open door policy.
15    Q.    Okay.
16    A.    The open door policy.
17    Q.    And the open door policy
18  says what?
19    A.    We basically can report any
20  incident to anybody without any
21  retaliation, anything that you felt --
22    Q.    Is that report it to a peer
23  or report it to a supervisor or somebody

15  (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1  in management?
2       A.    Open door policy, anybody.
3  And Brenda Cheatham, if I'm not
4  mistaken, she's also -- she has the
5  title of team lead.
6       Q.    Besides that one incident
7  prior to February of 2005, have
8  Mr. Williams said anything that you
9  consider to be offensive in nature to
10  you?
11       A.    No.
12       Q.    Had he ever touched you
13  prior to the February 2005 incident?
14       A.    No.
15       Q.    And you said -- what was the
16  conversation with Ms. Cheatham when you
17  told her what had happened?
18       A.    I came to her desk and I was
19  like something just -- weird just
20  happened.  And she was like what.  I
21  said Jeff made a statement to me in the
22  breakroom and she was like what was it
23  and that's when I told her.

Page 62

1       Q.    And what was her response?
2       A.    She was like, oh, you know,
3  just shrug it off.  I'm like oh.  If he
4  say anything else to you, just basically
5  let me know.
6       Q.    All right.  Let's talk about
7  Mr. Williams, what you claim happened in
8  February of 2005.  Could you tell me
9  what happened?
10       A.    Okay.  I was coming back
11  from lunch and he was coming back from
12  lunch as well.  We walked into the
13  ground floor where the elevators are and
14  I felt something brush against my -- my
15  behind.  And I thought he just walked in
16  too close to me.  The elevator door
17  opened.  I stepped on first.  He came in
18  from behind -- came in behind me.  I
19  turned around.  I hit the sixth floor
20  button.  As soon as the door closed,
21  he -- he immediately grabbed me 'cause
22  it was cold that February, that
23  particular, he grabbed me.  And he was

Page 63

1  like, oh, it's cold outside.  And he was
2  like, oh, I need you to warm me up.
3  Then he put his hands down my pants.  He
4  put his -- excuse me.  I'm sorry.  He
5  placed his hands down by pants and he
6  grabbed my shirt out and he was rubbing
7  on my body.  And I was pushing him, get
8  -- get off me, get -- get off me.  And
9  he start rubbing on my stomach and he
10  moved up to my breast area and -- excuse
11  me.  Somebody have some tissue, please?
12  I'm sorry.
13
14       (Mr. Walker handed the witness a
15       box of Kleenex.)
16
17       A.    Thanks.  We -- he grabbed
18  my -- and I kept pushing him off of me.
19  And he said you feel good.  He layed his
20  hands -- head on my shoulder.  And I
21  just kept pushing and then the elevator
22  door opened up and he said I just had a
23  nice lunch and I looked at him.  I said

Page 64

1  where did you go.  He was like I had to
2  take some jeans by back to I think it
3  was Looking Good or Weil's.  And I
4  walked to my desk and my coworker, she
5  looked at me, and she asked me what was
6  wrong.  And I -- and I walked to the
7  breakroom and I told her.  And she told
8  me to report it immediately.  Can I --
9  can I step outside, please?
10       MS. JACOBS:  Sure.  Can take
11  a break.
12       MS. VIDEOGRAPHER:  Off the
13  record.  The time is 10:46.
14
15       (A brief recess was taken.)
16
17       MS. VIDEOGRAPHER:  Back on
18  the record.  We commence Tape 2.  The
19  time is 10:53.
20       Q.    (By Ms. Jacobs) Ms. Jacobs,
21  we were talking about the incident that
22  occurred in February of 2005.  And if
23  I'm correct, it was February 10th, does

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1  that sound the right date?
2      A.    Yes.
3      Q.    What time was it when you
4  were coming back to lunch
5  approximately?
6      A.    1:41.
7      Q.    1:41?
8      A.    Uh-huh (affirmative
9  response).
10     Q.    How do you know it was
11  1:41?
12     A.    'Cause I was on the phone
13  with my friend because we just left from
14  lunch.
15     Q.    Who were you on the phone
16  with?
17     A.    Brian Woodgett.
18     Q.    Were you on the phone with
19  him when you were on the elevator as
20  well?
21     A.    No. I got off the elevator.
22  I told him I said, look, I'm about to
23  get on the elevator. I'll talk to you

Page 66

1  later.
2      Q.    Was anybody else on the
3  elevator with you?
4      A.    No.
5      Q.    Did the elevator stop at any
6  other floor besides go from the basement
7  to the sixth floor?
8      A.    No.
9      Q.    How long were you on the
10  elevator with Mr. Williams?
11     A.    I don't know how long, but I
12  know from the basement to the sixth
13  floor, 45 minutes -- 45 seconds. I'm
14  sorry.
15     Q.    That's a really slow
16  elevator if it's 45 minutes. About 45
17  seconds?
18     A.    45 seconds to a minute.
19     Q.    Had you ever been on the
20  elevator before with Mr. Williams?
21     A.    Probably have but with other
22  people, not alone.
23     Q.    You've never been on the

Page 67

1  elevator with him alone?
2      A.    No.
3      Q.    What about the time you said
4  he made the statement about the woman
5  who got off on the fourth floor?
6      A.    Oh, that was -- I'm sorry.
7  That was from fourth floor to -- fifth
8  floor to sixth floor, yeah.
9      Q.    Was that the only other time
10  you were alone with him?
11     A.    Yes.
12     Q.    Now, you stated that he put
13  his hands down your pants and grabbed
14  your shirt out --
15     A.    Yes.
16     Q.    -- correct? What were you
17  wearing that day?
18     A.    Some slacks and a blouse.
19     Q.    And you said that he rubbed
20  your stomach; correct?
21     A.    Yes, he did rub my
22  stomach.
23     Q.    Okay. And then you said

Page 68

1  that he rubbed your breast area. Did he
2  actually touch your breast or just
3  rub --
4      A.    The bra area. Right here
5  (indicated).
6      Q.    The bra. Underneath the
7  bra?
8      A.    No. He actually touched the
9  bra, the breast.
10     Q.    Okay. Did you yell or
11  scream at him while you were on the --
12     A.    Yes.
13     Q.    -- elevator?
14     A.    Yes.
15     Q.    What did you say?
16     A.    Say get off me. Get the "F"
17  off of me.
18     Q.    And what his response?
19     A.    He just kept grabbing and
20  pulling me tighter and stated I felt
21  good. He -- he wanted me to warm him
22  up. He was cold.
23     Q.    What was your relationship

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1 with Mr. Williams prior to this?
2    A.    Just see him in passing,
3 speaking hey, how you doing,
4 camaraderie, just how you doing, good
5 day, bless day, keep going.
6    Q.    So friendly?
7    A.    Cordial.
8    Q.    Okay. Had you heard anybody
9 else make any complaints about
10 Mr. Williams?
11    A.    No.
12    Q.    Except for that one time
13 when y'all were talking about the lady
14 getting off the elevator, had he ever
15 made a statement to you that you
16 consider offensive?
17    A.    Not that I recall.
18    Q.    Or had you ever heard him
19 say something to anybody else that you
20 thought could have been offensive?
21    A.    I don't -- wasn't in
22 communication around him that I could
23 hear anything. He works on a different

Page 70

1 side of the floor.
2    Q.    So no, you hadn't heard him
3 say anything?
4    A.    No.
5    Q.    When the elevator doors
6 opened, could you tell me how -- what
7 they open into, what's the elevator
8 lobby area look like on the sixth
9 floor?
10    A.    As soon as you walk out, you
11 could see it's two elevators on each
12 side.
13    Q.    So there's four elevators
14 total?
15    A.    Four total.
16    Q.    Okay. And it opens up -- is
17 the elevator lobby open?
18    A.    Is it open?
19    Q.    How do you get to your work
20 space from the elevator?
21    A.    Okay. I'm sorry. It's a
22 secure area. We have a door on this
23 side and a door on that side

Page 71

1 (indicated). So four elevators, two on
2 each side, you step out, you go left or
3 you go right.
4    Q.    Okay. And you say it's
5 secure so do you have to use a badge --
6    A.    Yes.
7    Q.    -- to get through those
8 doors? Did you both go, you and Mr.
9 Williams, go through the same door --
10    A.    No.
11    Q.    -- after you got off?
12    A.    No.
13    Q.    Okay.
14    A.    We went -- I went left. He
15 went right.
16    Q.    Now, you said that when he
17 was getting off y'all continued to have
18 a conversation about what he had done
19 over lunch?
20    A.    Actually, he was -- was --
21 you hear the bing of the elevator --
22    Q.    Uh-huh (affirmative
23 response).

