# FREEDOM COURT REPORTING

Page 165

1    A.   I knew about that.
2    Q.   So that there is a policy
3  that the complaint and investigation are
4  to be kept confidential from just
5  anybody?
6    A.   I don't know the complaint.
7  I know the confidentiality.
8    Q.   What do you know about the
9  confidentiality?
10    A.   Confidentiality is I -- I
11  tell Tara. Tara tells Jarvis and Jarvis
12  do whatever she does with it.
13    Q.   Okay.
14    A.   And what I mean by that is,
15  she escalates it.
16    Q.   Okay. And it -- now, by the
17  time Tara -- do you know when Tara told
18  Jarvis?
19    A.   No.
20    Q.   So by the time Tara had told
21  Jarvis, you may have already reported it
22  to Leslie Liebman; correct?
23    A.   I don't know.

Page 166

1    Q.   It could have happened --
2    A.   Could.
3    Q.   -- that way?
4    A.   Could.
5    Q.   Okay. And if Leslie Liebman
6  was already -- had already been
7  contacted and was already conducting an
8  investigation, would that be
9  appropriate?
10    A.   No.
11    Q.   Leslie Liebman, the human
12  resources person, shouldn't be the one
13  conducting the investigation?
14    A.   Oh, she -- she should be
15  investigate it, but --
16    Q.   Do you think she should be
17  reporting everything she does to Ms.
18  Robinson?
19    A.   She did, yes.
20    Q.   You know she did?
21    A.   No. No. Take it back.
22  Take that back. She actually -- I don't
23  know what Leslie did. I think she

Page 167

1  should have.
2    Q.   You think she should have
3  reported it to Ms. Robinson?
4    A.   Yeah.
5    Q.   Why?
6    A.   'Cause she's the operation
7  manager.
8    Q.   Okay. But you don't know if
9  that's EDS' policy?
10    A.   No.
11    Q.   Okay. Now, you -- I want to
12  go back to EDS not taking it seriously
13  and you said something about the way
14  management treated you. Could you tell
15  me what you meant by that? Has Tara
16  treated you any differently?
17    A.   I don't know. I don't
18  know.
19    Q.   You'd be the only one that
20  would know.
21    A.   No. I -- I -- it was a lot
22  going on, I don't know, in my head, my
23  mind. Everything was -- I don't know.

Page 168

1    Q.   As you sit here today, is
2  Tara today treating you any
3  differently?
4    A.   No.
5    Q.   What about Jarvis
6  Robinson?
7    A.   Yes.
8    Q.   How is she treating you
9  differently?
10    A.   She's -- prior to that, she
11  was nice, friendly, whatever, hello, how
12  you doing. Now it's more she looks at
13  me, just don't say anything. I'm not
14  the type that needs that, but she's
15  just -- her whole attitude is -- is
16  totally different.
17    Q.   You have to tell me what her
18  attitude is. I can't get in your
19  mind --
20    A.   Her attitude is -- is
21  nasty.
22    Q.   How is she nasty to you?
23    A.   Well, nonchalant nasty.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 169

1  Just --
2      Q.   So she doesn't speak to you
3  as much?
4      A.   Right.
5      Q.   She hasn't said anything
6  inappropriate to you, has she?
7      A.   No.
8      Q.   And she hasn't yelled at you
9  or been rude to you outright, has she?
10     A.   No.
11     Q.   Okay.  Just she doesn't
12  speak to you as often as she did
13  before?
14     A.   Right.
15     Q.   Anyone else in management
16  that you feel is treating you
17  differently?
18     A.   No.
19     Q.   Now, in your complaint --
20  let's go ahead and mark it.
21
22     (Defendants' Exhibit No. 9 was
23      marked for identification.)

Page 170

1
2      Q.   Hand you what's been marked
3  as Exhibit No. 9.  And if you'd look on
4  Page 3, Paragraph 11, it states that you
5  were subjected to sexually suggested
6  remarks and derogatory comments as well
7  as improper physical contacts by
8  defendant Jeff Williams and others.  Did
9  anybody besides Mr. Williams physically
10  contact you inappropriately at EDS?
11     A.   No.
12     Q.   So it's just Jeff
13  Williams --
14     A.   Yes.
15     Q.   -- that you contend touched
16  you inappropriately?
17     A.   Yes.
18     Q.   Okay.  And you stated that
19  the sexually suggested remarks and
20  derogatory comments, have we talked
21  about all those?
22     A.   Yes.
23     Q.   There's none other that you

Page 171

1  can think of?
2      A.   No.
3      Q.   That anybody else made --
4      A.   I can't --
5      Q.   -- derogatory comments or
6  sexually suggestive comments to you?
7      A.   No, I can't think of any.
8      Q.   Okay.  And we've talked in
9  Count 2 which is -- starts at Paragraph
10  20, we've been talking about how you
11  believe EDS was negligent in hiring,
12  training and supervising Mr. Williams;
13  correct?
14     A.   Yes.
15     Q.   Okay.  And I think I
16  understand the hiring and the training.
17  I want to talk specifically about the
18  supervising.  How do you think EDS was
19  negligent in actually supervising Mr.
20  Williams?
21     A.   There was -- I think they
22  was negligent because -- ask that
23  question again.  I'm sorry.

Page 172

1      Q.   Sure.  We've talked about
2  why you believe EDS was negligent in
3  hiring Mr. Williams and training him.
4  And now I just want to know supervising,
5  is it any different than what you've
6  already told me?  How could they have
7  supervised him better?  How were they
8  negligent in supervising Mr. Williams is
9  what I'm asking.
10     A.   Rephrase that.
11     Q.   Sure.  Part of your claim
12  against EDS is that they were negligent
13  in supervising Mr. Williams.  I want to
14  know how they were negligent.
15     A.   When they initially hired
16  him, we talked about that.
17     Q.   Right.  Okay.
18     A.   Okay.
19     Q.   Anything else?
20     A.   No.
21     Q.   Okay.  The next cause of
22  action you have is wanton hiring and
23  training and supervision.  Anything

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 173

1  different than what we've already talked
2  about that would support that claim or
3  that cause of action?
4       A.   Which is wantonness?
5       Q.   It's a legal term.  Are
6  there any other -- have you not -- are
7  there any additional facts that you
8  think would support this cause of action
9  as opposed to the one we've already
10  talked about?
11      A.   Wanton, what is --
12      Q.   The just simple negligent?
13      A.   -- the wanton?
14      Q.   I'm not your lawyer.  This
15  is your complaint.
16      A.   Okay.  No, we've discussed
17  it.
18      Q.   Okay.  There's nothing
19  additional, no additional facts?
20      A.   No.
21      Q.   Okay.  Now, the next cause
22  of action is outrage and you allege that
23  defendant's conduct was extreme and

Page 174

1  outrageous.  I want to know what conduct
2  of EDS specifically was extreme and
3  outrageous?
4       A.   EDS?
5       Q.   Yes.
6       A.   The way they handled the
7  situation.
8       Q.   And you're talking about the
9  elevator incident specifically?
10      A.   Even -- even after the
11  elevator incident, yes.
12      Q.   And how do you think they
13  handled that, what was wrong with how
14  they handled that?
15      A.   How they handled that.
16      Q.   Is it because he's not
17  fired?
18      A.   No.  The investigation
19  process.
20      Q.   What part of the
21  investigation process?
22      A.   I don't know what went on in
23  the investigation so I can't tell you

Page 175

1  what part of it.
2       Q.   Okay.  So it's simply
3  because you don't know --
4       A.   Exactly.
5       Q.   -- what's happened?
6       A.   What's the outcome other
7  than --
8       Q.   Well, you were told what the
9  outcome was, weren't you?
10      A.   I was -- only thing I was
11  told was we didn't find anything.
12      Q.   Right.  That it was
13  unsubstantiated?
14      A.   Right.
15      Q.   That there was no witnesses
16  and you said one thing and he said
17  something else; correct?
18      A.   Basically, last statement
19  was we didn't find any supporting.
20      Q.   Right.
21      A.   That's all.
22      Q.   Okay.  Anything else -- any
23  other conduct by EDS that you thought

Page 176

1  was extreme and outrageous besides the
2  way they --
3       A.   No.
4       Q.   -- handled the
5  investigation?
6       A.   Other than him still being
7  there.
8       THE REPORTER:  I'm sorry?
9       Q.   Pardon?
10      A.   Other than him still being
11  there, no.
12      Q.   So the fact that he wasn't
13  terminated?
14      A.   Well, yes.
15      Q.   Okay.  Anything else?
16      A.   No.
17      Q.   Can you tell me what
18  emotional distress you --
19      A.   I was --
20      Q.   Pardon me.  -- you claim to
21  have suffered because of EDS' outrageous
22  conduct?
23      A.   Anxiety attacks, panic

44  (Pages 173 to 176)

# 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1  attacks, paranoia, humiliation. I was
2  deprived of sleep. I wasn't even
3  comfortable in my work environment
4  anymore. Can't trust anybody around me,
5  just -- can't ride the elevator alone.
6      Q.  You said you have anxiety
7  attacks. Have you ever had anxiety
8  attacks prior to February of 2005?
9      A.  No.
10     Q.  Do you still have anxiety
11  attacks?
12     A.  Periodically.
13     Q.  How often?
14     A.  Well, I had it actually the
15  month of February.
16     Q.  Of '05?
17     A.  '6.
18     Q.  Okay.
19     A.  I had one in February '06.
20  Was the year anniversary, actually the
21  year after the incident happened.
22  That's probably about around that
23  time.

Page 178

1      Q.  Is that the last one that
2  you had?
3      A.  Yes.
4      Q.  Okay. How often did you
5  have them before that?
6      A.  Before that?
7      Q.  Uh-huh (affirmative
8  response).
9      A.  Oh, after the '05 incident,
10  I was having it quite often.
11     Q.  What do you mean by quite
12  often?
13     A.  Seems like two, three times
14  a week and I'd have to actually leave.
15     Q.  And you'd leave work?
16     A.  Yes.
17     Q.  And your supervisor allowed
18  that?
19     A.  Yes. I had a panic attack.
20  Paramedics had to be called on the
21  job.
22     Q.  When did you have a panic
23  attack?

Page 179

1      A.  I don't recall the time, but
2  I had one and had to be driven home.
3      Q.  When was that?
4      A.  I don't recall.
5      Q.  This year?
6      A.  Summer. No, it's last
7  year.
8      Q.  Is that the last panic
9  attack you've had?
10     A.  No, I had one in '06,
11  February. I'm sorry. '06.
12     Q.  So is there a difference
13  between an anxiety attack --
14     A.  No.
15     Q.  -- and a panic attack --
16     A.  No. I thought --
17     Q.  -- or are they the same
18  thing?
19     A.  They're different.
20     Q.  How are they different?
21     A.  Panic attack last you -- the
22  panic I was just afraid, just frozen.
23  Anxiety is like I'm hyperventilating.

Page 180

1      Q.  Did anything happen
2  specifically in February '06 to make you
3  hyperventilate or was it just that it
4  was the anniversary?
5      A.  Well, it was around the
6  anniversary.
7      Q.  But was there anything else
8  specific that had happened?
9      A.  No.
10     Q.  What about the panic attack,
11  anything specific set it off or is it
12  just being at work?
13     A.  No, it wasn't being at work.
14  It was just -- just sitting there. I
15  don't know. During the summer, last
16  summer sometime is one of the times he
17  was talking to Annie or whatever. And I
18  sit there and I cringe and I just
19  started shaking. And I --
20     Q.  And when was the last panic
21  attack you had, was that last summer?
22     A.  Yes.
23     Q.  Do you take anything for

45  (Pages 177 to 180)

# FREEDOM COURT REPORTING

Page 181

1  your anxiety?
2      A.   I just took Lexapro for
3  antidepressant supposed to calm me.
4  Some cloc -- I can't say the word.  It
5  start with a "C."
6      Q.   Okay.  What about for panic
7  attacks?
8      A.   No.
9      Q.   You said you're also
10 paranoid now?
11     A.   I was paranoid.
12     Q.   Okay.  For how long did that
13 last?
14     A.   Oh, that lasted good seven,
15 eight months.
16     Q.   But you don't feel like
17 you're paranoid now as --
18     A.   No.
19     Q.   When you say you were
20 humiliated, how?
21     A.   Just the -- just had -- one
22 of the coworkers made a remark about the
23 incident that I know I didn't say

Page 182

1  anything to anybody about, and she made
2  a remark -- two -- two remarks actually.
3  One of them was when I had an ice pack
4  on my shoulder and a heating pad on my
5  back because I had some torn, whatever,
6  cartilage, ligament, whatever the doctor
7  said.  I can't remember.  And she came
8  over and she asked me why did I have it
9  on.  And I told her I said it's an
10 incident that happened last year and it
11 hadn't healed.  She made the comment you
12 shouldn't have fought him.  You just
13 have just gave him some.  You shouldn't
14 have fought him off in the elevator.
15 You should have just gave him some.
16     Q.   Who was that?
17     A.   Laura.  Laura McNeil.
18     Q.   And you're saying you never
19 spoke to --
20     A.   No.
21     Q.   -- Ms. McNeil about the
22 incident?
23     A.   Never.  Never spoke to her