Page 72

1    A.    -- he -- he let go. He
2 released me.
3    Q.    Okay. And then what
4 happened?
5    A.    And he was like wow, I had a
6 good lunch. I had a great lunch. And
7 he -- made some statement he had to
8 return some items to -- some jeans he
9 just purchased. And I was like for
10 real. I said where. And he said --
11 made a statement Weil's or Looking Good.
12 And I just was basically flabbergasted.
13 'Cause I just walked out the elevator
14 like what did just happen.
15    Q.    So you didn't get off the
16 elevator yelling and screaming?
17    A.    No.
18    Q.    And you actually asked him
19 where he had to return his jeans?
20    A.    Yes.
21    Q.    Now, you mentioned that you
22 went back to your work area and a
23 coworker asked you what was wrong, who

18  (Pages 69 to 72)

## FREEDOM COURT REPORTING

Page 73

1  was that?
2      A.   Twana Anthony.
3      Q.   What did you tell her?
4      A.   I -- I stated I said come
5  here for a sec.  No.  She looked at me
6  and she said -- she said what's wrong
7  with you.  I said -- and I had my hand
8  in my mouth like (indicated), she like
9  what's wrong.  I said something just
10  happened to me.  And she was like what.
11  And she said, you know, we went to the
12  breakroom.  She motioned for to go to
13  the breakroom.  We walked to the
14  breakroom and I was standing there and I
15  told her what happened.  And she was
16  like, and she said you need to report
17  that now.
18      Q.   Were you crying at the
19  time?
20      A.   I was shocked.
21      Q.   So no?
22      A.   I was -- no.
23      Q.   Who all is on your team

Page 74

1  besides Ms. Anthony?
2      A.   Brenda Cheatham, Tara Relf,
3  Ava Collier at the time -- at that time?
4      Q.   Uh-huh (affirmative
5  response).
6      A.   Barbara Cline, Sandra
7  Williams on that particular side.  Rita
8  Arenya, Susan Lang, Michael Brown,
9  Sheldon Payne, Wanda Davis, Katherine
10  Howser, Danny Spears, Shawn Nevels.
11      Q.   And that was back in
12  February of '05?
13      A.   Yes.
14      Q.   Who all was present when you
15  returned from lunch that day, do you
16  recall?
17      A.   Tara, Brenda, and Twana.
18      Q.   What's your -- what's it set
19  up like, your team area?
20      A.   We have -- it's eight in the
21  area, eight people in the area, so four
22  on each side, cubicle area.
23      Q.   You told me a lot more than

Page 75

1  eight people.
2      A.   You asked who was on the
3  team.
4      Q.   Okay.  I apologize.  Who
5  within that eight area?
6      A.   Who sits in that area?
7      Q.   Who sits in that area with
8  you?
9      A.   Okay.  Tara Relf, Brenda
10  Cheatham, Twana Anthony, Barbara Cline,
11  Ava Collier, Sandra Williams.  And I
12  think Annie Kent.  Yes, Annie Kent
13  was.
14      Q.   Where are the other team
15  members located?
16      A.   On the other side.  It's
17  just like only eight can sit on that
18  side, then you have another on the other
19  side of the cubicles.
20      Q.   Okay.  Can you see them?
21      A.   No.
22      Q.   So after you told Twana
23  Anthony what happened, what did you

Page 76

1  do?
2      A.   I sat down and immediately
3  told Tara what happened.
4      Q.   Okay.  What did Tara say?
5      A.   She stated to me, she said
6  that she was going to mention something
7  to Jeff, his supervisor.  I think it was
8  Sandra Hindon at the time.
9      Q.   Anything else?
10      A.   I -- she stated to me, she
11  said I e-mailed Jeff at the time and
12  stated to him what he did was
13  inappropriate and disrespectful.
14      Q.   Had you already e-mailed
15  Jeff when you spoke with Tara?
16      A.   Yes.  She told me to go
17  ahead and e-mail Jeff.
18      Q.   Okay.  So I'm trying to
19  figure out the time line.  Did you talk
20  to Tara before --
21      A.   I talked to Tara first.
22      Q.   Okay.  And did she ask you
23  what you wanted to do?

19  (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1    A.    Tara stated she -- she said
2  what are you going to do.  She said I'm
3  going to talk to his supervisor and I
4  said -- I said, well, okay.  And she
5  said, well, e-mail him and let him know
6  what he did, you know, you didn't
7  appreciate it.  And that's what I did.
8        Q.    So you're saying that Tara
9  told you to e-mail?
10   A.    Yes.
11       MS. JACOBS:  Okay.  I don't
12  have enough copies.  Let me show it to
13  him first.  I'm sorry.
14
15       (Defendants' Exhibit No. 4 was
16         marked for identification.)
17
18       Q.    (By Ms. Jacobs)  Handed
19  what's been marked as Exhibit No. 4.  Do
20  you recognize that?
21   A.    Yes.
22       Q.    This is the e-mail from you
23  to Mr. Williams?

Page 78

1    A.    Yes.
2        Q.    It's dated February 10,
3  2005?
4    A.    Yes.
5        Q.    Time is 1:52 p.m.?
6    A.    Correct.
7        Q.    So that's after you spoke
8  with Twana Anthony?
9    A.    Yes.
10       Q.    And after you spoke with Ms.
11  Relf?
12   A.    Yes.
13       Q.    Okay.  And could you read
14  what you wrote to Jeff, please?
15   A.    Jeff, what just happened in
16  the elevator, please don't let this --
17  that happen again.  That was very
18  inappropriate and disrespectful.  No
19  need to apologize in the few -- future.
20  Let's just keep things on a business
21  level.
22       Q.    Okay.  So you didn't put
23  anything in the e-mail about him rubbing

Page 79

1  your stomach or touching your breast or
2  putting his hands down your pants?
3    A.    Correct.
4        Q.    When you spoke to Ms. Relf,
5  did she tell you what to put in the
6  e-mail?
7    A.    No.
8        Q.    Did Mr. Williams respond?
9    A.    Yes.
10       Q.    How?
11   A.    He stated that he was only
12  kidding around, no disrespect meant or
13  something along that line.
14       Q.    Okay.  But did he do that in
15  person or did he respond via e-mail?
16   A.    E-mail and he walked over in
17  person.
18       Q.    What did he do first?
19   A.    E-mail.
20
21       (Defendants' Exhibit No. 5 was
22         marked for identification.)
23

Page 80

1        Q.    Handed what's been marked as
2  Exhibit No. 5.  Is that the e-mail
3  response you received from Mr. Williams?
4    A.    Yes.
5        Q.    Dated February 10, 2005?
6    A.    Yes.
7        Q.    And the time is 2:09 p.m.?
8    A.    Correct.
9        Q.    Okay.  And he says, I
10  understand.  Just joking around with
11  you.  No disrespect meant; correct?
12   A.    Yes.
13       Q.    Was there anything
14  inappropriate that you thought was about
15  this response?
16   A.    No.
17       Q.    And then you said that he
18  also spoke with you personally?
19   A.    Yeah.  He came over to my
20  desk.
21       Q.    When was that?
22   A.    Right after he sent this
23  e-mail.  About five, ten minutes after

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1  he sent this e-mail.
2      Q.   Was there anybody around at
3  the time?
4      A.   Yes.  Tara, Twana and Brenda
5  was around.
6      Q.   And what did Mr. Williams
7  say to you at that time?
8      A.   He came from -- down the
9  aisle, came behind me, hovered over me
10 and said something in my ear.  And I
11 just slumped down and I just nodded.  I
12 wasn't listening to what he was saying.
13 I was just -- wanted him to get away.
14     Q.   You don't remember at all
15 what he said to you?
16     A.   I really don't.  I just
17 wanted him away.  I just --
18     Q.   And how did he talk to
19 you?
20     A.   He was -- I was sitting at
21 my desk.  He came over, had both hands
22 over like this over my desk area
23 (indicated).  And I was under here like

Page 82

1  that.
2      Q.   Around you?
3      A.   Around me (indicated).
4      Q.   Did anybody besides you see
5  this?
6      A.   Tara and -- Tara had to have
7  seen it.  She sits right across from me.
8      Q.   Did you say anything to
9  Mr. Williams at that time?
10     A.   No, I just nodded.
11     Q.   Had you ever engaged in any
12 conduct at EDS that was offensive or
13 sexual in nature?
14     A.   No.
15     Q.   You've never talked about
16 sex with your coworkers?
17     A.   No.
18     Q.   Never talked about your
19 relationships with coworkers?
20     A.   As -- what, sexual
21 relationships?
22     Q.   Sure.
23     A.   Implied or just flat out?

Page 83

1      Q.   Either?
2      A.   No.  They may implied, but
3  they implied, but no.
4      Q.   Okay.  You ever touch a male
5  coworker on his butt?
6      A.   No.
7      Q.   Have you ever been
8  disciplined or warned for inappropriate
9  conduct at EDS?
10     A.   No.
11     Q.   Have you received any
12 disciplines or warnings at EDS?
13     A.   No.  Let me ask you a
14 question, Ms. Jacobs.
15     Q.   Sure.
16     A.   State the question you just
17 asked you said any disciplinary, is
18 it -- Jarvis made a statement way after
19 this incident about something that I
20 so-called have done four years prior to
21 this, is that what you're asking?
22     Q.   I'm asking at any time have
23 you been disciplined whether it's a

Page 84

1  verbal --
2      A.   -- was no discipline.
3      Q.   -- or written warning?
4      A.   It was no discipline.  No,
5  was nothing disciplined.  She mentioned
6  something but there was no
7  disciplinary.
8      Q.   What did she mention?
9      A.   She stated that Ms. Liebman
10 investigated and said that I so-called
11 touched someone on the behind and that
12 was after the incident -- well, it was
13 February of this year actually.  And she
14 stated that -- Leslie stated that the
15 young fellow had stated that I did it.
16 And I said that same fellow you're
17 referring to contacted me and basically
18 he said you guys are fishing or
19 something.
20     Q.   So you've never touched
21 him?
22     A.   No.
23     Q.   And you've never talked

21  (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1 about having sex with men in front of
2 your coworkers --
3    A.  No.
4    Q.  -- or with your coworkers?
5    A.  No.
6    Q.  Or talked about men's body
7 parts in front of your coworkers?
8    A.  No.
9    Q.  How good somebody looks, how
10 much you'd like to have sex with
11 somebody even implying it?
12    A.  Implying it, I can't go off
13 what someone else's implied or what
14 their thought process, no, I can't.
15    Q.  But you never meant to imply
16 it?
17    A.  I've never implied it.
18    Q.  Now, Ms. Relf in addition to
19 talking to Mr. Williams' supervisor
20 reported it to human resources or the
21 employee relations department;
22 correct?
23    A.  I don't know.