Page 183

1  about the incident.
2      Q.   Did you report her statement
3  to anyone?
4      A.   No.
5      Q.   Do you know if she spoke to
6  somebody you had talked to about the
7  incident?
8      A.   I don't know.  I know she's
9  friends with Brenda.
10     Q.   Okay.  So she might have
11 spoken to somebody you actually told?
12     A.   Right.
13     Q.   Okay.  And you said there
14 was something else?
15     A.   Oh, Debra.  The day of the
16 incident actually.  She was on a break
17 and I was talking to her about it and I
18 was like, Debra Adkins, and I was
19 talking to her about it.  And she said,
20 she made a statement, she said, you
21 might want to give it up to him and get
22 some of that cobweb off of your -- she
23 said the personal word of it --

Page 184

1      Q.   Are you and Ms. Adkins
2  friends?
3      A.   -- said cat.  Yes.
4      Q.   Did you report that?
5      A.   No.
6      Q.   And you'd actually talked to
7  Ms. Adkins --
8      A.   That day.
9      Q.   -- about the incident?
10     A.   Yes.
11     Q.   Any other thing that you say
12 contributed to your humiliation?
13     A.   I can't think of it.
14     Q.   Had you ever had anything
15 like this happen before?
16     A.   No.
17     Q.   Never had been in an abusive
18 relationship?
19     A.   No.
20     Q.   Hadn't been raped or
21 attacked?
22     A.   No.
23     Q.   You said that you were

46 (Pages 181 to 184)

# FREEDOM COURT REPORTING

Page 185

1  deprived of sleep?
2      A.   Oh, yes.
3      Q.   For how long?
4      A.   Oh, I know it had to been up
5  until -- still off and on now, but
6  constantly like seven, eight months,
7  nine months tops.
8      Q.   And you got Ambien?
9      A.   Yes.
10      Q.   Did you ever take Ambien
11  before this?
12      A.   No.
13      Q.   Any other thing, the
14  emotional distress, anything that has
15  happened that you claim to be the
16  emotional stress that you suffered?
17      A.   No.
18      Q.   Just anxiety, panic attacks,
19  paranoia, humiliation, deprived of
20  sleep.  You said you're not comfortable
21  in the work environment?
22      A.   Right.  Shoulder pain.
23      Q.   The shoulder pain?

Page 186

1      A.   Yes.
2      Q.   When did you see a doctor
3  about that?
4      A.   Actually, initially saw
5  Rachel McKinney back in February of last
6  year.  She sent me to a neurologist.
7      Q.   To a neurologist?
8      A.   Yes.
9      Q.   Okay.
10      A.   On -- on the 17th of
11  February of '05.
12      Q.   And who was that?
13      A.   Paul Miller.
14      Q.   And what did he do?
15      A.   He did a ECG or E something
16  on that.
17      Q.   And what did he find,
18  anything?
19      A.   I think he found something.
20  He gave me something.  Some
21  anti-inflammatory and he told me to come
22  back in six months.  And I came back in
23  six months and pains was still there.

Page 187

1  And he said he has to schedule an MRI.
2      Q.   Have you had an MRI?
3      A.   Yes.  Two.
4      Q.   And?
5      A.   And I don't know --
6      Q.   You don't know the
7  results?
8      A.   Yeah, I know the results.  I
9  don't know the terminology that they
10  used.
11      Q.   In layman's terms.
12      A.   Layman's terms, something is
13  torn in between that.  It was swelling.
14      Q.   Had you done anything
15  between February of '05 and when was the
16  MRI?
17      A.   The MRI I had November.  I
18  had two.  I don't recall the dates.  But
19  I had --
20      Q.   So November of '05?
21      A.   And -- no.  January this
22  year, '06, and I think it was one last
23  year.

Page 188

1      Q.   Okay.
2      A.   X-ray, MRI, one of the
3  two.
4      Q.   And it's your contention it
5  happened because of what was on the
6  elevator?
7      A.   Because I pulled -- tore
8  cartilage or ligament or something.  It
9  was swelling.  Said releasing fluids in
10  there.
11      Q.   And you hadn't done anything
12  between --
13      A.   No.
14      Q.   -- the visits that would
15  cause that?
16      A.   No.
17      Q.   Okay.  And my understanding
18  is you filed a worker's comp claim --
19      A.   Yes.
20      Q.   -- about a year after the
21  incident?
22      A.   Yes.  I didn't know about it
23  when I was going through physical

47  (Pages 185 to 188)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 189

1  therapy or something they was telling
2  me. Dr. Barrington's office, she stated
3  she was going to -- I need to file a
4  workman's comp claim on it. I didn't
5  know. I was -- I just paying it.
6      Q.   And EDS didn't try to stop
7  you from filing a worker's comp claim,
8  did they?
9      A.   Not that I'm aware.
10     Q.   In fact you went to your
11 supervisor Tara Relf and she helped you
12 fill out the forms?
13     A.   No. She just told me where
14 to go to get it.
15     Q.   Okay. Did she have to fill
16 anything out?
17     A.   I think she did. I don't
18 know.
19     Q.   What happened with that?
20     A.   They denied it because they
21 stated that it was on the elevator,
22 something.
23     Q.   Okay. Did you appeal the

Page 190

1  denial?
2      A.   No. I didn't -- didn't know
3  I could.
4      Q.   And do you know who made the
5  decision?
6      A.   No.
7      Q.   Okay. Is it your
8  understanding that EDS has a third party
9  administrator for its worker's comp?
10     A.   No, I didn't.
11     Q.   Okay. How did you find out,
12 who told you that your worker's comp had
13 been denied?
14     A.   They sent a letter.
15     Q.   Who's they?
16     A.   Someone out of Georgia from
17 the workman's comp.
18     Q.   Okay. It wasn't from EDS?
19     A.   I'm not sure.
20     Q.   Do you have that
21 documentation?
22     A.   I don't know. I may. I
23 don't think I have it on me, but I have

Page 191

1  it. I'll give it to my attorney. He'll
2  get it to you.
3      Q.   Who all have you seen as a
4  result of what you claim to have
5  happened at EDS? And by seen, I mean
6  doctors or counselors.
7      A.   Vonceil Smith, Paul Miller.
8  You said for the incident or just
9  purely --
10     Q.   First as a result of the
11 incident.
12     A.   Okay. Dr. Barrington,
13 McKinney, physical therapy at A -- AOS
14 which is Dr. Barrington's office, a
15 chiropractor. I think it's Peavy.
16     Q.   What's his name again?
17     A.   Dr. Peavy. P-E-A-V-Y. I
18 think that's it.
19     Q.   Okay. We've talked about
20 Ms. Smith. She's a psychiatrist.
21     A.   Psychiatrist.
22     Q.   And you stopped seeing her
23 in November?

Page 192

1      A.   Yes.
2      Q.   And what medication did she
3  give you?
4      A.   She actually can't
5  prescribe. Another doctor in there
6  prescribe some -- the cloc -- start with
7  a "C" and Lexapro. He put me on some
8  Zoloft that was too strong. Ambien.
9      Q.   Okay. Did you see this
10 other doctor?
11     A.   Yes.
12     Q.   What was his name?
13     A.   I can't recall his name.
14     Q.   How often did you see him?
15     A.   I think I saw him a total of
16 three times.
17     Q.   Were they counseling
18 sessions as well or was it --
19     A.   Yes.
20     Q.   -- just --
21     A.   Counseling.
22     Q.   Have you seen him since
23 November of '05?

48  (Pages 189 to 192)

# FREEDOM COURT REPORTING

Page 193

```
1      A.   No.
2      Q.   And I think you said that
3  your -- I guess your primary care
4  physician has been the one giving you
5  Lexapro now?
6      A.   Yes.  He's in Baptist
7  East.
8      Q.   Zest?
9      A.   East.
10     Q.   Okay.  How long has he been
11 prescribing Lexapro?
12     A.   I just begin new insurance.
13 Old primary so this year, April.
14     Q.   Was there a time frame you
15 weren't taking Lexapro or any other
16 antidepressant?
17     A.   No.  No.  I have Lexapro --
18 I have a prescription for Lexapro so on
19 file.
20     Q.   Okay.  Paul Miller?
21     A.   Neurologist.
22     Q.   Is he the person you saw for
23 your shoulder?
```

Page 194

```
1      A.   Yes.
2      Q.   When's the last time you saw
3  him?
4      A.   Well, I saw Barrington for
5  my shoulder.  Miller was ruling out MRI,
6  anything.  He's neurologist.
7      Q.   Okay.  So he was --
8      A.   I saw him in January.
9      Q.   So he's the person who did
10 the MRI?
11     A.   One of them, yes.  Stephen
12 Barrington did the other one.
13     Q.   And who's the one that said
14 you had something torn?
15     A.   Barrington.
16     Q.   What did Paul Miller say?
17     A.   He ruled out any neurology
18 damage and he referred me to
19 Barrington.
20     Q.   So you saw Miller first?
21     A.   I saw Miller first of last
22 year and they did an ECG on the
23 shoulder.
```

Page 195

```
1      Q.   And didn't find anything --
2      A.   No.  He wasn't specialized
3  in that.
4      Q.   What about McKinney, who was
5  that?
6      A.   She was my primary care.
7      Q.   When did you see her?
8      A.   I saw her February '05.  I
9  don't know the exact date.  But it was
10 like 13th or the 14th.
11     Q.   Prior to seeing Dr. Smith?
12     A.   No -- yes, prior to Smith.
13     Q.   Okay.  And what did Dr.
14 McKinney do for you in February of
15 '05?
16     A.   Give me some ibuprofens and
17 some Ambien.  Because I was explaining
18 to her I wasn't able to sleep.
19     Q.   Have you seen her since for
20 anything as a result of the incident?
21     A.   No.
22     Q.   Okay.  I assume you might
23 see her for something else, but nothing
```