Page 86

1    Q.  Well, at some point in time,
2 you were advised that an investigation
3 was taking place and asked to write a
4 statement, weren't you?
5    A.  I contacted human
6 resource.
7    Q.  Who did you contact?
8    A.  Leslie Liebman.
9    Q.  When did you contact
10 Leslie?
11    A.  I think it was that day, a
12 couple days later.
13    Q.  How did you contact her?
14    A.  Via e-mail.
15    Q.  What'd she say?
16    A.  I e-mailed her and she
17 e-mailed me back.
18    Q.  Okay.  What was the e-mail
19 correspondence about?
20    A.  Basically, I was telling her
21 about the incident.  I was told to get
22 in touch with her and I told her about
23 the incident in the elevator.  Then she

Page 87

1 informed me that she wanted me to put it
2 in writing.  I put it in writing and she
3 stated she was going to get back with me
4 in a couple weeks, which she never
5 done.
6    Q.  Who told you to contact
7 Leslie?
8    A.  I'm not sure was it Tara or
9 Brenda.  But I want to say Brenda but
10 I'm not sure because she told me I need
11 to escalate it.
12    Q.  How did you know to contact
13 Leslie?
14    A.  Info center, looked it up.
15    Q.  Her name's on the info
16 center?
17    A.  Well, I think it's -- it's
18 human resource, her name is on it,
19 yes.
20    Q.  Had you ever spoken to her
21 before?
22    A.  Prior to this?
23    Q.  Uh-huh (affirmative

Page 88

1 response).
2    A.  No.
3    Q.  And you said that she asked
4 you to write a statement?
5    A.  Yes.
6
7    (Defendants' Exhibit No. 6 was
8    marked for identification.)
9
10    Q.  You've been handed Exhibit
11 No. 6.  Do you recognize this
12 document?
13    A.  Yes.
14    Q.  Is this the statement you
15 wrote?
16    A.  Yes.
17    Q.  So you actually sat down and
18 typed this statement?
19    A.  Yes.
20    Q.  Did you do that at work or
21 at home?
22    A.  At work.
23    Q.  Okay.  And it's dated

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1  February 23, 2005?
2      A.   Correct.
3      Q.   Is that the date you wrote
4  it?
5      A.   That's the date I typed
6  it.
7      Q.   And that was at the request
8  of Leslie Liebman?
9      A.   Yes, 'cause I spoken with
10 her via e-mail prior to that.
11     Q.   This was a little over a
12 week after the incident had occurred?
13     A.   I -- I -- this is the
14 statement she e-mailed me back to write
15 to her.  We had a conversation prior to
16 that before she had this statement.
17     Q.   Okay.  So you had a
18 conversation with her?
19     A.   Right.
20     Q.   Over e-mail or telephone?
21     A.   E-mail.
22     Q.   Okay.  And she said please
23 give me a statement?

Page 90

1      A.   Well, this day she e-mailed
2  me and told me to type this statement up
3  exactly what happened.
4      Q.   Okay.  So on February 23rd
5  she says please --
6      A.   Yes.
7      Q.   -- write me a statement?
8      A.   Yes.
9      Q.   Okay.  She didn't actually
10 write this statement, did she?
11     A.   No.  I wrote this statement.
12 She requested that day for this
13 statement.
14     Q.   Did she do that over the
15 phone or via e-mail?
16     A.   Via e-mail.
17     Q.   And this was a little over a
18 week after the incident?
19     A.   Yes, that she requested
20 this, yes.
21     Q.   Okay.  And you wrote it?
22     A.   Yes.
23     Q.   Was the events still fresh

Page 91

1  in your mind?
2      A.   Yes.
3      Q.   You tried to be truthful?
4      A.   I tried to put as much
5  detail like as I can remember.
6      Q.   So everything you could
7  remember you put in this statement?
8      A.   Yes.
9      Q.   Do you know if Ms. Liebman
10 talked to anybody else?
11     A.   No.
12     Q.   You don't know if she talked
13 to anybody else in your office?
14     A.   No.
15     Q.   Or if she spoke with
16 Mr. Williams?
17     A.   No.
18     Q.   Did you e-mail this to
19 her?
20     A.   Yes.
21     Q.   In this statement, you said
22 that you've gone to the doctor and she
23 gave you something to help you sleep.

Page 92

1  Who was that?
2      A.   Rachel McKinney.
3      Q.   Where does she work?
4      A.   The Jackson building.
5      Q.   Is she with a practice, is
6  she a doctor?
7      A.   PCP, primary.
8      Q.   When did you see her?
9      A.   I saw her on the 12th or
10 13th.
11     Q.   What she give you?
12     A.   She gave me some ibuprofen
13 and some Ambiens.
14     Q.   Did she actually give you a
15 prescription or just --
16     A.   She gave me a
17 prescription.
18     Q.   What was the ibuprofen for?
19     A.   Pain.
20     Q.   Pain how?
21     A.   When I pushed him off of
22 me.
23     Q.   After you gave her this

23  (Pages 89 to 92)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  statement, did you speak with Ms.
2  Liebman again either by phone, in
3  person, or --
4    A.  Yes.
5    Q.  -- by e-mail?
6    A.  Yes.
7    Q.  When?
8    A.  After this statement here?
9    Q.  Yes.
10   A.  Okay.  It was March, couple
11  times -- several times in March.  I
12  think another time in like June.  It may
13  have been in May, May or June.
14   Q.  So you spoke with Leslie
15  Liebman several times in March?
16   A.  Yes.  Via e-mail and phone
17  conversation.
18   Q.  What was your conversations
19  with Ms. Liebman at those times?
20   A.  She called me, stated she
21  need to speak with me.  Asked me what a
22  good time would it be for her to call
23  me, she called me back.  And she asked

Page 94

1  me was I on a secure line.  I stated to
2  her no.  And she told me to go to a room
3  that is secure and gave me a number to
4  call her back.  I called her back.
5  Someone walked into the conference room
6  with me because I was afraid to walk
7  around the office by myself and called
8  Leslie back.
9    Q.  And what was the
10  conversation?
11   A.  Oh, I'm sorry.  The
12  conversation was about she asked me what
13  had happened.  And she said she -- at
14  that time, she stated to me that she'd
15  spoken with Jeff and he stated that he
16  gave me a hug.  And I stated to her he
17  didn't just give me a hug.  He -- he
18  actually grabbed me and assaulted me.
19  She said, well, he stated that he just
20  gave you a hug.  Since there was nobody
21  else in the elevator, she told me that
22  there's things set up -- well, I stated
23  to her that I'm seeing a therapist at

Page 95

1  the time.  And she said, well, that's
2  good.  And she said EDS pays for certain
3  number of visits and she said, well,
4  that just something you have to deal
5  with.  I said excuse me.  And she said
6  you just have to deal with the
7  situation.  You got things in place, so
8  just deal with it.  And I was just so
9  shaken up that actually the person that
10  walked into the conference room with me
11  just had to really -- I was shaking.
12  She had to walk me out.  It's like try
13  to calm me down.  She said wait a
14  minute, calm down, just calm down.  And
15  I just started shaking.  And she walked
16  me back to my area.  And at that time,
17  she -- she told Tara I was really upset
18  and I probably need to go home and I
19  left.  Tara walked me to the elevator
20  and walked me out from there.
21   Q.  Ashley who?
22   A.  Sorry?
23   Q.  What's Ashley's last name?

Page 96

1    A.  Actually.  I said
2  actually.
3    Q.  No.  The person who was in
4  the conference room?
5    A.  Brenda Cheatham.
6    Q.  Oh, sorry.  Did she hear the
7  phone conversation?
8    A.  Yes.
9    Q.  Was it on speakerphone?
10   A.  Yes.
11   Q.  And at that time, Ms.
12  Liebman had said that she had spoken
13  with Jeff?
14   A.  Yes.
15   Q.  Who had denied your
16  allegations and said he just gave you a
17  hug?
18   A.  Yes.
19   Q.  And said that there weren't
20  any witnesses; correct?
21   A.  Correct.
22   Q.  And you'd agree there wasn't
23  any witnesses; correct?

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  A.  Yes.
2  Q.  It was just you on the
3  elevator with Mr. Williams?
4  A.  Right.
5  Q.  No one saw what happened?
6  A.  Right.
7  Q.  Okay.  And so you told her
8  you were seeing a therapist and she said
9  that was good?
10  A.  Yes.
11  Q.  And that EDS would pay for a
12  certain number of visits?
13  A.  She said EDS has things in
14  place for that.
15  Q.  Okay.
16  A.  Basically.
17  Q.  Did you discuss with her
18  about what those things were?
19  A.  No.
20  Q.  Okay.  Did you ever look
21  into what those things were?
22  A.  Yes.
23  Q.  And what types of things

Page 98

1  does EDS have in place?
2  A.  They -- I think they pay for
3  like six visits and you pay for the
4  rest.
5  Q.  And did you have EDS pay for
6  the first six visits?
7  A.  I think I paid for the
8  initial first two, and then she was
9  like, no, just go ahead and let them do
10  it.  Tara was like, you know, she was
11  looking into the paperwork for me to do
12  it.
13  Q.  Okay.  And did that
14  happen?
15  A.  Yes.
16  Q.  So EDS paid for a certain
17  number of visits?
18  A.  Yes.  My insurance paid for
19  it and they paid for the copay.
20  Q.  Okay.  So your medical
21  insurance paid for the visits and
22  then --
23  A.  I'm not really sure how the

Page 99

1  billing went.  I'm -- I'm not too clear
2  on that one.
3  Q.  Okay.
4  A.  But I know I paid most of
5  the bill.
6  Q.  Right.  So there's medical
7  insurance and then for some of the
8  visits EDS would have paid you back for
9  the copay?
10  A.  No, they didn't pay me back
11  for the copay.  They was --
12  Q.  Then what did they pay
13  for?
14  A.  I'm -- I'm not sure what
15  they paid for, but they paid for I think
16  six visits, copays.
17  Q.  Who were those visits to?
18  A.  Vonceil Smith.
19  Q.  Who is that?
20  A.  A psychiatrist.
21  Q.  How'd you find Dr. Smith?
22  A.  From a book.
23  Q.  Had you ever been to Dr.