Page 196

```
1  related to this incident?
2      A.   Right.
3      Q.   Okay.  You said you had some
4  physical therapy.  How often and when?
5      A.   Started it was three days a
6  week.
7      Q.   When was that?
8      A.   Started in May, June this
9  year.
10     Q.   Of '06?
11     A.   Yes.
12     Q.   Hadn't had physical therapy
13 before then?
14     A.   No.
15     Q.   Okay.  Are you currently?
16     A.   I have a -- physical
17 therapy?
18     Q.   Physical therapy.  How often
19 now?
20     A.   I have to do it three days a
21 week.
22     Q.   Where do you do it?
23     A.   Fluctuates.  They gave me --
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 197

1  I couldn't afford it because it was too
2  expensive.  Gave me a chart and traction
3  and everything to do it at home, make
4  sure do it at home.
5      Q.   Do you still have medical
6  benefits through EDS?
7      A.   Yes.
8      Q.   Now, you said something
9  about a chiropractor.  When did you see
10 a chiropractor?
11     A.   I saw him in January '06.
12     Q.   Only once?
13     A.   Yes.
14     Q.   Why only once?
15     A.   Because the swelling was in
16 my neck so high that he stated to me
17 that I need to see a doctor to get the
18 swelling down.
19     Q.   Did he refer you to someone?
20     A.   No.  I had someone.
21     Q.   Did you see him before or
22 after you saw the neurologist Miller?
23     A.   Saw Miller '05 and I just

Page 198

1  went to a chiropractor '06, January
2  '06.
3      Q.   So you didn't see the
4  neurologist in '06?
5      A.   Yes, I did.  I saw one in
6  '05.
7      Q.   Okay.
8      A.   Saw -- when the swelling in
9  my shoulders, the anti-inflammatory
10 wasn't -- wasn't taking it.  I went to
11 see a chiropractor because I thought it
12 was tension.
13     Q.   Uh-huh (affirmative
14 response).
15     A.   And he did an X-ray and he
16 stated to me I have swelling.  Then I
17 went back to Miller.
18     Q.   Okay.  So you saw the
19 chiropractor first and then you went
20 back to Miller?
21     A.   Yes.
22     Q.   Okay.  Have you been back to
23 the cry -- chiropractor since?

Page 199

1      A.   No.
2
3      (Defendants' Exhibit No. 10 was
4      marked for identification)
5
6      Q.   You've been handed Exhibit
7  No. 10.  Do you recognize this
8  document?
9      A.   Yes.
10     Q.   What is it?
11     A.   From my psychiatrist,
12 Vonceil Smith.
13     Q.   Okay.  And she's actually a
14 licensed psychologist --
15     A.   Yes.
16     Q.   -- not a psychiatrist?
17     A.   Yes.
18     Q.   Okay.  And this is dated
19 March 14, 2005?
20     A.   Uh-huh (affirmative
21 response).
22     Q.   Is that about the time you
23 started seeing her?

Page 200

1      A.   Yes.
2      Q.   Okay.  Why did she write
3  this note?
4      A.   Because of my anxiety and
5  panic attacks.
6      Q.   Did you ask her to write the
7  note?
8      A.   No.
9      Q.   Okay.  She handed you the
10 note --
11     A.   No, she did not.  I guess
12 during our sessions and the medicine
13 that was prescribed to me and she -- I
14 don't know why she did it.  But she --
15 based off of how I was acting,
16 responding.  She was questioning me
17 basically about the workplace and she
18 wrote the note.
19     Q.   Okay.  Did you ever give the
20 note to anybody?
21     A.   Yes.  I gave it to Tara.
22     Q.   Okay.  And what was Tara's
23 response?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 201

1    A.    Just filed it.
2    Q.    And did you ever have to
3    take some time off work because of the
4    anxiety attacks or panic attacks?
5    A.    Yes.
6    Q.    Okay.  And EDS let you take
7    that time off?
8    A.    Yes.
9    Q.    She said that your
10   medication regiment.  What was your
11   medication regiment in March of '05?
12   A.    That was the Ambien and
13   cloc -- start with a "C", some other
14   stuff, antidepressants.
15   Q.    I understand you've been on
16   different antidepressants.  Have you
17   ever been on more than one at a time?
18   A.    No.
19   Q.    Okay.  And you would take
20   the Ambien at night to sleep?
21   A.    Yes.
22   Q.    You didn't take it during
23   the day, did you?

Page 202

1    A.    No.
2    Q.    Okay.  And the
3    antidepressants, how often did you take
4    that?
5    A.    She had me take those once a
6    day.
7    Q.    Okay.  And were there any
8    side effects from the antidepressants?
9    A.    Not that I noticed.  I don't
10   know.  Maybe groggy.
11   THE REPORTER:  Maybe what?
12   A.    I'm sorry.  Groggy.
13   Q.    Did you ever have to leave
14   work because you were too groggy to
15   work?
16   A.    Yes.
17   Q.    When?  How often?
18   A.    Not often.  I don't
19   recall.
20   Q.    More than once that you left
21   work because you were too groggy?
22   A.    From the medicine?
23   Q.    Yes.

Page 203

1    A.    Probably, yes.
2    Q.    Ten times, less than ten?
3    A.    No, it's not that.  No more
4    than two, three times probably.
5    Q.    And EDS always let you take
6    that time off?
7    A.    Sick time.
8    Q.    Sick time; correct?
9    A.    Yes.  Some vacation.  Took
10   vacation time off.
11   Q.    Okay.
12
13   (Defendants' Exhibit No. 11 was
14       marked for identification.)
15
16   Q.    This appears -- I mean,
17   you've got Exhibit No. 11 and it's
18   something I believe you produced to us.
19   A.    Uh-huh (affirmative
20   response).
21   Q.    It appears to be some sort
22   of pharmacy history?
23   A.    Right.

Page 204

1    Q.    Okay.  And this is your
2    pharmacy history for 2005?
3    A.    Uh-huh (affirmative
4    response).
5    Q.    Okay.  Can you tell me what
6    the first prescription fluconazole is
7    for?
8    A.    I don't know.  That's
9    from -- I think it was like something
10   like a Diflucan --
11   Q.    Okay.  This wasn't --
12   A.    -- like flu --
13   Q.    That --
14   A.    No, that's my GYN, the first
15   one.
16   Q.    Okay.  So Dr. Saucer is your
17   OB/GYN?
18   A.    Correct.
19   Q.    So anything he's on here for
20   wasn't as a result of the --
21   A.    No.
22   Q.    -- alleged incident at EDS?
23   A.    No.

51  (Pages 201 to 204)

# FREEDOM COURT REPORTING

Page 205

1    Q.   Okay.  And then you've got
2  Rachel McKinney, the ibuprofen?
3    A.   Correct.
4    Q.   Okay.  And she's your
5  primary care physician?
6    A.   Correct.
7    Q.   Okay.  And also the
8  Ambien?
9    A.   Yes.
10    Q.   Okay.  And it looks like she
11  didn't prescribe anything else for you
12  in 2005; correct?
13    A.   Correct.
14    Q.   Had she pres -- prescribed
15  for you in 2006?
16    A.   She's not my primary care
17  physician.  She's out of network, so I
18  had to find another one.
19    Q.   Who's your primary care
20  physician now?
21    A.   Baptist East.
22    Q.   Who?
23    A.   The Baptist East.

Page 206

1    Q.   Oh.  But do you have a
2  specific doctor?
3    A.   No.
4    Q.   Do you have a pharmacy
5  history printout for 2006?
6    A.   No.
7    Q.   Can you get one?
8    A.   Yes.
9    Q.   I'd ask that you get one and
10  provide to your attorney --
11    A.   Okay.
12    Q.   -- so he can give it to me.
13  Then you have Dr. Hall?
14    A.   Yes, Behavior Medicine.
15    Q.   Is he the psychiatrist that
16  worked with Dr. Smith?
17    A.   Yes.  Yes.
18    Q.   Okay.  And this has
19  Clonazepam?
20    A.   Yes.
21    Q.   In March of '05?
22    A.   Uh-huh (affirmative
23  response).

Page 207

1    Q.   Okay.  Was that an
2  antidepressant?
3    A.   I think that was the -- for
4  antipanic, antidepressant.
5    Q.   For panic or --
6    A.   Panic.  The panic.
7    Q.   That was panic?
8    A.   Yes.
9    Q.   Okay.  So that was not an
10  antidepressant?
11    A.   No.
12    Q.   Okay.  Then you have Dr.
13  Saucer again, who's --
14    A.   Yes.
15    Q.   -- the OB/GYN that's not
16  related to this?
17    A.   That's correct.
18    Q.   And you have in June of '05
19  Dr. Hall prescribing Clonazepam again?
20    A.   Okay.
21    Q.   And that's the anxiety,
22  panic attack?
23    A.   Yes.

Page 208

1    Q.   Okay.  There doesn't appear
2  to be any antidepressant on here?
3    A.   Plus he gave me samples.
4    Q.   Okay.  Do you know what
5  samples he provided?
6    A.   Lexapro and Zoloft.
7    Q.   Have you ever gotten a
8  prescription for either one of those?
9    A.   No.
10    Q.   Even today you don't have a
11  prescription?
12    A.   No, I have -- have a
13  prescription for it.
14    Q.   And who gave you that
15  prescription?
16    A.   Baptist East.
17    Q.   And when did you get that
18  prescription written?
19    A.   She gave me that August this
20  year.
21    Q.   So prior to August of '06,
22  you didn't have a prescription for an
23  antidepressant, you just had samples?

52  (Pages 205 to 208)

# FREEDOM COURT REPORTING

Page 209

1      A.   I had -- I had a
2  prescription but I had another sample
3  that I didn't need to get the
4  prescription filled.
5      Q.   Okay.  When did you
6  originally get the prescription?
7      A.   He gave that back to me back
8  in June of last year.
9      Q.   June of '05?
10     A.   Yes.
11     Q.   And you say he.  Who?
12     A.   Dr. Hall.
13     Q.   But you never had it
14 filled?
15     A.   No.  'Cause he gave me
16 enough samples.
17     Q.   And what was that
18 prescription for?
19     A.   Lexapro.
20     Q.   And currently I think from
21 earlier you're taking Ambien and
22 Lexapro --
23     A.   Right.

Page 210

1      Q.   -- and that's it?  Now, you
2  also made in your complaint an
3  allegation, a cause of action for
4  assault and battery.  Is that against
5  Mr. Williams, against EDS, or against
6  both?
7      A.   Mr. Williams.
8      Q.   Mr. Williams.  It's not
9  against EDS?
10     A.   No.
11     Q.   What about invasion of
12 privacy, is that against Mr. Williams or
13 against EDS or both?
14     A.   Both.
15     Q.   Okay.  How did EDS invade
16 your privacy?
17     A.   Public humiliation and the
18 shame basically and the uncomfortable
19 work environment that I incurred after
20 that.  Plus, they allowed -- I feel they
21 allowed it to go on and continue it to
22 go on.
23     Q.   Allowed what to continue to

Page 211

1  go on?
2      A.   The hostile environment that
3  I'm in.
4      Q.   And what's that hostile
5  environment that you're in?
6      A.   The looks, the
7  intimidation.
8      Q.   And by intimidation, it's
9  all nonverbal and noncontact?
10     A.   Right.
11     Q.   Okay.  Anything else that
12 EDS has done to invade your privacy?
13     A.   Pretty much allowing it to
14 go on.
15     Q.   And by that you mean, it's
16 all after February of '05?
17     A.   Right.
18     Q.   Did they invade your privacy
19 prior to February of '05?
20     A.   No.
21     Q.   And when did they start
22 invading your privacy?
23     A.   By allowing it after '05,

Page 212

1  just allowing it to go on.
2      Q.   So by -- and by that I
3  mean -- I'm trying to pin down by
4  allowing it to go on.  I -- it is the
5  intimidation that you're talking about;
6  correct, or is it something else?
7      A.   The intimidation and
8  humiliation the -- just the
9  uncomfortable work environment.
10     Q.   How have they -- okay.  How
11 have they allowed the humiliation to go
12 on?  You haven't reported --
13     A.   Yes, I reported to Tara
14 the --
15     Q.   What did you report?
16     A.   -- intimidation that
17 Mr. Williams done.
18     Q.   All by Mr. Williams?
19     A.   Yes.
20     Q.   Okay.  And you're not aware
21 of what, if any, investigation EDS did
22 with respect to that?
23     A.   Well, yes, I am.  She stated

53  (Pages 209 to 212)

# FREEDOM COURT REPORTING

## Page 213

1 to me there was nothing she could do
2 about it as long as, you know, he's at
3 a -- he's at a distance or something.
4 She said just deal with it.
5    Q.   Okay.  Do you know if an
6 investigation took place?
7    A.   No, it didn't take place.
8       MS. VIDEOGRAPHER:  Ms.
9 Jacobs, I'm sorry, I need to change
10 tapes.
11      MS. JACOBS:  That's okay.
12      MS. VIDEOGRAPHER:  Off the
13 record.  We conclude Tape 3.  The time
14 is 12:49.
15
16    (A brief recess was taken.)
17
18      MS. VIDEOGRAPHER:  Back on
19 the record.  We commence Tape 4.  The
20 time is 12:54.
21    Q.   (By Ms. Jacobs) Ms. Jacobs,
22 we've been talking a little bit about
23 counselors or psychiatrists that you

## Page 214

1 have seen since February of '05;
2 correct?
3    A.   Correct.
4    Q.   Have you actually been
5 diagnosed by any of them with
6 anything?
7    A.   Yes.
8    Q.   What's a diagnose that you
9 received?
10    A.   One doctor stated I was
11 suffering from post-traumatic stress
12 syndrome.
13    Q.   Who is that?
14    A.   Doctors at Baptist East.
15    Q.   So your primary care
16 physician?
17    A.   Yes.
18    Q.   Do you know specifically