Page 100

1  Smith before?
2  A.  No.
3  Q.  Nobody recommended Dr.
4  Smith?
5  A.  No.
6  Q.  How long did you see Dr.
7  Smith?
8  A.  From March until like
9  November '05.
10  Q.  How often did you see Dr.
11  Smith?
12  A.  Initially once a week, then
13  she went to twice a month, then back to
14  once every week.
15  Q.  And you stopped seeing her
16  in November of '05?
17  A.  Yes.
18  Q.  Why?
19  A.  Couldn't afford it
20  anymore.
21  Q.  Insurance stopped paying for
22  it?
23  A.  Oh, insurance been -- been

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1  stop paying for it.
2      Q.   Do you know what, if
3  anything, happened to Mr. Williams if he
4  was disciplined in any way, counseled in
5  any way?
6      A.   I don't know.  I got --
7  didn't get a -- I just had no dealings
8  with what was going on with him.  I was
9  trying to deal with me.
10     Q.   After February of 2005, did
11 Mr. Williams ever touch you again?
12     A.   No.
13     Q.   So he's never tried to
14 attack you, touch you, hug you, anything
15 since February of 2005?
16     A.   Intimidate.
17     Q.   I'm not asking about
18 intimidate.  I'm asking has he ever
19 touched you?
20     A.   No.
21     Q.   Okay.  Has he ever spoken to
22 you?
23     A.   No.

Page 102

1      Q.   So he hasn't spoken to you
2  or touched you but he's intimidated
3  you?
4      A.   Yes.
5      Q.   How?
6      A.   He was walking back and
7  forth through my area like 20, 25 times
8  a day.  He'll stop at the water fountain
9  right in front of my desk and stare at
10 me.  He'll stop -- and at the time,
11 Annie Kent was sitting right in my area.
12 He'd stand there and look back at me and
13 stare at me and just roll his eyes at
14 me.
15     Q.   Anybody else see this?
16     A.   When I see him, I slump
17 down.  Tara saw a lot of it.
18     Q.   How often did this occur?
19     A.   Oh, quite often.  Up until
20 yesterday, actually.
21     Q.   Yesterday it occurred?
22     A.   Yes.
23     Q.   What happened yesterday?

Page 103

1      A.   I was sitting at my desk,
2  and where I sit, I sit like right in
3  front of the door when people walk in
4  and out.  And every time somebody walk
5  pass, we have a habit, we all would look
6  and see who's passing by.  And everybody
7  was gone to lunch and I was the only one
8  sitting back there.  And like I said,
9  didn't know who it was but if somebody
10 walked pass me immediately just look up.
11 And when I looked up, he looked at me
12 and he rolled his eyes at me and I just
13 slumped back down in my chair.
14     Q.   He works for EDS still?
15     A.   Yes.
16     Q.   And he works on the same
17 floor as you?
18     A.   Yes.
19     Q.   So periodically you're going
20 to have to see him; correct?
21     A.   Well, not -- well, I didn't
22 have to see him 'cause there's two
23 sides.

Page 104

1      Q.   Okay.  But it -- your --
2  from what I understand, you've got
3  cubicles.  And if he walks pass and you
4  pop up, you're going to see him?
5      A.   He was --
6      Q.   I'm not asking about
7  yesterday.  I'm just asking in general.
8      A.   I'm saying in general I
9  don't have to see him because like I
10 stated to Jarvis at the time, there's a
11 restroom on the other side of the
12 building.
13     Q.   Okay.
14     A.   A men's restroom.  There's
15 an entrance to the breakroom on the
16 other side that he can go but he comes
17 by that area.
18     Q.   Is it shorter to go by your
19 office?
20     A.   It's the same amount of
21 distance.
22     Q.   Okay.  You say he goes by
23 and stands by Annie Kent's desk?

26  (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1    A.   At the time.  Annie Kent's
2  no longer on the team.
3    Q.   So when did that happen?
4    A.   That -- well, I don't -- I
5  can't recall.  He's -- right by Leslie.
6  He just stand in front of Annie Kent's a
7  lot after the incident for a
8  while afterward.  I don't -- can't say how
9  long.  But I know all the time I see him
10  slump down and stand there.  And I
11  reported that incident.
12    Q.   Was he friends with Annie
13  Kent?
14    A.   Well, I don't how -- what
15  their relationship is.
16    Q.   Did he ever talk to Annie
17  Kent before February 2005?
18    A.   Yes.
19    Q.   Go stand at her desk before
20  February of 2005?
21    A.   Not that often.
22    Q.   How often did he after
23  February of 2005 did he go --

Page 106

1    A.   I'll --
2    Q.   -- stand at Annie's desk?
3    A.   I'll tell you he'll stand
4  anywhere between 10, 15 minutes at a
5  time.
6    Q.   But how often every day --
7    A.   -- there, two or three
8  minutes, speak to her and keep going.
9    Q.   How often would he do this
10  though?
11    A.   After or before?
12    Q.   Let's go before.
13    A.   Before, probably once a
14  day.
15    Q.   And after?
16    A.   About four, five times a
17  day.
18    Q.   So Ms. Kent could testify
19  that --
20    A.   Yes.
21    Q.   -- he would have stood at
22  her desk more after February of 2005?
23    A.   Yes.

Page 107

1    Q.   Anyone else would have seen
2  him do this?
3    A.   Twana, Brenda, Ava Collier;
4  she used to sit across from Annie so.
5    Q.   And you said you -- you
6  reported this when?
7    A.   Each time reported to
8  Tara.
9    Q.   Did you ever speak with
10  Leslie about it, report it to human
11  resources?
12    A.   Yes.
13    Q.   When?
14    A.   An e-mail around the -- I
15  don't recall the date, but I -- I know
16  I -- I sent it to her in e-mail.
17    Q.   And did Ms. Liebman talk to
18  you about it?
19    A.   No.
20    Q.   Did she try to talk to you
21  about it?
22    A.   No.
23    Q.   So no one from EDS tried to

Page 108

1  talk to you about it?
2    A.   About him coming in the
3  area, no.
4    Q.   Did they try to talk to you
5  about any of the allegations you made
6  that he was intimidating you?
7    A.   Leslie made the statement
8  that if he comes to me or something let
9  her -- oh, no, no.  She didn't say him.
10  She said if anybody else bothers me, let
11  her know.  It wasn't that incident.
12    Q.   When did she tell you
13  that?
14    A.   I don't recall, but it's in
15  e-mail.
16    Q.   Was it after the February
17  incident?
18    A.   Yes.
19    Q.   Before you reported him
20  intimidating you to her?
21    A.   I don't recall.
22
23    (Defendants' Exhibit No. 7 was

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1    marked for identification.)
2
3    Q.    Hand you what's been marked
4    as Exhibit No. 7.
5    A.    Uh-huh (affirmative
6    response).
7    Q.    Do you recognize that?
8    A.    Yes.
9    Q.    What is it?
10    A.    Confidentiality agreement.
11    Q.    Well, if you start at the
12    third page, it looks like it's an e-mail
13    strain between you and Ms. Liebman.
14    A.    I'm sorry?
15    Q.    It looks like an e-mail --
16    A.    Oh.
17    Q.    -- train between you and Ms.
18    Liebman; is that correct?
19    A.    Correct.
20    Q.    And the first e-mail is from
21    you to Ms. Liebman on June 13, 2005?
22    A.    Uh-huh (affirmative
23    response).

Page 110

1    Q.    Is this when you reported to
2    her the intimidation you believe
3    Mr. Williams was doing?
4    A.    Uh-huh (affirmative
5    response).
6    Q.    Is that a yes?
7    A.    Yes. I'm sorry.
8    Q.    This is when you reported it
9    to Ms. Liebman?
10    A.    Yes.
11    Q.    Okay. In addition you ask
12    for a copy of the investigation that
13    she'd given you the details but never
14    formally in writing; correct?
15    A.    Correct.
16    Q.    Okay. So she had told you
17    what the results of the investigation
18    was verbally, just hadn't put it down in
19    writing for you; correct?
20    A.    Yes. Yes.
21    Q.    Okay. Now, in this e-mail
22    you say, I was informed that the reason
23    was stated to you was that I was crazy

Page 111

1    and paranoid and that's the reason why
2    the investigation was handled in this
3    manner, no action still?
4    A.    I'm sorry. Where are you
5    at? Okay.
6    Q.    I'm on --
7    A.    I see it.
8    Q.    -- June 13th e-mail from
9    you.
10    A.    Correct.
11    Q.    What did you mean by that?
12    A.    I was informed by the reason
13    was stated I was informed by another
14    employee that people -- that they wasn't
15    taking me serious.
16    Q.    Who told you that?
17    A.    Debra Adkins.
18    Q.    How did she know this?
19    A.    She work closely with
20    management.
21    Q.    Was she in management?
22    A.    I think she is. I don't
23    know her official title but she worked