19 which doctor at Baptist East that was?
20    A.   No.
21    Q.   Male or female?
22    A.   Male.
23    Q.   Had you been diagnosed with

## Page 215

1 post-traumatic stress disorder prior to
2 that?
3    A.   Dr. Smith.
4    Q.   When did she diagnose you
5 with that?
6    A.   '05.
7    Q.   Anybody else?
8    A.   No.
9    Q.   Any other diagnosis that
10 you've been given?
11    A.   No.
12    Q.   So Dr. Hall, I think, was he
13 the psychiatrist that wrote the
14 prescriptions?
15    A.   Yes.
16    Q.   Did he make any diagnosis as
17 far as you're aware?
18    A.   Not as far as I'm aware.
19    Q.   When was the last time you
20 saw a doctor at Baptist East?
21    A.   August '06.
22    Q.   August '06?
23    A.   August '06.

## Page 216

1    Q.   And what was that for?
2    A.   A physical.
3    Q.   When's the last time you saw
4 a doctor with respect to your mental
5 issues?
6    A.   November '05.
7    Q.   And what doctor was that?
8    A.   Smith.
9    Q.   So you're not currently
10 seeing a psychiatrist or psychologist?
11    A.   No.
12    Q.   And you're not currently
13 seeing anybody at Baptist East for
14 that?
15    A.   No.
16    Q.   Have you talked to any of
17 your coworkers about this litigation?
18    A.   No.
19    Q.   You've not talked to one of
20 your coworkers the fact that you've sued
21 EDS or Mr. Williams?
22    A.   No, not sued.  I told them I
23 have an attorney.

54  (Pages 213 to 216)

# FREEDOM COURT REPORTING

Page 217

1    Q.   Okay.  Have you talked to
2  them about what you were planning to
3  do?
4    A.   No.
5    Q.   Have you talked to them --
6  have you ever talked to a coworker about
7  the fact that you thought EDS would
8  settle with you?
9    A.   No.
10    Q.   Have you talked to them
11  about any specific dollar amounts that
12  you want from EDS?
13    A.   No.
14    Q.   So if a coworker said you
15  had, they'd be lying?
16    A.   Yes.
17    Q.   Okay.  Have you told anybody
18  that EEOC thought you had a good case?
19    A.   No.
20    Q.   Have you told anybody that
21  your attorney said that EDS had offered
22  to settle with you?
23    A.   No.

Page 218

1    Q.   Or that was going to settle
2  with you?
3    A.   No.
4    Q.   So if anybody said any of
5  those things, they would be lying?
6    A.   Correct.
7    Q.   Have you ever had
8  pornographic material on your
9  computer?
10    A.   No.
11    Q.   Have you ever been alleged
12  to have had it on your computer?
13    A.   Yes.
14    Q.   When was that?
15    A.   Back in '98, '99.
16    Q.   And what happened?
17    A.   Was pulled in the office and
18  showed some information.  Stated that
19  they pulled it off my computer and I
20  stated that it didn't come off my
21  computer.  I don't know how it got on
22  there.
23    Q.   Had you received some

Page 219

1  pornographic information on that
2  computer?
3    A.   Not to my knowledge.
4    Q.   Did you state differently to
5  EDS?
6    A.   Yes, I did.
7    Q.   And what did you tell them?
8    A.   I told them I didn't know
9  where it came from.
10    Q.   You didn't tell them that
11  you'd received something from a friend
12  and deleted it or thought you had
13  deleted it?
14    A.   I told them -- I get --
15  probably said something along the line I
16  got an e-mail.  I didn't know what it
17  was.  Wasn't familiar and I deleted it
18  that way.
19    Q.   That you never even opened
20  it?
21    A.   No.
22    Q.   Now, if -- if a coworker
23  testified that you had -- had stated

Page 220

1  that you had brought a gun to work or
2  had it in you car, would they be
3  lying?
4    A.   Yes.
5    Q.   And if they stated that you
6  threatened to use it against another
7  coworker, would that be a lie as well?
8    A.   Yes.
9    Q.   Okay.  And if somebody said
10  that you had threatened your coworkers
11  or made threats against your coworkers
12  that would be a lie as well?
13    A.   Yes.
14    Q.   Have you ever talked to any
15  of your coworkers that this would be --
16  this litigation would be a way to get
17  you out of debt?
18    A.   No.
19    Q.   So if somebody said that,
20  that would be a lie as well?
21    A.   Yes.
22    Q.   Did you ever tell a coworker
23  that you had a role to play and that's

55  (Pages 217 to 220)

# FREEDOM COURT REPORTING

Page 221

1 why you were going to see a
2 psychiatrist?
3      A.   No.
4      Q.   Have you ever told a
5 coworker that EDS couldn't fire you
6 now?
7      A.   No.
8      Q.   Do you think EDS could fire
9 you?
10     A.   Yes.
11     Q.   Okay.  Do you think they
12 had -- that you understand the at will
13 nature of your employment that --
14     A.   Yes.
15     Q.   -- you can quit at any
16 time?
17     A.   Yes.
18     Q.   And they can fire you as
19 long as it's not for any legal reason?
20     A.   Yes.
21          MS. JACOBS:  Okay.  Pass the
22 witness to you.
23          MR. WILLIAMS:  Okay.

Page 222

1          MS. VIDEOGRAPHER:  You want
2 to just switch mics or want --
3          MR. WILLIAMS:  Sure.
4          MS. JACOBS:  Okay.
5          MS. VIDEOGRAPHER:  Or he can
6 use that one, whatever.
7          MS. JACOBS:  Happy to get
8 rid of the mic.
9          MR. WILLIAMS:  Sounds
10 agreeable.
11          MR. WALKER:  A lot of
12 responsibility comes with that mic.
13          MR. WILLIAMS:  That's right.
14
15 EXAMINATION BY MR. WILLIAMS:
16     Q.   Ms. Jacobs, do you have
17 family here in Montgomery?
18     A.   Yes.
19     Q.   Tell me the names of any
20 family that you have in this area, and
21 if they're employed, where they're
22 employed, please.
23     A.   My entire family's here.

Page 223

1 Cynthia Sanders, Eddie Sanders, Linda
2 Bowling.
3      Q.   Well, if you'll -- if you'll
4 go ahead, it might save some time.  Just
5 go ahead and tell me if where they live
6 and if they're employed.
7      A.   Most my family's here is --
8      Q.   I'm just saying, we do it
9 anyhow you want to.
10     A.   Okay.
11     Q.   But it'd be helpful if you'd
12 say their name, where they live, and if
13 they're employed and where.
14     A.   Cynthia Sanders, Ridgecrest,
15 employed at the -- I think it's the
16 Capitol; Eddie Sanders, retired, works
17 at the church; Jerome Bowling --
18     Q.   Which church?  I'm sorry.
19     A.   Freewill.  I'm sorry.
20 Freewill.  Jerome Bowling; stepfather,
21 Ellis; Mildred Smith, school teacher;
22 Eloise Smith, work at Baptist; Mable
23 Robinson, works at Wal-Mart; Reginald

Page 224

1 Smith, works on Gunter, IT; Daryl Smith,
2 works at Russell; Taqueta Smith, works
3 at Colonial Bank.  Let's see.  Andrew
4 Smith, works at Stern Brothers; Joseph
5 Smith, works at Rheem.  I have aunts
6 that's nurses.  Fab --
7          THE REPORTER:  I'm sorry.
8      A.   Fabiola Jacobs, she's a
9 nurse.  I have a big, huge family.
10     Q.   Let -- let me stop you right
11 there.  You didn't tell me what
12 relationship they were.  Tell me who are
13 your parents.
14     A.   Linda Bowling and Jerome
15 Bowling.  Well, Linda Bowling is my
16 mother.  Willie Jacobs, Major Willie
17 Jacobs is my father.
18     Q.   All right.  And the other
19 family members you listed, is that
20 brothers and sisters?
21     A.   No.  Aunties.  And I have a
22 sister Tonya Jacobs Phillips in
23 Mississippi.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 225

1  Q.   Okay. Let me ask you
2  something else. We'll be here all day.
3  Why don't we just get a list.
4       MR. WALKER: We'll get --
5  we'll put one together for you.
6       MR. WILLIAMS: So you can
7  tell me what their relationship is.
8       MR. WALKER: We'll -- we'll
9  give you the relationship and we'll give
10  you --
11  Q.   (Mr. Williams) That'd be
12  great. And your children, your two
13  sons, where they attend school?
14  A.   One at Floyd -- Floyd Middle
15  Magnet School. The other one's at
16  Dannelly.
17  Q.   All right. Since you've
18  been living at Flamingo Lane, has anyone
19  lived there with you other than your
20  sons and I think you said
21  Senior?
22  A.   That's it.
23  Q.   All right. Now where does

Page 226

1  , Senior live now?
2  A.   He's in North Carolina.
3  Q.   Does he work in North
4  Carolina?
5  A.   I'm not sure. He just
6  recently relocated.
7  Q.   What was he doing when he
8  lived down here with you?
9  A.   He was general manager at
10  Applebee's.
11  Q.   Has he ever been arrested?
12  A.   I think so.
13  Q.   For what?
14  A.   I don't know.
15  Q.   But you said I think earlier
16  he's the father of your two sons?
17  A.   Yes.
18  Q.   Is he originally from the
19  Montgomery area?
20  A.   Yes, he is.
21  Q.   Do you know where he went to
22  school here?
23  A.   Lee, Robert E. Lee.

Page 227

1  Q.   Now, I thought you said
2  earlier that there was a Dr. Bernard
3  Hill at --
4  A.   Hale.
5  Q.   -- American Family Care?
6  A.   Hale. Hale.
7  Q.   I'm sorry.
8  A.   Bernard Hale.
9  Q.   How do you Spell that?
10  A.   H-A-L-E.
11  Q.   Now, is he your doctor
12  too?
13  A.   No, he's not my doctor.
14  He's just an emergency care physician.
15  Q.   Okay. Has he prescribe
16  medication for you?
17  A.   Yes, he did. Ambien.
18  Q.   All right. We saw a sheet
19  of paper that showed us Rite Aid and I'm
20  not sure what the location was, but it
21  looks like it's on West Fairview?
22  A.   Correct.
23  Q.   Is that your primary drug

Page 228

1  store?
2  A.   Yes.
3  Q.   Have you got any
4  prescriptions filled anywhere in the
5  last couple years anywhere else?
6  A.   Yes. CVS.
7  Q.   Which location?
8  A.   Fairview.
9  Q.   All right. So if we got the
10  records for Rite Aid and CVS on
11  Fairview, we'd have all your pharmacy
12  records --
13  A.   Yes.
14  Q.   -- within the last three or
15  four years?
16  A.   Yes.
17  Q.   All right. You listed your
18  employment earlier since you graduated
19  from Alabama A&M in 1994. Is there any
20  other employment that you didn't tell us
21  about?
22  A.   Since '94?
23  Q.   Since you graduated from

57 (Pages 225 to 228)

# FREEDOM COURT REPORTING

Page 229

1  college?
2      A.    No.  I was pregnant.  No.
3      Q.    Was Mr.        living in
4  Huntsville too at that time?
5      A.    Yes.
6      Q.    Did he go to Alabama A&M as
7  well?
8      A.    Yes.
9      Q.    The church that you attend,
10 you mentioned something about your
11 church.  Which church do you --
12     A.    Freewill.
13     Q.    What's the whole?
14     A.    Missionary Baptist Church.
15     Q.    And where is it located?
16     A.    Hill Street.
17     Q.    And is that the only church
18 you've attended during -- since the last
19 couple years?
20     A.    Yes.
21     Q.    The Boys and Girls Club that
22 was located in the same building, is
23 that Montgomery or central Alabama?

Page 230

1      A.    I'm not sure.  I think
2  Montgomery.  I'm not sure.
3      Q.    Do you know anybody that
4  works there?
5      A.    No.
6      Q.    Or did you?
7      A.    No.
8      Q.    Okay.  You -- you mentioned
9  when you reported that there was some
10 knocking on your window or your door at
11 your house during that time period that
12 you called the police.  Was it the
13 Montgomery Police Department?
14     A.    Yes.
15     Q.    And so if we go to
16 Montgomery Police Department records,
17 there'll be records there --
18     A.    Yes.
19     Q.    -- for these occurrences?
20     A.    Yes.
21     Q.    More than ten times that you
22 reported it?
23     A.    No.

Page 231

1      Q.    Less than that?
2      A.    Yes.
3      Q.    And specifically what period
4  of time did you report that this was
5  occurring?
6      A.    What do you mean, the time
7  frame or --
8      Q.    Yes, ma'am.
9      A.    It was after -- it has to
10 been -- I know it was after February.
11 It might have been May '05, some in
12 June, July '05, if I'm not mistaken.
13     Q.    But you just don't have any
14 idea who that could have been?
15     A.    No.
16     Q.    And was Mr. Blue living
17 there at the time?
18     A.    He wasn't living there but
19 he was at -- he was there at the time.
20     Q.    So Mr.        could tell us
21 about circumstances of what had
22 occurred?
23     A.    Yes.

Page 232

1      Q.    Now, you mentioned that you
2  got the .22 pistol.  But as I understand
3  it, you got the pistol and took it and
4  then locked it up at your house?
5      A.    I placed it in my closet in
6  my safe, correct.
7      Q.    Right.
8      A.    Yes.
9      Q.    Well, I mean, if it's in a
10 safe, it's locked up, isn't it?
11     A.    Correct.
12     Q.    Okay.  So you got the
13 pistol, you took it and put it in your
14 safe?
15     A.    Correct.
16     Q.    Have you ever shot it
17 ever?
18     A.    No.  Probably once.
19     Q.    Okay.  Do you know how to --
20     A.    No.
21     Q.    -- handle a gun at all?
22     A.    No.  That's why it's put
23 up.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 233