Page 112

1    very closely with management.
2    Q.    Did she say who thought you
3    were crazy and paranoid?
4    A.    No. We was on break one day
5    and she just made the statement, talked
6    about who was -- I don't know what the
7    conversation led up to it. But she
8    said, oh, that's not going anywhere
9    'cause, you know, they think you crazy
10    and paranoid.
11    Q.    Okay. Did she say who
12    thought you were --
13    A.    No.
14    Q.    -- crazy and paranoid?
15    A.    No.
16    Q.    So you have no idea what she
17    was talking about --
18    A.    No.
19    Q.    -- or who she was talking
20    about?
21    A.    I just -- I just make the
22    assumption it was Jarvis because Jarvis
23    was the only one who knew about this

28 (Pages 109 to 112)

## FREEDOM COURT REPORTING

Page 113

1  that I know about this -- that knew
2  about this besides Leslie.
3      Q.    But that's your
4  assumption?
5      A.    Yes.
6      Q.    Debra didn't say Jarvis
7  thinks you're crazy?
8      A.    No.
9      Q.    Now, you say no action taken
10  still.  What do you mean by that?
11      A.    Because I haven't heard from
12  Leslie about this incident.
13      Q.    About what incident?
14      A.    About the elevator or the
15  investigation.
16      Q.    But in the previous
17  sentence, you state you've given me, and
18  you and I just talked about, she gave
19  you the results just not in writing?
20      A.    She didn't -- she didn't
21  give me the results from the
22  investigation.  This was -- she was
23  telling me it was still ongoing

Page 114

1  investigation.  I was asking her for
2  a -- basically up-to-date on the
3  investigation.
4      Q.    Okay.  Well, it says that --
5      A.    That -- okay.
6      Q.    -- can you give me the
7  details again.  You never formally gave
8  them to me in writing.  What details had
9  she given you previously if not the
10  results?
11      A.    The -- the ones over the
12  conference -- on the conversation over
13  the phone when she said he just gave you
14  a hug.
15      Q.    Oh --
16      A.    I just assumed --
17      Q.    -- and there were no
18  witnesses?
19      A.    I just assumed, I just
20  assumed that was the end of the
21  investigation.
22      Q.    Okay.
23      A.    At that time.

Page 115

1      Q.    Do you know if it was the
2  end of the investigation?
3      A.    No, it wasn't 'cause she
4  called me February this year.
5      Q.    February of this year?
6      A.    Yes.
7      Q.    What did she want February
8  of this year?
9      A.    She basically told me the
10  investigation was closed, that I had no
11  merits on my allegation.
12      Q.    Which investigation was she
13  talking about?
14      A.    The elevator incident.
15      Q.    She wasn't talking about the
16  intimidation incident?
17      A.    No.
18      Q.    Do you know if she
19  investigated the intimidation
20  allegations you made?
21      A.    I don't know.
22      Q.    Did you ever speak with Ms.
23  Liebman about those allegations --

Page 116

1      A.    No.
2      Q.    -- the intimidation
3  allegation?
4      A.    No.
5      Q.    This e-mail, the June 13th
6  one to Ms. Liebman also says that he --
7  I assume you meant to say he is close
8  with a manager here?
9      A.    Right.
10      Q.    And I recently found out
11  that's the reason it was stated to you
12  to discredit me.  What manager -- I
13  assume you're talking about
14  Mr. Williams?
15      A.    Yes.
16      Q.    What manager is he close
17  to?
18      A.    Jarvis.
19      Q.    Who told you he was close
20  with him or her, pardon me?
21      A.    I don't recall who it was
22  exactly at the time he told me was.  But
23  they stated they're -- go to church,

29  (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1 bible study, and they're always praying
2 together. And I just went off of that,
3 I guess.
4     Q.   And you have no idea who
5 told you this?
6     A.   I can't recall was it Lula,
7 girl name Lula who told me or it's a
8 girl named Felicia at the time.
9     Q.   And who are they?
10     A.   They're actually CSR.
11     Q.   Customer service reps?
12     A.   Yes. I'm sorry.
13     Q.   You never personally saw
14 Jarvis and -- Jarvis Robinson and
15 Mr. Williams interacting at church or
16 bible study?
17     A.   No.
18     Q.   So all you know is what --
19     A.   Hearsay.
20     Q.   -- somebody told you? It's
21 hearsay.
22     A.   Correct.
23     Q.   And so another customer

Page 118

1 service rep said he's close to Jarvis
2 and that's why they didn't take you
3 seriously?
4     A.   Correct.
5     Q.   And that was either Lula or
6 Felicia?
7     A.   Right.
8     Q.   Anybody else tell you
9 that?
10     A.   No.
11     Q.   Now, when you send this to
12 Ms. Liebman, the next e-mail in this
13 chain is the same day from her saying
14 that she'll call you tomorrow?
15     A.   Uh-huh (affirmative
16 response).
17     Q.   Which would have been a
18 Tuesday; correct?
19     A.   Correct.
20     Q.   And you respond and tell her
21 when you're at work?
22     A.   Correct.
23     Q.   And then the next e-mail is

Page 119

1 a June 15, 2005 from Ms. Liebman to you
2 basically saying she tried to call you;
3 correct?
4     A.   Okay. Yes.
5     Q.   Is that true?
6     A.   Yes.
7     Q.   Okay. And then said that
8 she was going to be leaving and wouldn't
9 be back until the following Monday?
10     A.   Correct.
11     Q.   And said she'd call you on
12 Monday?
13     A.   Uh-huh (affirmative
14 response). Correct.
15     Q.   Then it looks like you sent
16 her an e-mail on June 21st?
17     A.   Correct.
18     Q.   Asking when she's going to
19 get back to you?
20     A.   Correct.
21     Q.   And you received an e-mail
22 back from her June 27th; correct?
23     A.   Correct.

Page 120

1     Q.   Basically, saying she's been
2 out of the office for looks like over a
3 week sick; correct?
4     A.   Correct.
5     Q.   And then trying to find out
6 a time when she can speak with you?
7     A.   Correct.
8     Q.   And you say that will be
9 fine?
10     A.   Correct.
11     Q.   Now, the next thing is
12 this -- there appears to be a
13 confidentiality agreement forwarded to
14 you?
15     A.   Correct.
16     Q.   And did you ever sign
17 that?
18     A.   No.
19     Q.   Why not?
20     A.   'Cause I was advised by my
21 attorney not to.
22     Q.   Okay. And did Ms. Liebman
23 tell you why she wanted you to sign a

30  (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 121

1  confidentiality agreement?
2      A.  I don't think I spoke with
3  her. My attorney contacted her.
4      Q.  Okay. So you were already
5  represented by counsel by this time?
6      A.  At that time, correct.
7      Q.  Okay. And did you ever
8  speak with Ms. Liebman regarding the
9  allegations of intimidation after
10  this?
11      A.  I don't recall, no.
12      Q.  Do you know if she tried to
13  get in contact with you?
14      A.  About -- no, I don't know.
15      Q.  Did you refuse to speak with
16  her?
17      A.  No. We actually had a
18  conversation in Jarvis' office I think
19  after this incident.
20      Q.  Okay. Tell me about that.
21      A.  Told you previously that she
22  made the statement about me faking and
23  wanting some money to pay off some

Page 122

1  bills. And at that time, I told her,
2  you know, contact my attorney. I don't
3  want to have any more conversations
4  without my attorney present.
5      Q.  So after that you refused to
6  speak to her without an attorney
7  present?
8      A.  Correct.
9      Q.  Do you recall when that
10  happened?
11      A.  I want to say November '05.
12  I -- I'm not sure. I'm not really sure
13  on that date.
14      Q.  Have you reported any other
15  harassment since this intimidation issue
16  arose?
17      A.  With Mr. Williams?
18      Q.  Yes?
19      A.  No.
20      Q.  About anybody else?
21      A.  Yes.
22      Q.  Whom?
23      A.  Jamal Spencer.

Page 123

1      Q.  When did that happen?
2      A.  Might have been a month and
3  a half, two months ago.
4      Q.  Who's Jamal?
5      A.  He's our tech guy, tech
6  support, tech support.
7      Q.  What happened with him?
8      A.  I called into the tech desk
9  because I couldn't log into, I don't
10  know, one of my databases. And he
11  was -- to the e-mail server and he made
12  the statement -- made a statement
13  towards me like are you sure -- he was
14  basically saying are you sure you
15  rebooted or basically talked to me like
16  I was a child. Said, well, Jamal, I
17  know about computers a little bit. I'm
18  just wondering is the server down. I
19  don't know the conversation. And he
20  said -- I said I'm not a child. I said,
21  you know, you don't have to talk to me
22  in that manner. And he said, I just --
23  I just want to make sure.

Page 124

1          Then he came over to my desk
2  and he said -- asked me did I get onto
3  the server. I said no. I contacted COE
4  and they stated that the server's down.
5  And he said, well, I didn't mean any --
6  to talk to you as if you was a child.
7  He said your behind's too big for me to
8  confuse you with being a child, on a
9  child level. And I was like whoa. And
10  he apologized to Mrs. Anthony who sits
11  in front me. What -- she didn't hear
12  him 'cause she had her music on. And he
13  made the statement, he said, you know,
14  you know, people get all riled up when
15  people make statements like that and go
16  report you. At that time, I told my
17  manager Scott.
18      Q.  Scott Arnt?
19      A.  Right.
20      Q.  What did Scott do?
21      A.  He just e-mailed me back and
22  said the situation's handled.
23      Q.  Do you know how?