```
1      Q.   So basically you got the
2  gun, took it, put it in your safe and
3  never got it back out?
4      A.   No.
5      Q.   Right?
6      A.   Right.
7      Q.   What was the occasion for
8  you shooting it?
9      A.   Just practice, tried it, and
10 didn't like the way it felt.
11     Q.   Where did you shoot?
12     A.   Just out in the air.
13     Q.   In your yard?
14     A.   Yes.
15     Q.   And who was with you?
16     A.   No one.
17     Q.   Do you actually have
18 ammunition for it?
19     A.   Yes.
20     Q.   Do you have that at your
21 home?
22     A.   Yes.
23     Q.   Where is that located?
```

Page 235

```
1  to you that you were offended by, is
2  there anywhere we can find any
3  documentation about that incident?
4      A.   Other than speaking to
5  Brenda, no.
6      Q.   Well, I mean
7  documentation?
8      A.   No.
9      Q.   An e-mail, anything written
10 down?
11     A.   No.
12     Q.   An e-mail that you send a
13 friend from your house, anything?
14     A.   No.
15     Q.   So the only person that
16 could tell us anything about that other
17 than you would be Brenda?
18     A.   Correct.
19     Q.   And you say you reported to
20 her on the day it occurred?
21     A.   Yes.
22     Q.   All right.  Let me ask you a
23 couple of questions about Defendants'
```

Page 234