31  (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1    A.   No.
2    Q.   Has Mr. Spencer said
3  anything inappropriate to you since?
4    A.   No.
5    Q.   Is that the first time he
6  ever said anything to --
7    A.   Yes.
8    Q.   -- you inappropriately?
9    A.   Yes.
10    Q.   Do you know how the
11  situation was handled?
12    A.   No.
13    Q.   Has Mr. Spencer tried to
14  intimidate you since?
15    A.   No.
16    Q.   Do you think that was
17  handled properly?
18    A.   Yes.
19    Q.   What about the situation
20  with Mr. Williams, the February 10th
21  elevator incident, do you think that was
22  handled properly?
23    A.   No.

Page 126

1    Q.   Why not?
2    A.   'Cause he violated me.  He
3  actually put his hands on me.  He messed
4  with my -- filed that incident, just
5  my -- it wasn't handled properly because
6  he wasn't properly trained.
7    Q.   Why do you say that?
8    A.   Because EDS has these
9  policies in place.  EDS doesn't follow
10  through and ensure that these policies
11  are acted upon.
12    Q.   Do you know what training
13  Mr. Williams received?
14    A.   He received -- everybody
15  cross the board has to take these sexual
16  harassment courses.  And you had to
17  certify these courses.
18    Q.   Okay.
19    A.   You have to say that you've
20  taken these courses.
21    Q.   Okay.
22    A.   Each year.
23    Q.   So how was he not properly

Page 127

1  trained?
2    A.   Okay.  I'm sorry.
3    Q.   I understand what you say he
4  did to you.
5    A.   Right.
6    Q.   How would training any --
7  what different training would have
8  prevented that?
9    A.   I think a thorough
10  background check into Mr. Williams' past
11  prior to EDS hiring him and seeing if
12  there ever been a pattern with this
13  before.  EDS apparently didn't do a
14  thorough background check on this for
15  the type of training that they need to
16  have with each employee.
17    Q.   Do you know what kind of
18  background check EDS did on
19  Mr. Williams?
20    A.   Apparently, just the
21  background check they do with every
22  individual.  No, I don't know what they
23  did on Mr. Williams but I --

Page 128

1    Q.   What type of background
2  check do they perform on other
3  employees?
4    A.   They do fingerprints.  They
5  do credit report.  They do the history
6  of any type of allegation or so forth.
7  That's what I'm -- I'm familiar with
8  what they've done.
9    Q.   And do you know if they did
10  that with Mr. Williams?
11    A.   No, I don't.
12    Q.   Okay.  Do you know there's
13  anything in Mr. Williams' background
14  that they would have found had they done
15  some new and different or better
16  check?
17    A.   Other than hearsay?
18    Q.   Oh, what do you know about
19  hearsay?
20    A.   Military.  He had military
21  allegations against him, hearsay.
22    Q.   Who did you hear that
23  from?

32  (Pages 125 to 128)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 129

1    A.    Lula Savage.
2    Q.    What did she say where those
3  allegations --
4    A.    She stated that someone else
5  in the military in his reserve unit
6  filed some allegation charges against
7  him as well.
8    Q.    What type of charges?
9    A.    Sexual harassment.
10    Q.    How did Lulu know this?
11    A.    Lula.
12    Q.    Lula.  Pardon me.
13    A.    That's okay.  Hearsay.
14    Q.    So she has no --
15    A.    I don't know where she heard
16  it from.
17    Q.    She wasn't in the military
18  with Mr. Williams?
19    A.    No.  I think someone else
20  that she knew probably knew him.  Like I
21  said, it's hearsay.
22    Q.    And do you know if the
23  background check would have --

Page 130

1    A.    Red flagged it, should
2  have.
3    Q.    Why -- have you performed a
4  background check before?
5    A.    No.
6    Q.    Personally?
7    A.    No.
8    Q.    Do you know what a
9  background check entails and what
10  information is actually provided?
11    A.    No.
12    Q.    Okay.  So you have no
13  personal knowledge of whether a
14  background check of the type you think
15  should have occurred would have
16  presented this information.  Do you
17  think -- do you know if the military
18  would have provided this information had
19  EDS asked?
20    A.    I don't know.
21    Q.    And this is assuming it
22  occurred.  Do you know if it was public
23  or private information that the military

Page 131

1  had?
2    A.    I don't know.
3    Q.    Besides the hearsay from
4  Lula, any other information from
5  Mr. Williams' background that you think
6  would have come to light had a new,
7  different, better background check?
8    A.    I don't know.
9    Q.    So that's the only thing you
10  know of in the background that possibly,
11  if it's true, EDS could have found out
12  about?
13    A.    Other than hearsay?
14    Q.    No.  I want to know
15  everything you know?
16    A.    Okay.  Well, another
17  hearsay, this comes from a girl named
18  Rita McCray, stated that Mr. Williams
19  was actually -- like another lady up
20  there, a young lady up there, Angelina
21  Edwards and that they somehow dated, may
22  or may not dated.  And he was at the
23  time stalking her at her apartment

Page 132

1  complex.  That's another hearsay.
2    Q.    And that's from Rita?
3    A.    Rita McCray.
4    Q.    Does she work for EDS?
5    A.    Yes.
6    Q.    And Angelina Edwards did as
7  well?
8    A.    Yes.  She's still employed
9  there.
10    Q.    Have you ever spoken to Ms.
11  Edwards?
12    A.    No.  I spoken with her but
13  to ask her, but I never did follow
14  through with it.
15    Q.    You did or you didn't --
16    A.    I did not.  I spoke with her
17  but I didn't speak with her about
18  this -- that.
19    Q.    And it's your understanding
20  from Ms. McCray that they were dating?
21    A.    No.  That she wouldn't go
22  out with him.  I don't know the
23  relationship.  Like I say, it's hearsay.

33  (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1  They --
2      Q.  Okay.
3      A.  -- may or may not have
4  dated. I don't know. But I know that
5  the hearsay is that he actually stalked
6  her in her apartment.
7      Q.  Do you know if Ms. Edwards
8  or Ms. McCray reported this to EDS?
9      A.  I don't know.
10     Q.  Do you have any information
11 that EDS had knowledge of this alleged
12 incident?
13     A.  I don't know.
14     Q.  And a background check
15 wouldn't have got that; correct, it
16 happened while they were at EDS?
17     A.  I don't know.
18     Q.  You don't know?
19     A.  I don't know.
20     Q.  Does EDS perform background
21 checks on its current employees?
22     A.  I don't know.
23     Q.  Okay. Anything else in

Page 134

1  Mr. Williams' past or whether you know
2  it by hearsay or personally that EDS --
3  you think EDS should have been aware of
4  or could have been aware of?
5      A.  No.
6          MS. JACOBS:  Can we take a
7  short break?
8          MR. WALKER:  Uh-huh
9  (affirmative response).
10         MS. VIDEOGRAPHER:  Off the
11 record. The time is 11:43.
12
13     (A brief recess was taken.)
14
15         MS. VIDEOGRAPHER:  Back on
16 the record. We commence Tape 3. The
17 time is 11:53.
18     Q.  (By Ms. Jacobs) Ms. Jacobs,
19 now you had mentioned that Mr. Williams
20 had intimidated you as early or as late,
21 as early -- as late as yesterday?
22     A.  Uh-huh (affirmative
23 response).

Page 135

1      Q.  And previously we had talked
2  about that after the incident that you
3  felt he was staring at you and walking
4  in the area pretty much constantly. Has
5  his intimidation for lack of a better
6  word leveled off some? I mean, is he
7  still in your area 20 times, 25 times a
8  day or has it lessened?
9      A.  It lessened because Annie
10 Kent is no longer in that area.
11     Q.  Okay. So Annie's no
12 longer --
13     A.  In that -- on that team.
14     Q.  Is she still with EDS?
15     A.  Yes.
16     Q.  But she moved?
17     A.  Yes.
18     Q.  And so he's not there
19 talking to her?
20     A.  No.
21     Q.  Does he come talk to anybody
22 else on a regular basis in your area?
23     A.  No. He comes and talks to

Page 136

1  Tara periodically.
2      Q.  What does he talk to Tara
3  about?
4      A.  I don't know.
5      Q.  Do you know if that's EDS
6  related --
7      A.  I don't --
8      Q.  -- or personal?
9      A.  -- I don't know.
10     Q.  How often does he come talk
11 to Tara?
12     A.  Not as often.
13     Q.  When did Annie move?
14     A.  I don't recall.
15     Q.  Had -- last month or has it
16 been longer?
17     A.  It might have been two,
18 three months.
19     Q.  Ago?
20     A.  Yes.
21     Q.  So sometime this year?
22     A.  Yes.
23     Q.  But you'll still see him

34  (Pages 133 to 136)

## FREEDOM COURT REPORTING

Page 137

1  walk by to go the breakroom or to the
2  restroom?
3      A.   Yes.
4      Q.   Has he done anything else to
5  try to intimidate you in your opinion
6  besides what we've already talked
7  about?
8      A.   Followed me out in the
9  parking lot.
10     Q.   How often does that
11 happen?
12     A.   Prior to or after?
13     Q.   Prior to February '05, did
14 he ever follow you out in the parking
15 lot?
16     A.   No.
17     Q.   So he never happened to
18 leave the parking lot after prior to
19 February of '05?
20     A.   I don't know.
21     Q.   Would you have noticed if he
22 did --
23     A.   Yes.

Page 138

1      Q.   -- prior to February of '05?
2      A.   Yes.
3      Q.   Why?
4      A.   Because I take a look at my
5  surroundings, keep familiarity of my
6  surroundings.
7      Q.   Okay.  And after February of
8  '05?
9      A.   Often.
10     Q.   How often?
11     A.   Often.  Three, four times a
12 week.  Depends on what shift he was
13 on.
14     Q.   Are y'all on the same
15 shift?
16     A.   Well, I'm on a straight
17 shift.  He wasn't at the time.
18     Q.   So he would follow you out
19 of the parking lot only if he was
20 working the same shift as you?
21     A.   Yes.  That's -- that's the
22 only time I notice because I'm never
23 there that late.