```
1      A.   In the safe.
2      Q.   Okay.  So you got the gun,
3  you went and bought some ammunition.
4  Did you go buy ammunition for it?
5      A.   Yes.
6      Q.   Where did you buy it?
7      A.   Wal-Mart.
8      Q.   Got ammunition for it, shot
9  it once, took it, locked it up in your
10 safe and hadn't gotten it back out since
11 then?
12     A.   Correct.
13     Q.   And it's still there
14 today?
15     A.   Yes.
16     Q.   Do you own any other gun?
17     A.   No.
18     Q.   Have you ever owned any guns
19 before?
20     A.   No.
21     Q.   On this incident you
22 described for us in January of '05
23 involving Mr. Williams saying something
```

Page 236

```
1  Exhibit No. 6 that we talked to about
2  before which is the statement that you
3  typed up dated February 23rd of '05.
4  You typed that up, didn't you?
5      A.   Yes.
6      Q.   And that was less than two
7  weeks after you say this occurred;
8  correct?
9      A.   Yes.
10     Q.   And you actually typed this
11 yourself?
12     A.   Yes.
13     Q.   And you knew that when you
14 typed this that it was important to
15 prepare a full and accurate account what
16 had occurred; correct?
17     A.   Not -- an account of what
18 happened, yes.
19     Q.   I mean, you made a report to
20 Ms. Leslie Liebman, didn't you?
21     A.   Correct.
22     Q.   And you knew that she was
23 human resources; correct?
```

59  (Pages 233 to 236)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 237

1    A.    Correct.
2    Q.    And you knew that you were
3  reporting something Mr. Williams had
4  done pursuant to sexual harassment
5  policy; correct?
6    A.    Correct.
7    Q.    You knew it was important to
8  include everything in here that had
9  occurred in that incident, didn't you?
10   A.    To report the incident, but
11  everything I didn't -- apparently, when
12  I was typing, I was thinking ahead of my
13  typing.
14   Q.    I'm not asking you what you
15  were thinking.
16   A.    Okay.
17   Q.    I'm asking you when you
18  prepared this you knew that it was
19  important to put everything in there
20  that had happened to you, didn't you?
21   A.    Not everything, majority of
22  what happened.
23   Q.    Okay. So when you reported

Page 238

1  to human resources person, you were just
2  going to put most of what happened?
3    A.    I put down what happened to
4  me. But I guess the details -- I didn't
5  put all the details. I put down what
6  happened to me.
7    Q.    Okay. So you didn't think
8  it was important enough when you made
9  this report less than two weeks from the
10  time it occurred to put the details in
11  the report; correct?
12   A.    I -- I put the details in
13  there.
14   Q.    Okay. All right. That's
15  what I asked you at the beginning of all
16  this. When you made this statement,
17  Defendants' Exhibit No. 6, to the human
18  resources director, you knew that it was
19  important to give a full and detailed
20  account of what had occurred?
21   A.    You're saying full. I put
22  the detail what happened. I didn't but
23  the full detail.

Page 239

1    Q.    Let's just go with detail
2  then. You knew when you made this
3  statement and when you typed it up that
4  it was important to put all of the
5  details of what had occurred, didn't
6  you?
7    A.    The detail, you put all.
8    Q.    What I just said --
9    A.    I didn't put -- you just
10  said all the detail. I didn't put all
11  the detail. I put the details.
12   Q.    Okay. There's something
13  about this you don't like, isn't it? Is
14  this -- let me ask you this: Is
15  Defendants' Exhibit No. 6, is that a
16  true account of what occurred?
17   A.    Not all of what occurred but
18  what occurred.
19   Q.    So you didn't give a
20  true and full account of what occurred
21  when you prepared this, did you?
22   A.    I gave the detail what
23  happened.

Page 240

1    Q.    Okay. Are the details
2  contained in Defendants' Exhibit No.
3  6?
4    A.    Not the full detail.
5    Q.    Okay. And you didn't think
6  it important enough to give the full
7  details?
8    A.    I guess I blocked it out.
9    Q.    But once you went to see a
10  lawyer and you went to his office and he
11  typed it up, then you put some
12  additional information in Defendants'
13  Exhibit No. 8, didn't you?
14   A.    I put down -- all of this
15  right here is not on here (indicated).
16   Q.    Okay. I didn't ask you
17  that.
18   A.    But this right here I told
19  exactly step by step what happened when
20  I was in his office.
21   Q.    No, ma'am, that's not what I
22  asked you. If you'll listen carefully
23  to my question.

60  (Pages 237 to 240)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 241

1    A.    Said add --
2    Q.    I think it was fairly clear.
3  I said after you went to see your
4  lawyer --
5    A.    Uh-huh (affirmative
6  response).
7    Q.    -- and you signed
8  Defendants' Exhibit No. 8 and he typed
9  it up, it's got additional information
10 in it, doesn't it?
11   A.    It got what happened in
12 here.
13   Q.    It has additional
14 information --
15   A.    Yes.
16   Q.    -- that's not in Defendants'
17 Exhibit No. 6?
18   A.    Exactly.
19   Q.    The word "breast" is not in
20 Defendants' Exhibit No. 6, is it?
21   A.    Okay.
22   Q.    Is it?
23   A.    No.

Page 242

1    Q.    You didn't put it in there,
2  did you?
3    A.    I neglected to put that in
4  there.
5    Q.    When -- less than two weeks
6  after this occurred and you prepared a
7  written statement, you didn't put that
8  he had touched your breast, did you?
9    A.    No, I didn't.
10   Q.    All right. And you didn't
11 put in Defendants' Exhibit No. 6 that he
12 put his hand in your pants either, did
13 you?
14   A.    No.
15   Q.    All right. But after you
16 went to meet with your lawyer and he
17 typed it up, it's in Defendants' Exhibit
18 No. 8, isn't it?
19   A.    Yes.
20   Q.    Is that your rendition of
21 what happened or is that somebody
22 else's?
23   A.    That's what happened.

Page 243

1    Q.    But you didn't remember it
2  when you prepared Defendants' Exhibit
3  No. 6?
4    A.    I remember everything that
5  happened.
6    Q.    You didn't remember it when
7  you wrote this down, did you?
8    A.    When I wrote it, but I
9  remember everything that happened.
10   Q.    Right. But when you
11 prepared Defendants' Exhibit No. 6
12 apparently you didn't remember it when
13 you prepared it because you didn't put
14 it in there?
15   A.    I remembered it then. I
16 just neglected to put it in there.
17   Q.    It wasn't important to
18 you?
19   A.    It was very important.
20   Q.    But you didn't put it in
21 there?
22   A.    It was very traumatizing.
23   Q.    It what -- but you didn't

Page 244

1  put it in there, did you?
2    A.    I was traumatized.
3    Q.    Let me ask you something
4  about No. 8. Did you type Defendants'
5  Exhibit No. 8 up?
6    A.    No.
7    Q.    Who typed that up?
8    A.    My lawyer.
9    Q.    Now, were you there when it
10 was prepared or was it provided to you
11 later?
12   A.    I think I was there.
13   Q.    Did you look at Defendants'
14 Exhibit No. 6 when you prepared --
15   A.    No.
16   Q.    -- No. 8?  No?
17   A.    No.
18   Q.    Did you review Defendants'
19 Exhibit No. 6 before this deposition?
20   A.    No.
21   Q.    Did you review Defendants'
22 Exhibit No. 8?
23   A.    No.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 245

1    Q.    What did you review?
2    A.    What did I review?
3    Q.    Right.
4    A.    My e-mails to Ms. Liebman.
5    Q.    All right. Have we looked
6    at all of the documents here today that
7    you reviewed to prepare for your
8    deposition?
9    A.    I didn't review none of this
10    before I came here.
11    Q.    What I'm saying is do you
12    have any additional documents that we
13    have not gone over?
14    A.    E-mails to Ms. Liebman.
15    Q.    That are not -- that are not
16    in here?
17    A.    That's not on here, right.
18    Q.    Anything else?
19    A.    Huh-uh (negative
20    response).
21    Q.    I'm sorry?
22    A.    Sorry. My performance
23    assessments.

Page 246

1    Q.    I'm sorry. What?
2    A.    My performance
3    assessments.
4    Q.    Okay. Anything else?
5         MR. WALKER: If I might
6    interject to save some time, there's
7    nothing she's reviewed that I didn't
8    produce.
9         MR. WILLIAMS: Let -- let
10    me -- let her -- let her tell me that.
11    I don't need you to tell me. I need her
12    to tell me what you reviewed.
13         You reviewed your
14    performance assessments?
15    A.    Uh-huh (affirmative
16    response).
17    Q.    You reviewed the e-mails
18    from Ms. Liebman. Have you reviewed
19    anything else in preparation for your
20    deposition?
21    A.    No.
22    Q.    Do you have any handwritten
23    notes that you prepared?

Page 247

1    A.    These are stuff that was --
2    no.
3    Q.    I'm sorry?
4    A.    No. No.
5    Q.    Well, what is all that?
6    A.    This is just junk.
7    Q.    Is it anything to do with
8    this?
9    A.    No, it doesn't.
10    Q.    What all I'm trying to find
11    out --
12    A.    I -- I just brought it in
13    looking professional.
14    Q.    You done a good job on that.
15    All I want to know is is there anything
16    else that you have reviewed to prepare
17    for your deposition other than the
18    e-mails, other than your performance
19    evaluations?
20    A.    No.
21    Q.    All right. You don't have
22    to look in there.
23    A.    Okay.

Page 248

1    Q.    Just all I want to know is
2    have you reviewed anything else?
3    A.    No.
4    Q.    Did you prepare any notes?
5    A.    I prepared no notes. I just
6    mentally wrote things down for myself.
7    Q.    When did you write things
8    down?
9    A.    Sunday.
10    Q.    Okay. And What were you
11    looking at to write things down?
12    A.    Just pretty much my
13    performance assessment, e-mails, jot
14    down e-mails that I felt that was
15    important.
16    Q.    Okay. Anything else that --
17    did you make any notes at the time this
18    occurred?
19    A.    As far as what?
20    Q.    Anything?
21    A.    About what, the incident
22    occurred?
23    Q.    Right. Right after it

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 249

1  or any time?
2       A.   Yes, I made several, several
3  notes.
4       Q.   Well, where are they?
5       A.   They may be at home. Made
6  copies, forward to my attorney. She
7  forwarded to her.
8            MR. WALKER:  Anything I've
9  got I've given --
10           MS. JACOBS:  I've got no
11 handwritten notes.
12           MR. WALKER:  I've not --
13      A.   No, no handwritten notes.
14           MR. WALKER:  I've not gotten
15 any handwritten notes.
16      A.   No.
17           MR. JACOBS:  And I don't
18 have any --
19           MR. WALKER:  I've not
20 received any handwritten notes.
21      Q.   (By Mr. Williams) What have
22 you prepared? What have you prepared?
23      A.   What you mean prepared?

Page 250

1       Q.   Well, I mean, you just got
2  through telling me that you made some
3  notes?
4       A.   I have this (indicated.)
5       Q.   I thought you said that
6  didn't have anything to do with this?
7       A.   This my performance
8  assessments.
9       Q.   Okay. Other than that, I
10 thought you just told me that you had
11 made notes?
12      A.   I just made notes on certain
13 things as far as, you know, when I got
14 the stick -- stack of stuff they sent
15 me, just wrote down some stuff that I
16 remembered. I wanted to remember.
17      Q.   I'm confused. I thought
18 earlier I asked you during the course of
19 this after you say this occurred that
20 you made some notes?
21      A.   Yes, I have made notes, not
22 handwritten, typed notes.
23      Q.   All right. Where are

Page 251

1  they?
2       A.   I e-mailed those to my
3  attorney. They were notes that I jotted
4  down.
5            MR. WALKER:  Wait. Wait.
6  Time out. Any correspondence that has
7  taken place between she and I are
8  questionably be privileged and wouldn't
9  have anything to do with this
10 deposition.
11      Q.   Right. I'm not asking about
12 that. All I want to know is you -- you
13 just told me earlier that you prepared
14 notes during the course of -- after this
15 incident; correct?
16      A.   Correct.
17      Q.   You made those notes?
18      A.   Correct.
19      Q.   All right. And then you
20 sent them to your lawyer?
21      A.   Correct.
22           MR. WALKER:  She made them
23 for her lawyer.

Page 252

1            MR. WILLIAMS:  Well, now are
2  you going to testify or you going to let
3  her?
4            MR. WALKER:  I'm trying to
5  clarify.
6            MR. WILLIAMS:  Well, I mean
7  I -- I -- that's not what she just said.
8            Let me ask you this: The
9  notes that you made, when did you make
10 them?
11      A.   I made them ongoing. Every
12 time something happened, I took notes.
13 I typed them. I sent them to my
14 attorney.
15      Q.   Right. Anything else that
16 you looked at or reviewed?
17      A.   Such as?
18      Q.   Well, see, I don't know
19 because I didn't review it. That's why
20 I'm asking you.
21      A.   I'm just wondering what --
22 which line -- I mean, review like what?
23      Q.   Well, you -- did you prepare

63  (Pages 249 to 252)

# FREEDOM COURT REPORTING

Page 253

1   for the deposition?
2       A.   I prepared myself mentally
3   for the deposition.
4       Q.   What about reviewing
5   documents?
6       A.   My e-mails that I stated
7   earlier.
8       Q.   All right.  Now, tell me
9   about how you go about preparing those
10  e-mails.
11      A.   If something happened, I'd
12  type it down.  An incident occurred, I'd
13  type it up.  I sent it to myself at home
14  and I sent it to my attorney.
15      Q.   Like give me an example of
16  something.
17      A.   The parking lot incident;
18  such and such date this occurred.
19      Q.   You would document what had
20  occurred and you would put what the
21  circumstances were; correct?
22      A.   Correct.
23      Q.   And anytime anything like

Page 254

1   this intimidation you talked about, you
2   would do -- type that up and say what
3   had happened?
4       A.   Correct.
5       Q.   What other -- give me some
6   other examples.
7       A.   That's basically it.
8       Q.   All right.  Other than
9   reviewing those e-mails to prepare for
10  your deposition, and other ones from Ms.
11  Liebman and then your performance
12  evaluations --
13      A.   Uh-huh (affirmative
14  response).
15      Q.   -- did you look at anything
16  else to help you prepare for the
17  deposition?
18      A.   The file that they sent me I
19  made copies for myself, the questions
20  that they wanted.
21      Q.   The?
22      A.   Ms. Jacobs.
23          MR. WALKER:  Inter-

Page 255

1   rogatories.
2       Q.   All right.  Other than that
3   then?
4       A.   No.
5       Q.   Other than the e-mails,
6   performance evaluations?
7       A.   That's it.
8       Q.   Notes you prepared and the
9   interrogatories and request for
10  documents --
11      A.   That's it.
12      Q.   -- anything else?  You know
13  right after you got off the elevator
14  after this -- you say this occurred, was
15  anyone standing there?
16      A.   No.
17      Q.   Nobody was a witness to that
18  either?
19      A.   No.
20      Q.   And you say this occurred,
21  this incident on the elevator, between
22  45 and 60 seconds?
23      A.   The ride of the elevator?

Page 256

1       Q.   Well, I mean, everything
2   that you say that happened happened in
3   that time frame?
4       A.   The elevator ride, yes.
5       Q.   All of what you've told us
6   about what you claim Mr. Williams did on
7   that elevator occurred between 45 and 60
8   seconds?
9       A.   Yes.
10      Q.   Let me ask you just a few
11  questions about this.  You say that
12  he -- in Defendants' Exhibit 8, you say
13  he began rubbing my breast and then he
14  began putting his hand in my pants.  Are
15  you talking about both hands, he's
16  rubbing you on your breast with --
17      A.   No.
18      Q.   -- both hands, putting both
19  hands in your pants?
20      A.   No.  He put his right hand
21  down my pants.
22      Q.   And how is he holding you,
23  how is he restraining you?

64  (Pages 253 to 256)

# FREEDOM COURT REPORTING

Page 257

1    A.   He's got his hands on this
2 way (indicated), push my body towards
3 his body and was holding me that way.
4    Q.   He's holding you with one
5 arm?
6    A.   Yes, he jerked, yes.  At the
7 time, I was only 115 pounds.
8    Q.   He's beside you or behind
9 you?
10    A.   He's on the side of me.
11    Q.   On your right side?
12    A.   On my right side.
13    Q.   And he's got which arm
14 around you?
15    A.   He has his left arm around
16 me (indicated), grabbed me.
17    Q.   Left arm around your
18 waist?
19    A.   Yes.
20    Q.   Standing beside your right
21 side?
22    A.   He's on the right side.  He
23 pressed his body right here and this was

Page 258

1 up under here and I'm pushing like that
2 (indicated).
3    Q.   So he's got his left arm
4 around you?
5    A.   Yes.
6    Q.   And then he's pulling on
7 you?
8    A.   Yes.
9    Q.   And you're trying to pull
10 away?
11    A.   I'm pushing.
12    Q.   You're pushing?
13    A.   Yes.
14    Q.   You're not trying to pull
15 away, you're pushing?
16    A.   No, I'm pushing.
17    Q.   And you're screaming?
18    A.   Get off.  Yes, I was
19 screaming.
20    Q.   And he takes -- while all
21 that's going on, he takes his right hand
22 and puts that in your pants?
23    A.   Yes.

Page 259

1    Q.   And then all that's still
2 going on and then he takes his right
3 hand out of your pants?
4    A.   No.