Page 139

1      Q.   Okay.  Did he ever try to
2  follow you home?
3      A.   No.  Once I noticed him
4  behind me, I took a different route.
5      Q.   And he didn't follow you?
6      A.   No.
7      Q.   Did he every try to hit your
8  car?
9      A.   No.
10     Q.   Say anything to you?
11     A.   No.
12     Q.   He just followed you out of
13 the parking lot?
14     A.   Yes.
15     Q.   What was intimidating about
16 that?
17     A.   An incident when I saw him
18 get on the elevator.  We was about to
19 get on the elevator together.  I went
20 back and sat down at my desk, waited
21 five, ten minutes, and I just assumed he
22 would be out of the parking lot by then.
23 Got to my car, drive out and he pulls

Page 140

1  out behind me and he has a smirk on his
2  face when I looked in my rearview mirror
3  so I turned off.
4      Q.   So you just assumed because
5  you had waited a few minutes he would be
6  out of the parking lot?
7      A.   That one incident, yes.
8      Q.   That one incident.  Do you
9  know if he stopped and talked to
10 anybody?
11     A.   I don't know.
12     Q.   He was on the phone?
13     A.   I don't know.
14     Q.   Okay.  And so you start to
15 leave the parking lot and he pulls in
16 behind you and you say he had a smirk on
17 his face?
18     A.   He pulls out behind me not
19 in.
20     Q.   Right.
21     A.   Yeah.
22     Q.   Okay.  Maybe I'm
23 misunderstanding this.  You pull out and

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 141

1  he pulls out behind you?
2      A.   Yes.
3      Q.   Okay.  What's the parking
4  lot like?  Maybe I need to know what the
5  parking lot is.
6      A.   It's right up here
7  (indicated).  You can park under the
8  building.
9      Q.   Okay.
10     A.   And you can park in an open
11  parking lot.
12     Q.   Where were you parked?
13     A.   Under the building.
14     Q.   Where was he parked?
15     A.   He was parked under the
16  building.
17     Q.   Near you?
18     A.   It had to have been near me
19  because he pulled out behind me.
20     Q.   Okay.
21     A.   And --
22     Q.   And you just assumed he was
23  waiting for you?

Page 142

1      A.   On that incident.  Another
2  incident was intimidation.  I just
3  coming back from a break and somebody
4  was sitting in a truck and start blowing
5  and blew at me and -- and just waved.
6  And I looked and it was tinted windows.
7  And I looked and I -- I noticed it
8  was -- was him.  He had -- I guess he
9  had just purchased a second vehicle.
10     Q.   So he honked the horn and
11  waved at you and that was
12  intimidation?
13     A.   Yeah.
14         MS. VIDEOGRAPHER:  Ms.
15  Jacobs, can you put your mic on?
16         MS. JACOBS:  I'm sorry.
17         MS. VIDEOGRAPHER:  It's
18  okay.  I had it up.  I could hear you
19  but -- thank you.
20     Q.   (By Ms. Jacobs)  But you
21  said since February of '05 he's never
22  tried to speak to you?
23     A.   No.

Page 143

1      Q.   And he's never touched
2  you?
3      A.   No.
4      Q.   Has he ever called you at
5  home?
6      A.   No.
7         MS. JACOBS:  Can we go off
8  the record for just a second?
9         MR. WALKER:  Sure.
10         MS. VIDEOGRAPHER:  Off the
11  record.  The time is 11:58.
12
13         (A discussion was held off the
14         record.)
15
16         MS. VIDEOGRAPHER:  Back on
17  the record.  The time is 11:58.
18     Q.   (By Ms. Jacobs)  Now, since
19  February of 2005, you haven't been
20  demoted, have you?
21     A.   No.
22     Q.   You still work at EDS;
23  correct?

Page 144

1      A.   Yes.
2      Q.   In the same position?
3      A.   Yes.
4      Q.   You haven't lost any
5  salary?
6      A.   No.
7      Q.   Changed your salary --
8      A.   No.
9      Q.   -- to where it's less?
10     A.   No.
11     Q.   Do you recall when you first
12  contacted an attorney about this case?
13     A.   Do I recall?
14     Q.   Yeah.  How soon after the
15  incident did you contact an attorney?
16     A.   Might have been a month,
17  month and a half.
18     Q.   Why did you contact an
19  attorney at that time?
20     A.   I don't recall the reason
21  behind it.
22     Q.   How did you find your
23  attorney?

36  (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1    A.   Just basically knew him,
2  just from being with him.
3       Q.   How?
4       A.   Just knew him from different
5  scenes, scenery.
6            MR. WALKER:  If you don't
7  mind, I can tell you how.  The YMCA.
8       Q.   Okay.  And you filed a
9  charge of discrimination with the EEOC;
10 correct?
11      A.   Correct.
12      Q.   How soon after the
13 incident?
14      A.   June -- March, June.
15
16      (Defendants' Exhibit No. 8 was
17       marked for identification.)
18
19      Q.   Hand you what's been marked
20 Exhibit No. 8.  Do you recognize that?
21      A.   Yes.
22      Q.   Is that the charge of
23 discrimination you filed with the

Page 146

1  EEOC?
2       A.   Yes.
3       Q.   And it's dated what?
4       A.   March 8.
5       Q.   2005?
6       A.   Yes.
7       Q.   And is that your signature
8  above the date?
9       A.   Yes.
10      Q.   So you signed it on March 8,
11 2005?
12      A.   Yes.
13      Q.   So less than a month after
14 the incident occurred?
15      A.   Yes.
16      Q.   And did you write what is in
17 the -- the typewritten part that's the
18 particulars are?
19      A.   Yes.
20      Q.   You actually personally
21 typed that in?
22      A.   No.
23      Q.   Who typed that in?

Page 147

1       A.   My attorney.
2       Q.   Okay.  Did you tell the
3  attorney what to put in there?
4       A.   Yes.
5       Q.   How?  You just talk to him
6  about it?
7       A.   Yes.
8       Q.   Were you with him when he
9  did it?
10      A.   Yes.
11      Q.   Now, the details in this are
12 different than the written statement
13 that you provided to EDS, aren't they?
14      A.   Yes.
15      Q.   Why?
16      A.   I didn't -- what you asked
17 me, that some of the stuff was in there
18 detail, I don't --
19      Q.   Okay.  Well, for example, in
20 this statement that you gave to the EEOC
21 a month later after the incident, you
22 actually say, He began rubbing my breast
23 and then he began putting his hands in

Page 148

1  my pants, do you see that?  It's in the
2  first paragraph towards the end.
3       A.   I don't have my glasses.
4  I'm sorry.  Okay.
5       Q.   You see that in this
6  statement, He began rubbing my breast
7  and then he began putting his hand in my
8  pants; correct?
9       A.   Correct.
10      Q.   That's in Exhibit 8 to the
11 EEOC?
12      A.   Supposed to have been the
13 other way around.
14      Q.   Pardon me?
15      A.   Supposed to been the other
16 way around.  He first began -- put his
17 hands down my pants.
18      Q.   Uh-huh (affirmative
19 response).
20      A.   And pulled it out and was
21 rubbing my stomach and breast.
22      Q.   Okay.  But that's not --
23 this statement wasn't in your written

37  (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1  statement to EDS, was it?
2      A.   This statement was.
3      Q.   All right.  Let's look at
4  that exhibit and you can show me where
5  it is in that statement.  It's Exhibit
6  No. 6.
7      A.   Right here (indicated).  He
8  proceed to --
9      Q.   Read it.
10     A.   He proceeded to take my
11 blouse out of my pants and began to rub
12 my stomach, my bare stomach.  Said he
13 wants to warm me up.
14     Q.   Okay.
15     A.   Okay.  That part --
16     Q.   That is different, isn't it,
17 from he began rubbing my breast?
18     A.   Yes.
19     Q.   And then he began putting
20 his hand in my pants.
21     A.   That past part happened
22 first.  That was the first thing he did,
23 he put his hands down my pants.

Page 150

1      Q.   And that's not anywhere in
2  this statement to EDS either, is it?
3      A.   That he put his hands down
4  my pants?
5      Q.   Yes.
6      A.   He proceeded to take my
7  blouse out my pants.
8      Q.   Okay.  But nowhere does it
9  say he put his hands down your pants,
10 does it?
11     A.   Oh, I see what -- I didn't
12 put that in that statement.
13     Q.   Okay.  And nowhere in the
14 statement to EDS do you say that he
15 began rubbing your breast?
16     A.   No.
17     Q.   That was not in the
18 statement to EDS?
19     A.   It was not the statement to
20 EDS.
21     Q.   Why was it not in the
22 statement to EDS --
23     A.   I guess I --

Page 151

1      Q.   -- but in the statement to
2  the EEOC?
3      A.   I just neglected to put it
4  in there.
5      Q.   You forgot when you wrote
6  the written statement to EDS?
7      A.   No.  I was so traumatized
8  that when I was typing certain things I
9  guess in my mind when you type I meant
10 to put it and I'm typing and didn't
11 reread it before I sent it.
12     Q.   Did you ever tell anybody at
13 EDS that he had rubbed your breast?
14     A.   I think I told Twana.  I'm
15 not -- she's the only one I think was
16 told about the incident, what
17 happened.
18     Q.   You didn't tell Leslie or
19 Tara specifically that he rubbed your
20 breast?
21     A.   I'm not sure.  I think I
22 told Tara, but I'm not sure if I told
23 Leslie.