5    Q.   Okay.  What did he do after
6 he took his --
7        He didn't take -- he
8 took his hand -- right -- the shirt was
9 tucked down in my pants.  He grabbed me.
10 He pulled me in.  And I looked, I said
11 get off me.  He put his hand down my
12 pants, pulled the blouse up and start
13 beginning to rub on me saying I felt
14 good.  He needed me to warm him up.
15 Then he was moving all up here and I
16 kept pushing off, get off -- get -- get
17 off of me.  Then -- then he say -- bing,
18 alerts you that the elevator door is
19 going to open and he released me.
20    Q.   So all the touching he did
21 on you on -- on your stomach and all
22 that, was with his right hand?
23    A.   Yes.

Page 260

1    Q.   He was using his left hand
2 to hold you?
3    A.   He was restraining me like
4 this (indicated).
5    Q.   Around your waist?
6    A.   Yes.
7    Q.   Well, the way you just
8 described it didn't sound like he stuck
9 his hand in your pants?
10    A.   He did.
11    Q.   He did.
12    A.   Because my blouse was inside
13 of my pants.
14    Q.   Okay.
15    A.   He put his hand down in my
16 pants, pulled my shirt out.
17    Q.   Okay.
18    A.   My shirt was actually like
19 this (indicated) when I got off of the
20 elevator.
21    Q.   Okay.  Stuck his hand down
22 in the pants and pulled your shirt
23 out?

65  (Pages 257 to 260)

# FREEDOM COURT REPORTING

Page 261

1    A.   No.  Shirt inside my pants,
2  belt, slacks, gets on the elevator,
3  walks in the elevator, elevator door
4  closed.  He proceeded -- when the
5  elevator door closed, he grabbed me,
6  pulled me towards him on this way
7  (indicated).  This was locked under here
8  his frame (indicated).  Push his hand
9  down in my pants, pulled my shirt out of
10  my pants.  He was rubbing down -- he
11  start rubbing my stomach, then he moved
12  up.
13    Q.   Did he actually touch your
14  breast?
15    A.   Yes.  He touched the bra
16  area of the breast.
17    Q.   Okay.  And then that's when
18  the elevator stopped right after that?
19    A.   Bing.  That's all I
20  remember, bing and he -- he released
21  me.
22    Q.   You mentioned something
23  about your medical insurance.  Who --

Page 262

1  that's probably through your employment.
2  Do you know what company that is,
3  whether that's Blue Cross --
4    A.   Aetna.
5    Q.   Aetna.
6    A.   Uh-huh (affirmative
7  response).
8    Q.   Now, you mentioned that they
9  ought to terminate Mr. Williams at EDS
10  or terminate Mr. Williams; right?
11    A.   Because of the incident,
12  yes.
13    Q.   Right.  And what you would
14  be asking them to do is take your word
15  for what happened?
16    A.   Yes.
17    Q.   'Cause if they take his
18  word, Mr. Williams' word, then he ought
19  not be terminated; right?
20    A.   Correct.
21    Q.   So why should they take your
22  word over his?
23    A.   I can't answer for him.

Page 263

1    Q.   Now, you told me -- told us
2  about all the doctors you've seen I take
3  it for your shoulder?
4    A.   Yes.
5    Q.   You got -- any other
6  physical injuries that you claim you
7  suffered other than your shoulder?
8    A.   No.
9    Q.   Now, who was the doctor if I
10  wanted to go and talk to a doctor and
11  find out what's wrong with your
12  shoulder, who's the one that knows the
13  most, is that Dr. Barrington?
14    A.   Barrington.
15    Q.   He's an orthopedic doctor?
16    A.   Yes.
17    Q.   He's told you you got torn
18  cartilage?
19    A.   Some leakage or tear that
20  fluids leak out.
21    Q.   Did he tell you that what
22  happened during the -- what you say
23  happened during this elevator ride in

Page 264

1  February '05 would have caused --
2    A.   Yes.
3    Q.   -- this kind of injury?
4    A.   Yes.
5    Q.   He has said that?
6    A.   Yes.
7    Q.   But you didn't see him until
8  2006; right?
9    A.   Right.
10    Q.   And what is it that showed
11  the problem with your shoulder, MRI?
12    A.   Yes.
13    Q.   Okay.  While we're on that.
14  Let me ask you something about before
15  February of '05.  Have you seen any
16  other doctors that we haven't talked
17  about?
18    A.   Before '05?
19    Q.   (Nodded head affirmatively.)
20    A.   Yes, I had surgery on my
21  feet.  Yes.
22    Q.   Okay.  Who was that?
23    A.   Mark Veres.

66 (Pages 261 to 264)

# FREEDOM COURT REPORTING

Page 265

1  THE REPORTER: Mark who?
2  A.  Veres.
3  Q.  V-E-R-E-S?
4  A.  Yes.
5  Q.  All right. What about any
6  other physicians you've seen?
7  A.  Other than -- no.
8  Q.  Well, Dr. Saucer --
9  A.  Other than that --
10  Q.  -- for another problem. Any
11  other doctors?
12  A.  No.
13  Q.  Been hospitalized other than
14  with your children?
15  A.  Other than female things,
16  no.
17  Q.  And that would be Dr.
18  Saucer?
19  A.  Correct.
20  Q.  A surgical procedure?
21  A.  Correct.
22  Q.  Any other
23  hospitalizations?

Page 266

1  A.  No.
2  Q.  You had to go to the ER for
3  any problems that you've had?
4  A.  No.
5  Q.  None that you can think
6  of?
7  A.  None that I can think of.
8  Q.  All right. If you went to
9  the ER, where would you go?
10  A.  Depends.
11  Q.  On the emergency room?
12  A.  Yeah.
13  Q.  Before February of '05, had
14  you ever had to take anything to sleep
15  at all?
16  A.  No.
17  Q.  Have you been to a
18  psychologist, psychiatrist?
19  A.  No.
20  Q.  Counselor of any kind?
21  A.  No.
22  Q.  Have you ever had any
23  problems with Mr. Blue that resulted in

Page 267

1  you having him arrested --
2  A.  No.
3  Q.  -- or calling the police on
4  him, anything like that?
5  A.  No.
6  Q.  Any other other than
7  Mr. Blue, you ever had any problems with
8  any other boyfriends?
9  A.  No. Mr. Williams about it.
10  Q.  Were both your children born
11  here in Montgomery?
12  A.  Yes.
13  Q.  At which hospital?
14  A.  One was at Maxwell. The
15  other one was at Jackson.
16  Q.  Okay. And how is it at
17  Maxwell?
18  A.  My father was in the
19  military.
20  Q.  Okay. You told us about
21  Baptist East. But -- but can you not
22  tell us the name of any doctor?
23  A.  No, I just started seeing

Page 268

1  them.
2  Q.  All right. Where is that
3  located? It's not at the hospital?
4  A.  It's at the hospital.
5  Actually, at the hospital.
6  Q.  Okay. You go to the
7  hospital to see this doctor?
8  A.  Has an office inside the
9  hospital.
10  Q.  Okay. All right. Other
11  than what you've told us about while ago
12  about the notes that you made about the
13  different incidents that occurred, have
14  you documented anywhere anything else
15  that relates to this lawsuit in any
16  way?
17  A.  No. Other -- no.
18  Q.  You understand my
19  question?
20  A.  No. I'm just --
21  Q.  In other words, we've seen
22  the e-mails that you send.
23  A.  Okay.

67  (Pages 265 to 268)

# FREEDOM COURT REPORTING

Page 269

1    Q.    We've seen the statements
2  that you prepared.  You told us that you
3  did some narratives that you prepared
4  that are typed.
5    A.    Okay.
6    Q.    Is there anything else that
7  you've done either writing it down?
8    A.    No.
9    Q.    Preparing narratives?
10   A.    No.
11   Q.    Doing tape recordings or
12 anything?
13   A.    Just -- no.
14   Q.    I mean --
15   A.    You said type it out.  Other
16 than the notes, I told you about those.
17   Q.    Right.
18   A.    That's it.
19   Q.    You told me that.
20   A.    That's it.
21   Q.    Anything else --
22   A.    That's it.
23   Q.    -- you know, where you would

Page 270

1  write down and say, you know, this
2  happened today, keep a log or diary?
3    A.    I -- yes, I do have one
4  notebook, one notebook.
5    Q.    And what is that?
6    A.    It's basically same thing
7  that I typed.  I retyped them for --
8    Q.    What, is this like a log or
9  what is this?
10   A.    Yeah, it was a log.
11 Particular day and I typed it and
12 forward it.
13   Q.    All right.  Now, when did
14 you start doing that?
15   A.    Mid summer, last year,
16 '05.
17   Q.    So later after it occurred
18 after you had sent in your Defendants'
19 Exhibit No. 8, the thing is dated in
20 March, sometime after that --
21   A.    Yes.
22   Q.    -- you began this --
23   A.    Yeah.

Page 271

1    Q.    -- log?  But you typed it?
2    A.    Yes.
3    Q.    What kind of thing would you
4  put in there?
5    A.    Like the following incident,
6  stuff like that.
7    Q.    That you say he -- where he
8  followed you?
9    A.    Yes.
10   Q.    And would you still have all
11 that?
12   A.    I don't know.  I don't think
13 so.  Because once I typed it, I think I
14 just trashed it because I had a copy.
15   Q.    Okay.  Would this be
16 something you did on your computer?
17   A.    Yes.
18   Q.    All this preparation that
19 you did by way of notes or anything --
20   A.    Just typed, yes.
21   Q.    -- would be something you
22 put on your computer?  Are you just
23 saying you would have deleted at some

Page 272

1  point in time?
2    A.    Yes.
3    Q.    But you probably could go
4  back and find it?
5    A.    I doubt it because I redid
6  my computer.
7    Q.    When did you do that?
8    A.    When it crashed.
9    Q.    When was that?
10   A.    Back in December.  My son
11 put a virus on it.
12   Q.    So you got a new computer
13 now?
14   A.    No.
15   Q.    Okay.  What did you do to
16 it?
17   A.    Just restore it.
18   Q.    Did someone do the work for
19 you?
20   A.    No, I did it.
21   Q.    You did it yourself?
22   A.    Yes.
23   Q.    You never filed

68  (Pages 269 to 272)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 273

1  bankruptcy?
2      A.   No.
3      Q.   And Mr. Walker's the only
4  lawyer you ever talked to about this?
5      A.   Yes.
6          MR. WILLIAMS: Okay. We can
7  take just about five seconds. I think
8  we're probably --
9          MS. JACOBS: I'm going to
10 have a couple more questions.
11         MR. WILLIAMS: Okay. Why
12 don't you go ahead and then we'll do
13 that.
14         MS. JACOBS: Okay.
15
16 EXAMINATION CONTINUED BY MS. JACOBS:
17     Q.   Do you still have any
18 contact with Mr.        ?
19     A.   Yes, periodically.
20     Q.   How often?
21     A.   Once or twice a week.
22     Q.   Okay. And I think you've
23 testified he is the father of both your

Page 274

1  children?
2      A.   Yes.
3      Q.   But doesn't pay child
4  support?
5      A.   No.
6      Q.   Why not?
7      A.   Have to ask him.
8      Q.   Has he ever contributed to
9  their --
10     A.   Yes.
11     Q.   -- monetarily to their
12 education?
13     A.   Yes.
14     Q.   How often does he do that?
15     A.   Periodically.
16     Q.   Does he do it on a regular
17 basis?
18     A.   No.
19     Q.   Now, you testified earlier
20 that you typed some notes up. You --
21 Had you a -- I guess wrote them down
22 first, typed them up, and then would
23 send them to yourself and to your

Page 275

1  attorney?
2      A.   Correct.
3      Q.   Okay. So you typed them up
4  at work?
5      A.   At home, at work, when the
6  incident happened, yes.
7      Q.   Did you type any of them at
8  work on the computer --
9      A.   Yes.
10     Q.   -- at EDS?
11     A.   Yes.
12     Q.   And then from there you
13 would send them to yourself?
14     A.   Yes.
15     Q.   Otherwise why would you send
16 them to yourself?
17     A.   Why?
18     Q.   Yeah.
19     A.   For the home computer.
20     Q.   For your home computer;
21 right? But if you typed them at home,
22 you wouldn't send them to yourself
23 because you've got them; right?

Page 276

1      A.   I'm sorry?
2      Q.   I -- I'm just trying to
3  figure out why you would send them to
4  yourself if you typed them at home. If
5  you typed them at home, don't you have
6  them? So why would you resend it to
7  yourself, does that make sense?
8      A.   I send them to -- myself an
9  e-mail. Whatever -- if I typed the
10 notes, I send them to Tara and my
11 attorney; those typed notes, this
12 incident happened.
13     Q.   So you would send those to
14 Tara as well?
15     A.   Some of them, yes.
16     Q.   Not all of them?
17     A.   No.
18     Q.   Okay. And did they have
19 anything in them other than this is what
20 happened?
21     A.   I don't think so.
22     Q.   Okay. So you didn't say
23 this is what happened. What should I do

69  (Pages 273 to 276)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 277

1  about it.  It would just be a factual
2  statement to your attorney, this is the
3  facts that happened?
4      A.    Those are the notes from
5  home.
6      Q.    Right.
7      A.    Right.
8      Q.    What about the ones from
9  work?
10      A.    Those are pretty much
11  incidents that happened and letting
12  Tara, whomever know what happened and
13  also send him a copy.
14      Q.    Okay.  So once again you're
15  not seeking advice, you're just saying
16  this is what happened?
17      A.    Right.  Right.
18      Q.    Okay.  And any of the ones
19  that you sent him from home saying this
20  is what happened today, did you ask him
21  any advice --
22      A.    No.
23      Q.    -- in those e-mails?

Page 278

1      A.    No.
2          MS. JACOBS:  I'd ask that
3  any of those e-mails be produced.  The
4  facts --
5          MR. WALKER:  I'm sorry.
6          MS. JACOBS:  Any of those
7  e-mails that she sent to you, if all
8  they have is facts in them they're
9  producible.  They are not
10  attorney/client privilege.
11          MR. WALKER:  I'll take a
12  look at them and see.
13          MS. JACOBS:  She has stated
14  she wasn't seeking legal advice.  She
15  was just telling you what happened.
16          MR. WALKER:  I'll -- I mean,
17  I'll review them.  I'll take a look at
18  them and see.
19      Q.    (By Ms. Jacobs) Your
20  attorney provided me some supplemental
21  interrogatories today.  And they have a
22  couple of names on here that we haven't
23  talked about with respect to doctors.

Page 279

1  Dr. Benjamin Wouters.
2      A.    Wouters.
3      Q.    W-O-U-T-E-R-S?
4      A.    That's with Miller.  He's
5  with Miller.  MRI, the ECG.
6      Q.    Okay.  And have you seen
7  him --
8      A.    No.  Well, since that
9  incident?
10      Q.    Right.
11      A.    Yes, I saw him on '05.
12      Q.    He's the person that
13  performed the --
14      A.    Yes.
15      Q.    -- MRI?
16      A.    The ECG or something.
17      Q.    Any other time that you saw
18  Dr. Wouters?
19      A.    No.
20      Q.    Okay.  What about Dr. Oscar
21  Orille?
22      A.    I think that's another one
23  who did the MRI.

Page 280

1      Q.    He's with Dr. Miller as
2  well?
3      A.    No.  He's with Baptist.
4      Q.    Okay.
5      A.    Would have been at Baptist,
6  yeah.
7      Q.    So Dr. Miller is with
8  Baptist as well?
9      A.    He's Jackson and Baptist.
10      Q.    Okay.  Now, in this lawsuit,
11  you're obviously seeking damages of some
12  kind.
13      A.    Okay.
14      Q.    What do you want out of this
15  lawsuit?  What damages have you
16  suffered?
17      A.    Mental, physical.
18      Q.    Monetarily you haven't lost
19  any wages; correct?
20      A.    No.
21      Q.    'Cause you're still
22  employed?
23      A.    Correct.

70  (Pages 277 to 280)

# FREEDOM COURT REPORTING

Page 281

1    Q.    Okay.  Any other monetary
2  damages you're seeking?  Obviously, if
3  you're not seeking wages, anything
4  else --
5    A.    I'm --
6    Q.    -- besides for mental
7  anguish or something?
8    A.    No.
9    Q.    Okay.  Medical expenses?
10    A.    Yes.
11    Q.    Are they covered under your
12  medical --
13    A.    Not all of it.
14    Q.    What part isn't, your
15  copay?
16    A.    Copay, yes.
17    Q.    Okay.  So your copay you
18  think you're entitled to?
19    A.    Yes.
20    Q.    Okay.  Anything else?
21    A.    Attorney.
22    Q.    Okay.  Anything else?
23    A.    No.

Page 282

1    Q.    Okay.  Can you put a dollar
2  amount on what you think your mental
3  anguish has been?
4    A.    No.
5    Q.    You can't?
6    A.    No.
7    Q.    Why not?
8    A.    I just can't.
9    Q.    Okay.  You can't tell me
10  what you'd ask a jury to award you?
11    A.    No, I never actually thought
12  of that, thought that.
13    Q.    You've never thought of how
14  much money you could get out of this
15  lawsuit?
16    A.    No, did not.
17    Q.    And you've never talked to
18  anybody about how much money you could
19  get out of this lawsuit?
20    A.    No.
21    MS. JACOBS:  Why don't we
22  take the five minute break and we'll
23  wrap it up.

Page 283

1    MS. VIDEOGRAPHER:  Off the
2  record.  The time is 1:38.
3
4    (A brief recess was taken.)
5
6    MS. VIDEOGRAPHER:  Back on
7  the record.  The time is 1:42.
8    Q.    (By Ms. Jacobs) Ms. Jacobs,
9  have you understood our questions today
10  or let us know when you haven't?
11    A.    Yes.
12    Q.    Okay.  And have you tried to
13  answer truthfully and fully and
14  accurately to the best of your
15  ability?
16    A.    Yes.
17    Q.    Okay.  Are there any issues
18  that you think you need to clear up
19  before we go off the record today?
20    A.    No.
21    Q.    No?
22    A.    No.
23    MS. JACOBS:  Okay.  Any

Page 284

1  further questions?
2    MR. WILLIAMS:  No further
3  questions.
4    MR. WALKER:  I don't have
5  anything.
6    MS. JACOBS:  Okay.
7    MS. VIDEOGRAPHER:  We
8  conclude the deposition.  The time is
9  1:42.
10
11
12
13
14
15    FURTHER DEPONENT SAITH NOT
16
17
18
19
20
21
22
23

71  (Pages 281 to 284)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

☐ FEPA
☒ EEOC    130-2005-0

_____ and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Adwoia Jacobs | 334- |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| | Montgomery, Alabama 36116 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| ELECTRONICS DEA SYSTEMS | 1,000 + | 334 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | Montgomery, Alabama 36104 | Montgome |

| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE |
|---|
| EARLIEST          LATEST |
| Feb. 10, 05   to date |
| ☒ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

On February 10, 2005, I was getting on the elevator at my place of work when I felt someone touch my rear end. I looked up and saw that it was Jeff Williams, a co-worker of mine. Once the elevator doors shut, Mr. Williams grabbed me and pulled me close to him. He pressed his body against me and forced me agains the wall. I said "hey, get off me!" He said "I am cold and I want you to warm me up". He proceeded to take my blouse out of my pants and he began to rub my bare stomach. He began rubbing my breasts and then he began putting his hand in my pants. He laid his head on my shoulder and told me it felt good. The elevator came to a stop and he got off on the 6th floor. I was flabbergasted.

I have had to go to the Doctor as a result of this incident. I injured my shoulder when I tried to push him off of me. I am also seeing a Counselor because of the problems that I am having dealing with this.

I feel that I have been discriminated against in violation of the Civil Rights Act of 1964, specifically Title VII, 42 U.S.C. sections 2000e et se I am also alleging State claims of Assault, battery, wantonness, negligent hiring, training and supervision, invasion of privacy, and outrage.

DEFENDANT'S EXHIBIT

8 Jacobs

| ☒ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |

Date 3-8-05    Charging Party *(Signature)*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)   3/8/05

EEOC FORM 5 (Rev. 06/92)

JACOBS00112

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ADWOWA JACOBS, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| ELECTRONIC DATA SYSTEMS | § | 2:05-CV-925-MHT-SRW |
| CORPORATION AND JEFF | § | |
| WILLIAMS, | § | |
| Defendants. | § | |

## ELECTRONIC DATA SYSTEMS CORPORATION'S
## FIRST SET OF REQUESTS FOR ADMISSIONS, INTERROGATORIES AND
## REQUESTS FOR PRODUCTION

TO:    Adwowa Jacobs, by and through her attorney of record, Mr. L.D. Walker, III, The
       Walker Law Firm, 8650 Minnie Brown Road, Suite 160, Montgomery, Alabama
       36117.

       Electronic Data Systems Corporation, Inc. ("EDS"), one of the Defendants in the above-

entitled and numbered cause, serves the following Requests for Admissions, Interrogatories and

Requests for Production, to which Plaintiff shall respond in accordance with the Federal Rules of

Civil Procedure.    Plaintiff must answer each Request for Admission, Interrogatory and/or

Request for Production separately.    Plaintiff must deliver her written responses, as well as

responsive documents, to counsel for EDS within thirty (30) days of service of same to Baker &

Hostetler LLP, 1000 Louisiana, Suite 2000, Houston, Texas 77002-5009.

EXHIBIT "2"

Respectfully submitted,

BAKER & HOSTETLER LLP

Dated: March 27, 2006

By: _____

Tonya A. Jacobs
Texas Bar No. 00790954
Federal I.D. No. 18459
Rachel M. Smith
Texas Bar No. 24046483
Federal I.D. No. 570875
1000 Louisiana, Suite 2000
Houston, Texas 77002-5009
(713) 751-1600 Telephone
(713) 751-1717 Telecopier

BURR & FORMAN LLP

Ashley H. Hattaway (HAT007)
Wachovia Tower
420 North Twentieth Street, Ste. 3100
Birmingham, Alabama 35203
Telephone: (205) 458-5135
Telecopier: (205) 458-5100

ATTORNEYS FOR DEFENDANT ELECTRONIC
DATA SERVICES CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March, 2006, a true and correct copy of the foregoing document has been served on the following counsel of record, via Certified Mail, return receipt requested:

L. D. Walker, III
The Walker Law Firm
8650 Minnie Brown Road, Suite 160
Montgomery, Alabama 36117

James E. Williams
Melton, Epsy & Williams, P.C.
Post Office Drawer 5130
Montgomery, Alabama 36103-5130

_____
Tonya A. Jacobs

2

## DEFINITIONS

A.   "Jacobs," "You," or "Your" refers to Plaintiff, Adwowa Jacobs, including, without limitation, her agents, employees, attorneys, accountants, and all persons acting or purporting to act on her behalf.

B.   "Defendant" or "EDS" refers to Electronic Data Systems Corporation, Inc., including, without limitation, all persons which you contend act or purport to act on Defendant, EDS' behalf.

C.   "Defendants," in the plural, shall include both Electronic Data Systems Corporation, Inc. and Jeff Williams.

D.   "Williams" shall refer to Defendant, Jeff Williams.

E.   "Complaint" means Plaintiff's Complaint filed by you in this case, including all amendments thereto.

F.   The term "PERSON" includes a corporation, partnership, or any other type of business association or entity; a governmental body, municipality, board, agency, or entity of any type; and a natural person.

G.   The term "IDENTIFY" when used in connection with a natural person, entity, or document means that you are required to furnish the following information

   (a)   With respect to a natural person, state (i) his/her full name, (ii) his/her last known business and residence address and telephone numbers, (iii) his/her last known employer or place of employment and job title, and (iv) if such person was affiliated at any time with you by employment or otherwise, the nature and dates of such affiliation, including all job titles held and the dates during which each position was held;

   (b)   With respect to an entity, state its full name, address and telephone number; and

   (c)   With respect to a document, either produce a copy of the document or (i) state the title of the document, its, date, author and list its recipient(s) (as applicable), (ii) list any identification number, (iii) describe its contents, (iv) disclose whether any page or part thereof is missing, lost or otherwise omitted.

H.   "POSSESSION" means and includes documents actually within your possession, custody or control, including any employee, consultant, aide or other representative (including, without limitation, attorneys and accountants) and any other person acting or purporting to act on your behalf or in concert with you, and includes any temporary placing of possession, custody or control in any third party by any of the foregoing persons. All documents and tangible things in your possession which are responsive to these Requests for Production shall be produced.

3

I.    WRITINGS and RECORDINGS shall mean and include, without limitation, all handwritten, typed, printed and photostatic matter and drafts, duplicates or any other copies of all agreements, contracts, communications, correspondence, letters, telegrams, telexes, telecopies, memoranda, records, reports, books, tape recordings, summaries or other records of telephone conversations or interviews, summaries or other records of personal conversations, summaries or other records of meetings and conferences, diaries, calendars, appointment books, financial statements, worksheets, accounts, ledgers, notes, bills, statements, invoices, journal entries, receipts, checks, cancelled checks, envelopes or folders or similar containers, microfilm, microfiche, booklets, circulars, pamphlets, photographs, graphs, charts, computer programs, cards, tapes or disks, computer runs, magnetic or other memory components of computers containing information, summaries or analyses of computer runs, and all WRITINGS of any type and all other data compilations from which information can be obtained or translated into usable form.

J.    "RELATING TO" means refers to, relates to, concerns, reflects, contains, embodies or in any manner pertains to the subject matter of the Request for Admission, Interrogatory and/or Request for Production.

K.    "EEOC" means the Equal Employment Opportunity Commission.

L.    "Title VII" means Title VII of the Civil Rights Act of 1964.

M.    The singular shall include the plural, and the plural the singular, wherever the effect of doing so is to increase the information responsive to the request for information.

N.    The "last 10 years to the present" means 10 years preceding the service of this discovery through the present. Pursuant to the supplementation requirement under the Federal Rules of Procedure, you are hereby requested to update your answers regarding all complaints, lawsuits, settlements, information, documents, etc. that arise or are created or come to your attention during the pendency of this lawsuit.

O.    "Benefits" or "fringe benefits" means anything of value received by Plaintiff, including but not limited to, life insurance policies or plans, health insurance policies or plans, dental insurance policies or plans, disability insurance policies or plans, paid vacation, paid sick days, paid personal days, severance payments or packages, tuition reimbursement payments or plans, company picnics or parties, company retreats, company award programs at resorts paid for by the company, below-market interest loans, credit union membership, motor vehicles provided, car allowances, annuities, pension payments or plans, IRAs, SEPs, matching 401(k) or other pension or retirement payments, borrowing privileges against a 401(k) or other pension funds, employee awards or rewards programs, cafeteria plan benefits, programs that permit an employee to receive pay in a manner in which the employee gets tax benefits if [he/she] uses the income to pay for day care, deductibles on insurance payments, etc., vision payments or plans, country club memberships, club memberships, use of company owned tickets to sporting, musical or other entertainment events, use of country clubs or other clubs of which the employer is a member, or any other type of perks or perquisites.

4

## **INSTRUCTIONS**

A.    You are required to respond to these Requests for Admission, Interrogatories and Requests for Production, drawing upon all materials in your actual or constructive possession, ownership, custody, or control, including materials that you have a right to secure from any other source.   These sources include, but are not limited to, your agents, attorneys, accountants, consultants, and advisors.

B.    If any document requested was, but no longer is, in your possession or subject to your control, whether actual or constructive, please identify the document, state what disposition was made of the document, and the date or dates (or approximate date or dates) when such disposition was made.

C.    Supplementation is required.   You are required to supplement your responses to include information hereafter acquired or discovered in accordance with the Federal Rules of Civil Procedure.

D.    Objections.   If you file a proper and timely objection to any individual Request for Admission, Interrogatory and/or Request for Production or a portion thereof, please respond to all portions of the Request and/or Interrogatory that do not fall within the ambit of your objection. For example, if you object to a Request on the ground that it is too broad insofar as it seeks documents covering time periods that you contend are not relevant to this litigation, you should produce documents for all time periods which you concede are relevant.

E.    Withholding Documents.   If any document is withheld, in whole or in part, for any reason, including, but not limited to, any claim of privilege or confidentiality, please state with respect to each document: (a) the privilege or ground under which the document is being withheld; (b) a general description of the subject matter of the document; (c) the author of the document; (d) all persons to whom the document is addressed and all persons to whom copies of the document were furnished, together with their job titles; (e) the date of the document; (f) the present custodian and location of the document; and (g) the paragraph number of the request to which the document is responsive.

F.    No Responsive Documents.   If there are no documents responsive to a specific Request, please so indicate in your written response to that Request for Production.

G.    Manner of Production.   The documents produced in response to each Request shall be segregated and clearly marked or labeled as to the specific Request to which such documents are responsive and are being produced. Otherwise, such documents shall be produced as they are kept in the usual course of business, including the production of files from which such documents are taken.

H.    If it is claimed that any of the documents the identity of which is sought in these Requests and/or Interrogatories constitute trial preparation materials, then for each such document, please state:

(a)    who prepared the document;

(b)    who requested that the document be prepared;

(c)    when and where the document was prepared; and

(d)    the identity of each person who has revised the document.

I.    In the event that any document requested has been lost or destroyed, please identify such document by author(s), addressee(s), date, subject matter, number of pages, and attachments or appendices, identify all persons to whom such document was distributed, shown or explained, identify all persons who had custody of each such document, state the date of loss or destruction, and identify the person responsible for the loss or destruction.

J.    Unless otherwise specified, each Request for Admission, Interrogatory and/or Request for Production seeks information from the date you initially applied for employment with Defendant through the date of your response to these Requests.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**  Admit that you have not incurred and are not seeking to recover in this lawsuit any past or future medical expenses as a result of the alleged conduct of the Defendants as set forth in your Complaint.

RESPONSE:

**REQUEST FOR ADMISSION NO. 2:**  Admit that you have not been treated by a psychologist, psychiatrist, doctor, or medical professional as a result of the alleged conduct of the Defendants as set forth in your Complaint.

RESPONSE:

**REQUEST FOR ADMISSION NO. 3:**  Admit that at all times during your employment with EDS, you have been an at-will employee.

RESPONSE:

**REQUEST FOR ADMISSION NO. 4:**  Admit that you do not have a contract to be employed with EDS for any length of time.

RESPONSE:

**REQUEST FOR ADMISSION NO. 5:**  Admit that you are currently employed by EDS.

RESPONSE:

**REQUEST FOR ADMISSION NO. 6:**  Admit that you have not been harassed because of your gender.

RESPONSE:

**REQUEST FOR ADMISSION NO. 7:**  Admit that you have not suffered a substantial detrimental effect on your employment or your psychological well-being, as a result of any conduct of Defendants.

RESPONSE:

**REQUEST FOR ADMISSION NO. 8:**  Admit that you have not been treated for or diagnosed with severe emotional distress, mental anguish, anxiety, stress, humiliation, inconvenience, and/or loss of enjoyment of life.

RESPONSE:

7

REQUEST FOR ADMISSION NO. 9:  Admit that neither EDS nor Williams engaged in extreme and/or outrageous conduct toward you.

RESPONSE:

REQUEST FOR ADMISSION NO. 10:  Admit that neither EDS nor Williams discriminated against you because of your gender.

RESPONSE:

REQUEST FOR ADMISSION NO. 11:  Admit that neither EDS nor Williams intentionally and/or recklessly caused you severe emotional distress.

RESPONSE:

REQUEST FOR ADMISSION NO. 12:  Admit that neither EDS' nor Williams' actions or inactions constituted a wrongful intrusion into your private life and/or activities.

RESPONSE:

REQUEST FOR ADMISSION NO. 13:  Admit that EDS did not intrude into your private life and activities in such a manner as to cause you outrage, mental anguish, shame, and/or humiliation.

RESPONSE:

REQUEST FOR ADMISSION NO. 14:  Admit that you have no evidence that EDS intentionally interfered with your interest in solitude and seclusion, either as to your person or private affairs and/or concerns.

RESPONSE:

REQUEST FOR ADMISSION NO. 15:  Admit that you have never been subject to unwelcome sexual harassment during your employment with EDS.

RESPONSE:

REQUEST FOR ADMISSION NO. 16:  Admit that you reported only one alleged incident of harassment to anyone at EDS.

RESPONSE:

REQUEST FOR ADMISSION NO. 17:  Admit that during your employment with EDS, you have not been demoted or docked in pay.

RESPONSE:

8

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

ADWOWA JACOBS,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀CIVIL ACTION NO. 2:05CV925-MHT
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
ELECTRONIC DATA SYSTEMS⠀⠀)
CORPORATION, et al.,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Defendants.⠀⠀⠀⠀)

## ORDER

This matter is presently before the court on the motion to compel and for imposition of sanctions filed by defendant Electronic Data System Corporation on June 16, 2006 (Doc. # 15). Although she was given an opportunity to do so (see Doc. # 16), plaintiff has not responded to the motion. Upon consideration of the motion, it is

ORDERED that the motion to compel is GRANTED. Plaintiff is directed to respond to defendant's outstanding interrogatories and requests for production, without objection, on or before July 21, 2006.

It is further ORDERED that defendant's requests for admissions are deemed admitted by operation of Fed. R. Civ. P. 36(a).

It is further ORDERED that defendant's motion for sanctions is GRANTED to the extent that the court will require plaintiff to pay defendant reasonable expenses and attorney's fees incurred in making the present motion. Defendant's counsel is DIRECTED to file an affidavit itemizing such fees and expenses on or before July 20, 2006. Plaintiff may file a written objection to the reasonableness of any such fees or expenses on or before July 27, 2006. To the extent defendant's

**EXHIBIT "3"**

motion seeks fees for time expended in corresponding with plaintiff's counsel in an attempt to

resolve this discovery dispute, the motion is DENIED.

DONE, this 12th day of July, 2006.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

2