Page 152

1      Q.   You think you told Tara?
2      A.   Yes.
3      Q.   Okay.  You're not sure if
4  Leslie, who was investigating it the
5  human resources person, whether he
6  rubbed your breast or not?
7      A.   I don't think I -- I didn't
8  put it in there, no.
9      Q.   Besides Twana and Tara, who
10 you might have told, anybody else at EDS
11 that you would have told that he rubbed
12 your breast?
13     A.   No, I can't recall.
14     Q.   Now, I -- I just want to
15 make sure I understand every incident of
16 sexual harassment that you think
17 occurred.  We have talked about the
18 elevator incident; correct?  And I
19 understand that's an incident that you
20 believe was sexual harassment.
21     A.   Okay.
22     Q.   Were there any other -- and
23 we talked about Jamal Spencer.

38  (Pages 149 to 152)

# FREEDOM COURT REPORTING

Page 153

1    A.    Okay.
2    Q.    Right?
3    A.    Yes.
4    Q.    And that's not in any way
5  part of this lawsuit, is it?
6    A.    No.
7    Q.    I think you told me you
8  thought they handled that appropriately?
9    A.    Yeah.
10   Q.    Any other instances of
11  sexual harassment?
12   A.    No.
13   Q.    We've talked about them
14  all?
15   A.    Yes.
16   Q.    Okay.  By Mr. Williams or
17  anybody else at EDS?
18   A.    Yes.
19   Q.    As far as you know?
20   A.    Yes.
21   Q.    I want to talk to you a
22  little bit about why you believe EDS was
23  negligent in hiring Mr. Williams.  And

Page 154

1  we've talked a little bit about it I
2  think but I want to make sure I
3  understand exactly why you think they
4  were negligent in hiring and training
5  him.  Is it simply the -- you don't
6  believe that they performed an adequate
7  background check or is there something
8  else that you think they're negligent
9  for hiring him?
10   A.    For hiring, no, I can't
11  think of anything.
12   Q.    So hiring is just the
13  background check?
14   A.    Yes.
15   Q.    Anything else you can think
16  of?  Any other fact that you think EDS
17  was negligent in hiring Mr. Williams?
18   A.    As far as hiring him?
19   Q.    Yes.
20   A.    Initially bringing him on?
21   Q.    Correct.
22   A.    I don't know that process
23  what they've done as far as hiring him

Page 155

1  goes, what information he did that --
2  did that.  I don't know.
3    Q.    What about training or
4  supervision of Mr. Williams, what do you
5  believe -- why do you believe EDS was
6  negligent in training or supervising
7  Mr. Williams?
8    A.    Mainly that the training
9  that EDS has -- has given to
10  Mr. Williams wasn't good enough or
11  sufficient enough because the incident
12  did happen.
13   Q.    Is that the only reason why
14  you think -- is that what you're basing
15  the negligent training on is if they had
16  trained him properly that incident
17  wouldn't have happened?
18   A.    I think if they supervised
19  him and took the allegation seriously, I
20  think the outcome would have been
21  different.
22   Q.    Why do you think they didn't
23  take the allegation seriously?

Page 156

1    A.    I really believe that EDS
2  actually during this investigation just
3  basically I want to say pacify me into
4  doing a step-by-step process or acting
5  as if they took it seriously.  I don't
6  think they took it seriously.  I really
7  just -- I really feel they hadn't taken
8  it serious because he's still employed
9  there.  An allegation --
10   Q.    So you think that he
11  shouldn't be employed there?
12   A.    No, I don't think he should
13  have.
14   Q.    You think they should have
15  terminated him --
16   A.    Yes, I do.
17   Q.    -- based on your allegation?
18   A.    Yes, I do.
19   Q.    Even though there were no
20  witnesses?
21   A.    Okay.
22   Q.    True?
23   A.    True.

39  (Pages 153 to 156)

# FREEDOM COURT REPORTING

Page 157

1    Q.    And even though he denied
2  your allegations?
3    A.    Okay.
4    Q.    Okay. So I'm just asking,
5  you think even though there were no
6  witnesses and even though he denied the
7  allegations, he should have been
8  terminated?
9    A.    Yes, I do.
10    Q.    Nothing short of termination
11  would have been good enough?
12    A.    Nothing short of
13  termination, not of that magnitude.
14    Q.    Anything else you can -- I'm
15  just going to make sure I understand.
16  So the negligent training and
17  supervision is had they trained him,
18  Mr. Williams, properly, the incident
19  never would have occurred; correct?
20    A.    Correct.
21    Q.    And the negligent
22  supervision and training also entails
23  they didn't take it seriously because

Page 158

1  he's -- did not get terminated --
2    A.    Yes.
3    Q.    -- correct? Okay. Anything
4  else, any other facts that would support
5  your claim that EDS was negligent in
6  either training or supervising
7  Mr. Williams?
8    A.    I guess the best way to
9  describe that is that the training that
10  Mr. Williams received from EDS wasn't
11  taken serious by Mr. Williams. And if
12  by them having this training courses,
13  when someone brings cert --
14  some allegation towards someone they
15  need to take the severity of it and look
16  deep into the allegation instead of just
17  assuming or just taking his word over my
18  word.
19    Q.    So you feel they took
20  Mr. Williams' word over your word?
21    A.    I don't think they -- the
22  investigation was done fairly. I don't
23  think the investigation was done

Page 159

1  thoroughly.
2    Q.    Why?
3    A.    Why?
4    Q.    What -- what --
5    A.    He's still employed. He's
6  still there to --
7    Q.    So it wasn't thorough and it
8  wasn't proper because he's still there.
9  So if they'd done a proper
10  investigation, you believe he would have
11  been terminated?
12    A.    I don't know. I can't
13  answer that.
14    Q.    What -- what -- what more of
15  an investigation could EDS had done in
16  that instance? You've admitted there's
17  no witnesses so they can't really
18  interview any witnesses to find out what
19  you're saying is true or what
20  Mr. Williams is saying is true;
21  correct?
22    A.    Correct.
23    Q.    Okay. So what in

Page 160

1  addition -- what additional
2  investigation do you believe was
3  necessary and what would have -- have
4  revealed to change the results?
5    A.    I don't know what could have
6  been revealed, but I wasn't given any
7  information about it.
8    Q.    What do you mean?
9    A.    I wasn't given any --
10    Q.    They didn't tell you exactly
11  what they did on the investigation,
12  exactly what discipline. You wanted to
13  know exactly what they did?
14    A.    I mean, I didn't have to
15  know exactly what was -- I don't know
16  any of the details, but the way they
17  handled it, the way they handled me was
18  they brushed it under the rug, so to
19  speak.
20    Q.    How did they brush it under
21  the rug?
22    A.    They -- they -- they didn't
23  take it seriously.

40  (Pages 157 to 160)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

```
1      Q.   How did they not take it
2  seriously?
3      A.   It's hard to explain.  The
4  way I was treated after the incident.
5      Q.   By whom?
6      A.   Management.
7      Q.   Who?
8      A.   It was just -- it's hard to
9  explain.  It's really hard to
10 explain.   I need you to explain it
11 because you're saying that they didn't
12 take it seriously.  So I need to know in
13 your mind how did they not take it
14 seriously.  Did management treat you
15 differently?
16     A.   Training was -- the training
17 that Mr. Williams got on this wasn't
18 proper training.
19     Q.   What training is that?
20     A.   Sexual harassment.  This
21 right here (indicated) has been the same
22 since I've been here, same code of
23 business conduct.  We had to sign
```

Page 162

```
1  something.  We need -- EDS needs to do
2  some more thorough training, some
3  on-hands training, some one-on-one
4  training about this.  And people have --
5  need to be accountable for their action
6  and what they've done.  I'm --
7      Q.   You don't believe
8  Mr. Williams was held accountable?
9      A.   No, I don't think he was
10 held accountable.
11     Q.   Because he wasn't
12 terminated?
13     A.   No -- it's not even his
14 intimidation, his whole how he was
15 walking around, how he was acting.  He
16 was -- just felt like he had the need to
17 intimidate me.  I'm like okay, you
18 already done what you did.  And you
19 still walk around here like you crazy.
20 I mean, it just the way he -- he made me
21 feel behind that.
22     Q.   Okay.  I understand that.
23 And I understand you're talking about
```

Page 163

```
1  Mr. Williams.  I'm talking about EDS.
2      A.   EDS -- EDS whole attitude
3  is -- okay.  Jarvis Robinson.  Prior to
4  this, oh, I didn't know what was going
5  on.  I didn't know -- how you operation
6  manager and you don't know what is going
7  on in your center.
8      Q.   Did she not know that the
9  incident had happened or did she not
10 know --
11     A.   She stated to me she didn't
12 even -- she stated to me that she didn't
13 know the incident happened.  Then she
14 stated to me on another occasion she
15 thought it was dealt with.  That was
16 it.
17     Q.   Well, did you report the
18 incident to Jarvis?
19     A.   I reported to Tara.  Tara
20 supposed to -- or did report it to
21 Jarvis.
22     Q.   How do you know Tara
23 reported --
```

Page 164

```
1      A.   Tara told me.
2      Q.   Do you know what EDS' policy
3  is with respect to this type of
4  complaint investigation whether it's to
5  be kept confidential?
6      A.   It's supposed to be between
7  the parties or confidential across the
8  board, I don't know.
9      Q.   That they have a policy that
10 when there is a complaint in an
11 investigation that the investigation and
12 the complaint are to be kept
13 confidential as much as possible to
14 protect --
15     A.   From the parties?
16     Q.   From the parties, from --
17     A.   I didn't know that.
18     Q.   -- people who don't have a
19 need to know.
20     A.   From the parties, I didn't
21 know that.
22     Q.   Okay.  What about from
23 random people?
```

41  (Pages 161 to 164)