## FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT FOR

2         THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CASE NUMBER:  2:05-CV-925-MHT-SRW

6                          **COPY**

7    ADWOWA JACOBS,

8         Plaintiff,

9         vs.

10

11   ELECTRONIC DATA SYSTEMS CORPORATION

12   and JEFF WILLIAMS,

13        Defendants.

14

15        S T I P U L A T I O N

16        IT IS STIPULATED AND AGREED by

17   and between the parties through their

18   respective counsel, that the video

19   deposition of ADWOWA JACOBS may be taken

20   before Leslie K. Hartsfield, at the

21   Frank M. Johnson, Jr. Federal Building,

22   15 Lee Street, Courtroom 5B, Montgomery,

23   Alabama,

EXHIBIT

A

## FREEDOM COURT REPORTING

Page 2

1　　　　VIDEO DEPOSITION OF ADWOWA JACOBS

2　　taken on the 4th day of October, 2006.

3　　　　　IT IS FURTHER STIPULATED AND

4　　AGREED that the signature to and the

5　　reading of the deposition by the witness

6　　is waived, the deposition to have the

7　　same force and effect as if full

8　　compliance had been had with all laws

9　　and rules of Court relating to the

10　　taking of the deposition.

11　　　　　IT IS FURTHER STIPULATED AND

12　　AGREED that it shall not be necessary

13　　for any objections to be made by counsel

14　　to any questions except as to the form

15　　or leading questions, and that counsel

16　　for the parties may make objections and

17　　assign grounds at the time of the trial,

18　　or at the time said deposition is

19　　offered in evidence, or prior thereto.

20　　　　　IT IS FURTHER STIPULATED AND

21　　AGREED that the notice of filing of the

22　　deposition by the Commissioner is

23　　waived.

## FREEDOM COURT REPORTING

Page 3

1                         INDEX

2   EXAMINATION BY:        PAGE NUMBER:

3   Ms. Jacobs                  7

4   Mr. Williams                222

5   Ms. Jacobs continued        273

6

7

8   DEFENDANTS' EXHIBITS:

9   1 - EDS Code of Conduct        30

10  2 - Sexual Harassment Policy   33

11  3 - Driver's license           38

12  4 - E-mail 2-10-05             77

13  5 - E-mail 2-10-05             79

14  6 - Statement 2-23-05          88

15  7 - E-mail 6-28-05             108

16  8 - EEOC 3-8-05                145

17  9 - Complaint                  169

18  10- Letter 3-14-05             199

19  11- Rite Aid 2005              203

20

21

22

23

**FREEDOM COURT REPORTING**

Page 4

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5     CASE NUMBER:   2:05-CV-925-MHT-SRW

6

7     ADWOWA JACOBS,

8             Plaintiff,

9             vs.

10

11    ELECTRONIC DATA SYSTEMS CORPORATION

12    and JEFF WILLIAMS,

13            Defendants.

14

15    BEFORE:

16            LESLIE K. HARTSFIELD,

17            Commissioner.

18

19    APPEARANCES:

20            BAKER, HOSTETLER, by Ms. Tonya A.

21    Jacobs, 1000 Louisiana, Suite 2000,

22    Houston, Texas, 77002-5009, appearing on

23    behalf of the Defendant Electronic Data

## FREEDOM COURT REPORTING

Page 5

1  Systems Corporation.

2      MELTON, ESPY & WILLIAMS, by Mr.

3  James E. Williams, 301 Adams Avenue,

4  Montgomery, Alabama, 36103, appearing on

5  behalf of the Defendant Mr. Jeff

6  Williams.

7      L.D. WALKER, III, ESQUIRE, 8650

8  Minnie Brown Road, Suite 160,

9  Montgomery, Alabama, 36117, appearing on

10  behalf of the Plaintiff.

11

12  ALSO PRESENT:

13      Jeff Williams

14      Melissa Keicher, videographer

15

16          * * * * * * * *

17

18      I, LESLIE K. HARTSFIELD, a Court

19  Reporter of Prattville, Alabama, acting

20  as Commissioner, certify that on this

21  date, as provided by the Federal Rules

22  of Civil Procedure and the foregoing

23  stipulation of counsel, there came

## FREEDOM COURT REPORTING

Page 6

1   before me at the Frank M. Johnson, Jr.

2   Federal Building, 15 Lee Street,

3   Courtroom 5B, Montgomery, Alabama,

4   beginning at 10:04 a.m., ADWOWA JACOBS,

5   witness in the above cause, for oral

6   examination, whereupon, the following

7   proceedings were had:

8

9            MS. VIDEOGRAPHER:   We now

10  commence the deposition in the matter of

11  Adwowa Jacobs versus Electronic Data

12  Systems Corporation and Jeff Williams.

13  Videotaping is provided by Video

14  Visions.  Melissa Keicher, videographer.

15  The date is Wednesday, October 4, 2006,

16  The time is 10:04 a.m.  The location is

17  Frank M. Johnson, Jr. Federal Building

18  and U.S. Courthouse, 15 Lee Street,

19  Montgomery, Alabama.  The deponent is

20  Adwowa Jacobs.  The deponent will now be

21  sworn and the attorneys will then

22  introduce themselves.

23

## FREEDOM COURT REPORTING

1              ADWOWA JACOBS

2      being first, duly sworn, was examined

3              and testified as follows:

4

5              THE REPORTER:  Usual

6      stipulations?

7              MS. JACOBS:  Yes, that's

8      fine.  Tonya Jacobs for defendant

9      Electronic Data Systems.

10             MR. WILLIAMS:  Jim Williams

11     for defendant Jeff Williams.

12             MR. WALKER:  Dee Walker for

13     plaintiff Adwowa Jacobs.

14

15     EXAMINATION BY MS. JACOBS:

16         Q.    Ms. Jacobs, could you please

17     state your full name for the record?

18         A.    Adwowa Jacobs.

19         Q.    Is that the only name you've

20     gone by?

21         A.    My initial A.J.

22         Q.    Okay.  Is that your maiden

23     name?

## FREEDOM COURT REPORTING

1        A.      Jacobs?

2        Q.      Yes.

3        A.      Yes.

4        Q.      You don't have a married

5    name?

6        A.      No.

7        Q.      Ever gone by a married

8    name?

9        A.      No.

10       Q.      Where do you currently

11   reside?

12       A.      1525 Flam --

13               THE REPORTER:  I'm sorry?

14       A.      1525 Flamingo Lane.

15       Q.      Is that here in Montgomery?

16       A.      Yes, Montgomery, Alabama.

17       Q.      How long have you lived at

18   that address?

19       A.      Since '99, June '99.

20       Q.      Does anyone live with you at

21   that address?

22       A.      My two sons.

23       Q.      What are their names and

## FREEDOM COURT REPORTING

1    ages?

2          A.     Eric, 12; Aaron, 7.

3          Q.     Anyone else live with you at

4    that address?

5          A.     No.

6          Q.     Have you ever had your

7    deposition taken before?

8          A.     No.

9          Q.     I'm certain that your

10   attorney has gone over some of the

11   ground rules but I want to make sure you

12   and I understand each other.

13         A.     Okay.

14         Q.     And make it easier for the

15   court reporter and videographer as well.

16   We have a court reporter here.  She's

17   typing down everything you and I say.

18   So it's going to be important that I let

19   you finish an answer before I ask my

20   next question and important for you to

21   do the same for me, okay?

22         A.     Okay.

23         Q.     Even if you know what my

# FREEDOM COURT REPORTING

Page 10

1    question is, you need to wait till I get

2    it fully out, okay?

3         A.    Okay.

4         Q.    And you're doing fine right

5    now.  You need to be certain that you

6    answer verbally as opposed to a nod of

7    the head.

8         A.    Okay.

9         Q.    She can't really get down a

10   nod of the head.

11        A.    Okay.

12        Q.    Also, we're going to be here

13   for a while today, but it's by no means

14   a marathon session.  So if you need to

15   take a break, just let me know, we'll

16   take periodic breaks throughout the day.

17        A.    Okay.

18        Q.    All I ask is that if there

19   is a question on the table, you answer

20   that question.

21        A.    Okay.

22        Q.    Okay.  Also if you don't

23   understand one of my questions, just let

## FREEDOM COURT REPORTING

Page 11

1  me know and I'll rephrase it until you

2  do understand, okay?

3         A.    Okay.

4         Q.    I am going to assume if you

5  answer my question that you fully

6  understand it.

7         A.    Okay.

8         Q.    Is that all right?

9         A.    That's okay.

10        Q.    Okay.  Are you currently

11  taking any medication?

12        A.    Yes.

13        Q.    What medications?

14        A.    Lexapro and occasionally

15  Ambien.

16        Q.    What is Lexapro?

17        A.    Anti-depressants.

18        Q.    How long have you been on

19  it?

20        A.    Off and on because of the

21  side effects probably over a year.

22        Q.    Who prescribed that for

23  you?

## FREEDOM COURT REPORTING

Page 12

1     A.    Dr. Smith initially

2   prescribed it.  My -- I got off and

3   primary physician prescribed it back in

4   August of this year.

5     Q.    Who's your primary

6   physician?

7     A.    Forgive me.  He's out of --

8   Bernard Hale is one of them at American

9   Family Care.

10    Q.    Is he the one that

11  prescribed it for you in August?

12    A.    Yes.  And as well as the

13  Ambien.  And Ms. Smith -- Dr. Smith

14  prescribed the Ambien as well.

15    Q.    And the Ambien is for

16  sleeping?

17    A.    Yes.

18    Q.    How often do you take it?

19    A.    I take it probably twice --

20  twice a week.

21    Q.    What about the Lexapro?

22    A.    I have to take that daily.

23    Q.    Are you on any other

## FREEDOM COURT REPORTING

Page 13

1   medication currently?

2          A.     For hormonal things.

3          Q.     Okay.   Prescribed by an

4   OB/GYN?

5          A.     Yes.

6          Q.     Okay.   Anything else?

7          A.     No.

8          Q.     Would any of these

9   medications make it difficult for you to

10  understand my questions today?

11         A.     No.

12         Q.     Or difficult to tell the

13  truth today?

14         A.     No.

15         Q.     Have you ever -- let me back

16  up.  Have you reviewed any documents to

17  prepare for this deposition today?

18         A.     Such as?

19         Q.     Anything.  What did you do

20  to prepare to come to your deposition

21  today, if anything?

22         A.     Just read over some

23  information that I had from my files.

## FREEDOM COURT REPORTING

Page 14

1      Q.    Okay.  Is that information
2  you provided to your attorney?
3      A.    Yes.
4      Q.    Anything else?
5      A.    No.
6      Q.    Do you recall what
7  information that was that you
8  reviewed?
9      A.    Basically, the e-mail
10  correspondence from the human resource
11  person in Virginia, I think.
12      Q.    Would that be Leslie
13  Liebman?
14      A.    Yes.
15      Q.    Anything else that you
16  recall?
17      A.    No.
18      Q.    Have you created any tape
19  recordings or video recordings that
20  would be relevant to this lawsuit?
21      A.    Tape recording, yes.
22      Q.    What tape recordings?
23      A.    A conversation that I had

## FREEDOM COURT REPORTING

Page 15

1    with Leslie Liebman.

2         Q.    When was that?

3         A.    I think it was June '05.

4         Q.    Was that over the phone or

5    in person?

6         A.    Over the phone.

7         Q.    Did she know she was being

8    taped?

9         A.    I don't think so.

10         Q.    What was that conversation

11    about?

12         A.    If I -- if I'm not mistaken,

13    it was -- she was basically inquiring

14    about some accusations stated that I

15    said or done and -- basically some

16    accusation that was said or done, that I

17    so-called said and done.  I was like I

18    don't know what you're referring to.

19    She stated that I was faking my trauma,

20    so forth, and I stated to her no, I

21    wasn't faking.  And she just kept on

22    pushing and pushing, say well, she heard

23    someone told her or she had information

## FREEDOM COURT REPORTING

Page 16

1　that I was trying to get some money

2　out -- out of the lawsuit to pay off

3　some bills.  And I stated to her that I

4　was offended by that.  And I said any --

5　any more conversation please contact my

6　attorney.  I don't want to have anything

7　else to do with this conversation.

8　　　　　　MR. WALKER:  Tonya, if I

9　might interject, if we've not given you

10　a copy of that tape, we'll provide one

11　for you.

12　　　　　　MS. JACOBS:  Yes, we haven't

13　been given a copy of that tape.

14　　　　　　MR. WALKER:  We'll provide

15　you.

16　　　　Q.    (By Ms. Jacobs)  Do you

17　still have a copy of that tape?

18　　　　A.    No.

19　　　　Q.    Have you provided it to your

20　counsel?

21　　　　A.    Yes.

22　　　　Q.    When did you provide it to

23　your counsel?

# FREEDOM COURT REPORTING

Page 17

1          A.     Probably shortly after.

2                 MR. WALKER:  I'll tell you I

3    think we had it --

4          Q.     Shortly after when?

5          A.     After the conversation.

6          Q.     Any other tape recordings --

7          A.     No.

8          Q.     -- or video tape

9    recordings?

10         A.     No.

11         Q.     Have you ever filed a

12   lawsuit before this one?

13         A.     No.

14         Q.     Have you ever been a party

15   so either a plaintiff or a defendant --

16         A.     No.

17         Q.     -- in a lawsuit?

18         A.     I'm sorry.  No.

19         Q.     You haven't been sued for

20   debts or anything like that?

21         A.     No.

22         Q.     Have you ever been convicted

23   of a crime?

## FREEDOM COURT REPORTING

Page 18

1      A.    No.

2      Q.    Ever arrested?

3      A.    No.

4      Q.    Where did you go to high

5  school?

6      A.    Carver Senior High here in

7  Montgomery.

8      Q.    Could you say that --

9      A.    Carver.

10      Q.    Carver.  When did you

11  graduate?

12      A.    '89, 1989.

13      Q.    Did you go to college?

14      A.    Yes.

15      Q.    Where?

16      A.    Alabama A&M University in

17  Normal, Alabama.

18      Q.    Did you graduate?

19      A.    Yes.

20      Q.    What year?

21      A.    '94.

22      Q.    What did you have a degree

23  in?

**FREEDOM COURT REPORTING**

Page 19

1          A.     Telecommunication.

2          Q.     When did you start at EDS?

3          A.     1997, August.

4          Q.     Where did you work prior to

5     EDS?

6          A.     Air Force Quality Institute

7     on Maxwell Air Force Base.

8          Q.     How long did you work

9     there?

10          A.     Six months.

11          Q.     Were you an employee or a

12     temporary?

13          A.     Temporary.

14          Q.     What did you do?

15          A.     Audio visual technician.

16          Q.     And what time period was

17     that that you were employed there?

18          A.     From March -- I'm sorry.

19     From November to March.

20          Q.     Of what year?

21          A.     I'm sorry.  November '96 to

22     March '97.

23          Q.     And before that, where were

**FREEDOM COURT REPORTING**

Page 20

1  you employed?

2       A.     Kelly Temporary Service.

3       Q.     How long were you employed

4  there?

5       A.     Approximately six months.

6       Q.     What time period?

7       A.     Had to be April up until

8  that November.

9       Q.     So April of '96?

10      A.     Yes.

11      Q.     Through November of '96?

12      A.     Yes.

13      Q.     Prior to that, where were

14  you employed?

15      A.     C Con Pest Control.  It was

16  in Huntsville, was a subcontractor in

17  Hunts -- Huntsville.

18      Q.     C Com?

19      A.     C Con.

20      Q.     Oh, okay.  Pest Control?

21      A.     Yes.

22      Q.     How long were you there?

23      A.     Two years.

## FREEDOM COURT REPORTING

Page 21

1      Q.    What time period?

2      A.    Wait a minute.  It's a year,

3  year and a half, 18 months.

4      Q.    What time period,

5  approximately?

6      A.    From April of '95 up until

7  March of '96.

8      Q.    That was where?

9      A.    C Con.  It was in

10  Huntsville.

11      Q.    Huntsville.  Prior to that,

12  where were you employed?

13      A.    I wasn't employed.

14      Q.    You were going to school?

15      A.    Yes.  Well, just had a

16  baby.

17      Q.    Have you been terminated

18  from any position?

19      A.    No.

20      Q.    Any warnings or disciplinary

21  actions?

22      A.    No.

23      Q.    Prior to the charge that you

**FREEDOM COURT REPORTING**

Page 22

1    filed in this case, have you filed a

2    charge of discrimination before?

3          A.    No.

4          Q.    You said you started in

5    August of 1997 with EDS?

6          A.    Uh-huh (affirmative

7    response).  Yes.

8          Q.    How did you find out about

9    the position?

10          A.    A friend of mine that

11    attended church with me.

12          Q.    Who is that?

13          A.    Shonda Robinson.

14          Q.    Was she employed by EDS?

15          A.    Yes.

16          Q.    She currently employed by

17    EDS?

18          A.    No.

19          Q.    Did you have to interview

20    for the position?

21          A.    Yes.

22          Q.    Who did you interview

23    with?

**FREEDOM COURT REPORTING**

Page 23

1    A.    Shelton Hamilton, Brook; I

2    don't recall her last name.

3    Q.    Anyone else?

4    A.    No.

5    Q.    Who offered you the

6    position?

7    A.    They did.

8    Q.    Both?

9    A.    Yes.

10    Q.    And what was the position

11    when you first started?

12    A.    Customer service rep.

13    Q.    And have you remained in

14    that position since you've been at EDS

15    or that title?

16    A.    That title, yes.

17    Q.    When you first started, what

18    area were you in?

19    A.    On the phone.

20    Q.    So you were what I

21    would call --

22    A.    Customer service, yes.

23    Q.    -- call center?

**FREEDOM COURT REPORTING**

Page 24

1      A.     Yes.

2      Q.     Could you tell me a little

3  bit about what EDS does at the

4  Montgomery facility?

5      A.     This -- this particular

6  contract we consolidate student loans.

7      Q.     And is that what it did back

8  in '97?

9      A.     Yes.

10     Q.     And so when you started, you

11  were on the phones talking --

12     A.     Correct.

13     Q.     -- customer service?

14     A.     Yes, ma'am.

15     Q.     How long did you do that?

16     A.     Four months.

17     Q.     Who did you report to?

18     A.     Robert Martin.

19     Q.     Could you spell his last

20  name?

21     A.     M-A-R-T-I-N.

22     Q.     After four months, what did

23  you do?

**FREEDOM COURT REPORTING**

Page 25

1    A.    I went to the core edit team

2    as a TDY position.

3    Q.    The core edit team?

4    A.    Yes, correspondence edit,

5    research team basically.

6    Q.    When you were on the

7    customer service on the phone, where

8    were you actually located, what floor?

9    A.    Sixth floor.

10    Q.    Okay.  And the building I

11    understand it has eight floors?

12    A.    Has eight floors.

13    Q.    Okay.  Could you tell me how

14    many floors were occupied at -- by EDS

15    in 1997?

16    A.    Three.

17    Q.    What floors were those?

18    A.    Fourth, fifth, and sixth.

19    Q.    Has that changed throughout

20    the years?

21    A.    Yes.

22    Q.    How?

23    A.    Origination was on the fifth

**FREEDOM COURT REPORTING**

Page 26

1    floor.   Mailroom was on the fourth

2    floor.   And they expanded out to the

3    tech team on the third floor.   They

4    downsized that on the third floor.

5    Fourth floor moved to the tech and

6    center.   Fifth floor lost its contract,

7    it went away and has remained on the

8    sixth floor.

9         Q.    Okay.   So currently how many

10   floors does EDS --

11        A.    One.

12        Q.    Okay.   And what floor is

13   that?

14        A.    Sixth floor.

15        Q.    When did that occur?

16        A.    Well, they have sixth floor

17   and half of five.   That occurred

18   probably last year sometime.

19        Q.    What about when this

20   incident occurred that you filed the

21   lawsuit about with Mr. Williams, that

22   would have been in February of 2005?

23        A.    Yes.

## FREEDOM COURT REPORTING

Page 27

1      Q.      How many floors did EDS have

2   then?

3      A.      Two floors, fifth and sixth

4   floor.

5      Q.      And where were you

6   located?

7      A.      On the sixth floor.

8      Q.      What about Mr. Williams?

9      A.      On the sixth floor.

10      Q.      Now, on the core edit

11   team --

12      A.      Uh-huh (affirmative

13   response).

14      Q.      -- is that where you

15   currently are as well?

16      A.      Yes.

17      Q.      Okay.  Have you been on that

18   team since --

19      A.      Yes.

20      Q.      So sometime in late 1997 or

21   early 1998 you switched to the core

22   team?

23      A.      Correct.

**FREEDOM COURT REPORTING**

Page 28

1    Q.    Okay.  And have been there

2    ever since?

3    A.    Yes.

4    Q.    Who's your supervisor

5    currently?

6    A.    Tara Relf.

7    Q.    How long has she been your

8    supervisor?

9    A.    I would say for the past

10   four, five years.

11   Q.    How's your relationship with

12   Ms. Relf?

13   A.    Okay.

14   Q.    You've not had any issues

15   with her?

16   A.    Not no personal issues,

17   no.

18   Q.    Who else is in the building,

19   if anybody, other than EDS?

20   A.    I don't know who's currently

21   on the rest of the floor.  But now, I

22   don't -- I'm not familiar who's on other

23   floors.

**FREEDOM COURT REPORTING**

Page 29

1      Q.    Are there other occupants of

2  the building as far as you're aware?

3      A.    I'm not sure.

4      Q.    What about in early 2005,

5  were there other occupants at that

6  time?

7      A.    Yes.

8      Q.    Who?

9      A.    The Boys and Girls Club of

10  Montgomery.

11      Q.    Anyone else?

12      A.    I'm not sure.  Just know

13  that they were.

14      Q.    What floor did they have?

15      A.    They had the first floor.

16      Q.    Now, EDS has a policy which

17  prohibits harassment; correct?

18      A.    Correct.

19      Q.    And you're aware of that

20  policy?

21      A.    Correct.

22      Q.    In fact it's included in

23  EDS' code of conduct; correct?

## FREEDOM COURT REPORTING

Page 30

1       A.      Correct.

2

3       (Defendants' Exhibit No. 1 was

4        marked for identification.)

5

6       Q.      You've been handed what's

7   been marked as Exhibit No. 1.   Do you

8   recognize that document?

9       A.      Yes.

10      Q.      And that's EDS' Code of

11  Conduct?

12      A.      Correct.

13      Q.      The 2005 edition?

14      A.      Correct.

15      Q.      And EDS has an edition each

16  year; correct?

17      A.      Yes.

18      Q.      That you're provided with?

19      A.      Yes.

20      Q.      Okay.   And you actually have

21  to sign some sort of certification that

22  you've received it and read it;

23  correct?

## FREEDOM COURT REPORTING

1   A.     Correct.

2   Q.     And on Page 8 of the code of

3   conduct, there is the sexual harassment

4   and other unlawful behavior policy;

5   correct?

6   A.     Correct.

7   Q.     Which specifically notes

8   that EDS does not tolerate sexual

9   harassment or other unlawful behavior in

10  the workplace; correct?

11  A.     Correct.

12  Q.     And in addition to having

13  that policy and its code of conduct, EDS

14  has all of its policies on-line; is that

15  correct?

16  A.     Correct.

17  Q.     In something called "the

18  info center"?

19  A.     Yes.

20  Q.     Okay.  And so you can

21  routinely go, if you want to, and look

22  at all EDS' policies on-line?

23  A.     Correct.  Can I ask you a

## FREEDOM COURT REPORTING

Page 32

1    question?  You said I was handed this.

2            Q.    No.  You were provided with

3    a copy at some point each year?

4            A.    On-line, yes.

5            Q.    Yes.  Okay.  I -- I didn't

6    mean to imply that you -- somebody

7    physically handed it to you.

8            A.    Okay.

9            Q.    But you were given access

10   to --

11           A.    Right.

12           Q.    -- or provided it somehow?

13           A.    Right.

14           Q.    And you're telling me it was

15   on-line?

16           A.    Correct.

17           Q.    And then did you certify

18   on-line that you received a copy and

19   read it?

20           A.    Correct.

21           Q.    Okay.  So that was all done

22   on-line?

23           A.    Right.

**FREEDOM COURT REPORTING**

1    Q.    As all of its other policies

2    are on-line as well?

3        A.    Yes.

4        Q.    Okay.  Is that somewhere

5    different than the info center or is it

6    kept in the info center as well?

7        A.    This is as well as on info

8    center.

9        Q.    Okay.

10

11        (Defendants' Exhibit No. 2 was

12        marked for identification.)

13

14        Q.    You've been handed another

15    exhibit.  It's Exhibit 2.  Do you

16    recognize that document?

17        A.    Yes.

18        Q.    And that is EDS' sexual

19    harassment policy?

20        A.    Correct.

21        Q.    And this is what is actually

22    on-line in the info center?

23        A.    Yes.

**FREEDOM COURT REPORTING**

Page 34

1          Q.     And you had access to the

2    info center; correct?

3          A.     Yes.

4          Q.     Daily at work?

5          A.     Yes.

6          Q.     Now, EDS also provided

7    training to its employees including you

8    on its harassment policy --

9          A.     Correct.

10         Q.     -- is that true?

11         A.     Yes.

12         Q.     Okay.  They did it both in

13   person training, what I call live

14   training, somebody would come and give

15   you training every once in a while,

16   would that be correct?

17         A.     On this?

18         Q.     On harassment policy?

19         A.     I don't --

20         Q.     You don't remember that?

21         A.     No.

22         Q.     But you had web base

23   training?

**FREEDOM COURT REPORTING**

Page 35

1          A.      Yes.

2          Q.      Okay.  How often did you

3    have web base training?

4          A.      Once a year.

5          Q.      And by web base, you mean

6    you would get on the computer and take a

7    course regarding harassment?

8          A.      Info center, correct.

9          Q.      Okay.  Now, if we look at

10   Exhibit No. 2 which is entitled, Sexual

11   Harassment and Other Unlawful Behavior

12   Policy, which is the policy that was in

13   the info center, if you turn to Page

14   2 --

15

16          (There was a brief interruption.)

17

18          Q.      (By Ms. Jacobs)  Pursuant to

19   the harassment policy which is Exhibit

20   No. 2, it requires employees who feels

21   that they've been subjected to

22   harassment to report such conduct to

23   EDS; correct?

**FREEDOM COURT REPORTING**

1        A.     Correct.

2        Q.     Okay.  And it in fact

3    provides a number of avenues or

4    different ways or different people you

5    can report to, would that be true?

6        A.     Correct.

7        Q.     Okay.  It specifically says

8    you can report it to your immediate

9    leader or any other EDS leader with whom

10   you feel comfortable; correct?

11       A.     Correct.

12       Q.     Either inside or outside

13   your leadership chain?

14       A.     Correct.

15       Q.     It also says you can report

16   it to employee relations; correct?

17       A.     Correct.

18       Q.     The office of ethics and

19   compliance?

20       A.     Correct.

21       Q.     Legal affairs?

22       A.     Correct.

23       Q.     And human resources?

## FREEDOM COURT REPORTING

Page 37

1      A.     Correct.

2      Q.     Okay.  The policy also

3   specifically notes that an employee will

4   not be retaliated against in -- for any

5   way in making good faith complaint;

6   correct?

7      A.     Correct.

8      Q.     Now, the code of conduct

9   also includes a policy which

10   specifically prohibits violence in the

11   workplace; is that correct?

12      A.     Correct.

13      Q.     And if you look back at

14   Exhibit No. 1 on Page 9, do you see the

15   violence in the workplace policy?

16      A.     Correct.

17      Q.     And the code of conduct?

18      A.     Uh-huh (affirmative

19   response).  Yes, ma'am.

20      Q.     It basically says that EDS

21   does not tolerate violent acts or

22   threats of violence made by an employee

23   against another person; correct?

**FREEDOM COURT REPORTING**

1    A.    Correct.

2    Q.    And you were aware of that

3  policy?

4    A.    Yes.

5    Q.    And that's also a policy

6  that's on the Internet or info center;

7  correct?

8    A.    Correct.

9    Q.    The policy specifically

10  prohibits an employee from carrying a

11  gun on EDS premises; is that true?

12    A.    That's true.

13    Q.    Okay.  Even if you've got a

14  registration or if you're licensed to

15  carry a gun --

16    A.    Correct.

17    Q.    -- that's true?  Now, you

18  are licensed to carry a gun?

19    A.    Yes, I am.

20

21    (Defendants' Exhibit No. 3 was

22      marked for identification.)

23

**FREEDOM COURT REPORTING**

1      Q.      You've been handed Exhibit

2  No. 3.  Do you recognize what that is?

3      A.      Yes.

4      Q.      It's something that you

5  produced to us; correct?

6      A.      Correct.

7      Q.      It's your driver's license

8  and then this pistol license?

9      A.      Correct.

10      Q.      When did you get your pistol

11  license?

12      A.      March of '05.

13      Q.      Is that the first time?

14      A.      Yes.

15      Q.      That you ever had a pistol

16  license?

17      A.      Yes.

18      Q.      Why did you get it in March

19  of '05?

20      A.      Because I felt that I was

21  just nervous and hurt, just felt that I

22  needed one for protection because of the

23  incident that happened in February.  I

## FREEDOM COURT REPORTING

Page 40

1    just didn't feel safe.

2        Q.    You said the incident that

3    happened in February.  Do you mean the

4    incident with Mr. Williams at work?

5        A.    Yes.

6        Q.    Even though you couldn't

7    carry a pistol at work?

8        A.    I had this for home.

9        Q.    Okay.  Had Mr. Williams ever

10   been to your house?

11       A.    I don't know but I was --

12   someone was knocking on my window at

13   night.

14       Q.    And you have no idea whether

15   that was Mr. Williams or somebody

16   else?

17       A.    I don't know who it was.

18       Q.    Did you contact the

19   police?

20       A.    Yes.

21       Q.    When?

22       A.    Several occasions.  It was

23   around February and as well as March.

# FREEDOM COURT REPORTING

Page 41

1        Q.    Of '05?

2        A.    Yes, ma'am.

3        Q.    What did they do?

4        A.    They wrote down the

5   incident, wrote down statements and they

6   told me to actually try to get a

7   videocam and try to record it.

8        Q.    Did you do that?

9        A.    No.  Couldn't afford one.

10       Q.    After February and March,

11  did people keep knock -- or somebody

12  keep knocking on your door --

13       A.    Yes.

14       Q.    -- and your windows?

15       A.    Yes.

16       Q.    How often?

17       A.    It's -- it happened quite

18  often.  Seems like every night around

19  the same time.

20       Q.    What time is that?

21       A.    Two o'clock in the morning,

22  2:10.

23       Q.    Every day?

### FREEDOM COURT REPORTING

Page 42

1      A.      Pretty much most of --

2      Q.      For how long did that

3  occur?

4      A.      It occurred for at least

5  until November, December of '05.

6      Q.      Did you report it after

7  February or March of '05?

8      A.      Yes.

9      Q.      Every time it happen did you

10  report it?

11      A.      I reported the incident

12  every -- yes, when I -- it was

13  evidence left back there I called the

14  police and provided them the evidence.

15      Q.      What evidence?

16      A.      Chip bag, Coke, cigarette

17  butt, light bulb was broken.

18      Q.      And you have no idea who

19  that could have been --

20      A.      No.

21      Q.      -- back there?  Had you had

22  any work done on your house?

23      A.      No.

**FREEDOM COURT REPORTING**

Page 43

1      Q.     Boyfriend at the time?

2      A.     No.  We was living

3  together -- well, we wasn't living

4  together.  He was there.

5      Q.     Who is that?

6      A.     Eric Blue, Senior.

7             MR. WILLIAMS:  Blue you say?

8      A.     Senior, yes.

9      Q.     Is he the father of your

10 children?

11     A.     Yes.

12     Q.     Does he still currently live

13 with you?

14     A.     No.

15     Q.     Does he provide child

16 support?

17     A.     No.

18     Q.     Were y'all ever married?

19     A.     No.

20     Q.     So in November, December of

21 '05, the incidents at your house stopped

22 happening?

23     A.     Yeah.

# FREEDOM COURT REPORTING

1      Q.    Have you renewed your

2  license?

3      A.    Yes.

4      Q.    When did you renew it?

5      A.    April of '06.

6      Q.    I ask that you provide

7  another photocopy to your counsel to

8  provide --

9      A.    Sure.

10      Q.    -- to us of the renewed

11  license.

12      A.    Yes.

13          MR. WALKER:  We'll get that

14  to you.

15      Q.    Do you actually own a gun?

16      A.    Yes.

17      Q.    What kind?

18      A.    I think it's a .22.

19      Q.    You think.  You don't

20  know?

21      A.    Well, .22.

22      Q.    Did you purchase it?

23      A.    No, it was a gift.

**FREEDOM COURT REPORTING**

1      Q.    Gift from who?

2      A.    Brian Woodgett.

3      Q.    Who is he?

4      A.    He's my best friend.

5      Q.    Where does he work?

6      A.    UPS.

7      Q.    Do you know where he got the

8 gun?

9      A.    No.

10     Q.    When did you get it from

11 him?

12     A.    March '05.

13     Q.    Where do you keep the gun?

14     A.    In my safe in my closest at

15 home, my bedroom.

16     Q.    Do you ever take it out?

17     A.    No.

18     Q.    Since you got it in March of

19 '05, have you ever taken it out?

20     A.    Out the safe?

21     Q.    Yes.

22     A.    Yes.

23     Q.    How often?

**FREEDOM COURT REPORTING**

Page 46

1    A.    Here -- he comes by once

2    every six months to clean it.

3    Q.    When you say he, Brian?

4    A.    Brian.  Sorry.

5    Q.    You don't clean it?

6    A.    No.

7    Q.    And you've never actually

8    taken it out yourself to go target

9    practice or anything like that?

10    A.    No.

11    Q.    Have you learned to shoot

12    it?

13    A.    No.  That's why it's still

14    in the safe.

15    Q.    You've never carried it with

16    you?

17    A.    No.

18    Q.    Have you ever had it in your

19    truck?

20    A.    No.

21    Q.    Have you ever told anybody

22    at work that you did carry it in your

23    truck?

## FREEDOM COURT REPORTING

Page 47

1     A.    No.

2     Q.    Have you ever shown it to

3 one of your coworkers?

4     A.    No.

5     Q.    Did you ever even pretend to

6 have the gun in your truck --

7     A.    No.

8     Q.    -- while you were at work?

9 Have you ever told a coworker that you

10 had a gun, period?

11     A.    No.

12     Q.    Never?

13     A.    No.

14     Q.    You've never discussed the

15 fact that you have a gun whether you've

16 kept it at home or work?

17     A.    No.  She saw a gun permit in

18 my car and she asked me about it.

19     Q.    Who are we talking about?

20     A.    Brenda Cheatham.  I'm sorry.

21 Brenda Cheatham.

22     Q.    Saw the gun permit in your

23 car?

**FREEDOM COURT REPORTING**

Page 48

1      A.      Yes.

2      Q.      When was that?

3      A.      Had to have been -- I don't

4 remember the exact time frame.   June

5 '05, June, July, '05.

6      Q.      What did she ask you about

7 it?

8      A.      She just actually saw it

9 sitting between the cup holder -- we was

10 going to lunch.   And she saw it between

11 the cup holder and asked me what was it.

12 And I told her I got a gun permit.   And

13 she asked me, you know, why.   And I just

14 told her I just felt threatened and

15 uneasy.

16      Q.      You didn't show her the

17 gun?

18      A.      No.   She saw the permit.

19      Q.      Have you ever talked about

20 the gun or the gun permit with anybody

21 else at work?

22      A.      No.

23      Q.      No one else at work would

## FREEDOM COURT REPORTING

Page 49

1    know from you that you have a gun?

2           A.     Not that I can recall, no.

3           Q.     Have you ever told a

4    coworker that somebody wouldn't want to

5    mess with you because you'd go get your

6    gun?

7           A.     No.

8           Q.     Have you ever threaten to

9    hurt yourself?

10          A.     No.

11          Q.     Have you ever threaten to

12   hurt one of you coworkers?

13          A.     No.

14          Q.     Even in jest?

15          A.     No.

16          Q.     I want to talk to you a

17   little bit about the hierarchy at EDS,

18   okay?

19          A.     Okay.

20          Q.     You work at an EDS facility

21   here in Montgomery?

22          A.     Uh-huh (affirmative

23   response).

**FREEDOM COURT REPORTING**

Page 50

1      Q.    Correct?

2      A.    Correct.

3      Q.    Who is the person in

4  charge?

5      A.    Jarvis Robinson.

6      Q.    And she's in charge of that

7  facility?

8      A.    Correct.

9      Q.    And I think you said that

10  you report currently to Tara Relf?

11      A.    Yes.

12      Q.    Do you know who she reports

13  to?

14      A.    Scott Arnt.

15      Q.    What's his position, if you

16  know?

17      A.    Manager.

18      Q.    Is he on the same team as

19  you?

20      A.    He's actually not on the

21  same team, but he oversees two teams.

22      Q.    What are those teams?

23      A.    Certification team and --

## FREEDOM COURT REPORTING

Page 51

```
 1              THE REPORTER:  And the what?
 2         A.    Certification team and the
 3    core edit team.
 4         Q.    And who does he report to?
 5         A.    Jarvis.
 6         Q.    Jeff Williams is not your
 7    supervisor?
 8         A.    No.
 9         Q.    And he's never been your
10    supervisor?
11         A.    No.
12         Q.    Have you ever been his
13    supervisor?
14         A.    No.
15         Q.    Y'all have always been peers
16    or the same kind of level as far as
17    you're aware?
18         A.    I was once a team leader.
19         Q.    Okay.  When was that?
20         A.    '04.
21         Q.    What were you a team leader
22    for?
23         A.    Core edit team.
```

**FREEDOM COURT REPORTING**

Page 52

1    Q.    And for how long were you a

2    team leader?

3         A.    Only about a year.

4         Q.    What happened, why are you

5    no longer a team leader?

6         A.    The team downsized.

7         Q.    No other reason?

8         A.    No.    Team just downsized.

9    And they actually needed me to do

10   database for both teams.

11        Q.    So you weren't demoted?

12        A.    No.    They just wanted me to

13   do database for the certification team

14   as well as my team.

15        Q.    As far as you're aware, has

16   Mr. -- when you were a team lead, did

17   you supervise Mr. Williams?

18        A.    He was on a different floor

19   at the time.

20        Q.    So different floor and a

21   different team?

22        A.    Different basically account.

23   He was on the origination, fifth

**FREEDOM COURT REPORTING**

Page 53

1    floor.

2        Q.    So I would assume that would

3    be a no, you didn't supervise him?

4        A.    Correct.

5        Q.    Are you aware of

6    Mr. Williams has ever been a

7    supervisor?

8        A.    No, I'm not sure.

9        Q.    Or a team leader?

10        A.    I don't know.

11        Q.    Now, you have filed a

12    lawsuit against EDS as well as

13    Mr. Williams; correct?

14        A.    Correct.

15        Q.    And has alleged a number of

16    causes of action against one or both in

17    that lawsuit, do you understand that?

18        A.    No.

19        Q.    You don't know that --

20        A.    I don't understand.  I'm

21    sorry.

22        Q.    Okay.  You've made an

23    allegation that you were subjected to

## FREEDOM COURT REPORTING

1    sexual harassment; correct?

2         A.    Correct.

3         Q.    And then you've alleged

4    claims such as negligent hiring?

5         A.    Correct.

6         Q.    Do you understand that?

7    That's what --

8         A.    Yes.

9         Q.    That's what I mean by a

10   cause of action.

11        A.    Okay.

12        Q.    So I apologize for using

13   legalese.  We tend to do it a lot.  But

14   what I'd like to do is talk to you for a

15   few minutes about your causes of action.

16        A.    Okay.

17        Q.    Okay.  And I'm going to

18   start with sexual harassment.

19        A.    Okay.

20        Q.    Who do you believe subjected

21   you to sexual harassment?

22        A.    Jeff Williams.

23        Q.    Okay.  Anyone else?

**FREEDOM COURT REPORTING**

Page 55

1      A.    EDS.

2      Q.    You understand that EDS can

3  only act through employees?

4      A.    Correct.

5      Q.    Okay.  So I'm asking you

6  what employees do you think subjected

7  you to sexual harassment besides

8  Mr. Williams?

9      A.    I'm confused.  I'm sorry.

10      Q.    Okay.  You've alleged sexual

11  harassment?

12      A.    Correct.

13      Q.    I've asked you who sexually

14  harassed you.  You said Mr. Williams and

15  then you said EDS.

16      A.    Okay.

17      Q.    EDS is a corporation;

18  right?

19      A.    Correct.

20      Q.    And so EDS can't sexual

21  harass you.  It has to be its employees;

22  correct?

23      A.    Okay.

# FREEDOM COURT REPORTING

1    Q.    Do you understand that?

2    A.    Yes.  Yes.

3    Q.    So I'm asking you besides

4  Mr. Williams, are there any other

5  employees of EDS that you believe

6  sexually harassed you?

7    A.    Physically, no.

8    Q.    Okay.  Any other way besides

9  physically?

10    A.    Remarks, yes.

11    Q.    Who?

12    A.    That's -- I'm kind of

13  confused based off of the incident that

14  happened in March that was made after

15  that incident to me, is that what you're

16  referring to?

17    Q.    Anything that you believe

18  was sexual harassment?

19    A.    I would say Jeff Williams

20  and I guess there's a gray area there

21  because the incident that happened in

22  the elevator, the statement that was

23  made behind that.

## FREEDOM COURT REPORTING

Page 57

1    Q.    Okay.  Why don't we do it

2    this way:  Prior to the incident in

3    February of '05 that you claim occurred

4    on the elevator --

5    A.    Uh-huh (affirmative

6    response).

7    Q.    -- do you believe you've

8    been sexually harassed --

9    A.    No.

10    Q.    -- at any point before

11    that?

12    A.    No.

13    Q.    Okay.  By Mr. Williams or

14    anybody else prior to --

15    A.    The elevator.

16    Q.    -- the elevator incident?

17    A.    He made statements.

18    Mr. Williams made statements prior to

19    the elevator incident that basically

20    were -- were, but I didn't, you know,

21    think it at the time.

22    Q.    You didn't think that it was

23    sexual harassment at the time?

**FREEDOM COURT REPORTING**

1      A.    Well, I knew it was sexual

2  harassment at the time, but it was -- I

3  don't know how to explain it.  The

4  statement he made made me very

5  uncomfortable and I reported to another

6  peer.  And they was like, well, if he

7  does anything else, then report it.

8      Q.    What is it that you -- that

9  Mr. Williams said?

10      A.    Was in the breakroom and

11  getting some coffee one morning and he

12  came up to me and he said what did

13  you -- we was coming up an elevator that

14  morning and we went to the -- to the

15  breakroom.  He made the statement -- the

16  lady was getting off the elevator on

17  four and he's like what's -- what's

18  wrong with her.  I said I guess she had

19  woke up on the wrong side of bed this

20  morning.  And he said -- that's when he

21  followed me to the breakroom, I was

22  getting coffee.  He said what did you

23  say on the elevator.  I said, well, I

**FREEDOM COURT REPORTING**

Page 59

1    just made the statement that I think the

2    young lady may got up on the wrong side

3    of bed. And he said, oh, I thought you

4    wanted me to get up on the side of the

5    bed with you. And I looked at him and I

6    walked off.

7            Q.    When did that happen?

8            A.    January '05.

9            Q.    Prior to that, had he made

10   any statements to you that you thought

11   were inappropriate?

12           A.    No.

13           Q.    And you said you reported it

14   to another peer, whom?

15           A.    Brenda Cheatham.

16           Q.    But you didn't report it to

17   a supervisor?

18           A.    No.

19           Q.    Or to human resources?

20           A.    No.

21           Q.    So you didn't follow the

22   sexual harassment policy at that time?

23           A.    Did I follow it?

**FREEDOM COURT REPORTING**

1    Q.    Right.  You didn't report it

2    pursuant to the sexual harassment

3    policy?

4    A.    Yes, I did.

5    Q.    Who did you report it to?

6    A.    It said I can report it to

7    someone who's outside of management

8    to -- to someone else.

9    Q.    Okay.  Let's go look at the

10   sexual harassment policy, Exhibit No. 2.

11   Where in Exhibit No. 2 does it say that

12   you can report it to a peer?

13   A.    We have -- I'm sorry.  We

14   have open door policy.

15   Q.    Okay.

16   A.    The open door policy.

17   Q.    And the open door policy

18   says what?

19   A.    We basically can report any

20   incident to anybody without any

21   retaliation, anything that you felt --

22   Q.    Is that report it to a peer

23   or report it to a supervisor or somebody

**FREEDOM COURT REPORTING**

Page 61

1  in management?

2       A.    Open door policy, anybody.

3  And Brenda Cheatham, if I'm not

4  mistaken, she's also -- she has the

5  title of team lead.

6       Q.    Besides that one incident

7  prior to February of 2005, have

8  Mr. Williams said anything that you

9  consider to be offensive in nature to

10  you?

11      A.    No.

12      Q.    Had he ever touched you

13  prior to the February 2005 incident?

14      A.    No.

15      Q.    And you said -- what was the

16  conversation with Ms. Cheatham when you

17  told her what had happened?

18      A.    I came to her desk and I was

19  like something just -- weird just

20  happened.  And she was like what.  I

21  said Jeff made a statement to me in the

22  breakroom and she was like what was it

23  and that's when I told her.

## FREEDOM COURT REPORTING

Page 62

1      Q.    And what was her response?

2      A.    She was like, oh, you know,

3  just shrug it off.  I'm like oh.  If he

4  say anything else to you, just basically

5  let me know.

6      Q.    All right.  Let's talk about

7  Mr. Williams, what you claim happened in

8  February of 2005.  Could you tell me

9  what happened?

10     A.    Okay.  I was coming back

11 from lunch and he was coming back from

12 lunch as well.  We walked into the

13 ground floor where the elevators are and

14 I felt something brush against my -- my

15 behind.  And I thought he just walked in

16 too close to me.  The elevator door

17 opened.  I stepped on first.  He came in

18 from behind -- came in behind me.  I

19 turned around.  I hit the sixth floor

20 button.  As soon as the door closed,

21 he -- he immediately grabbed me 'cause

22 it was cold that February, that

23 particular, he grabbed me.  And he was

**FREEDOM COURT REPORTING**

1  like, oh, it's cold outside.  And he was

2  like, oh, I need you to warm me up.

3  Then he put his hands down my pants.  He

4  put his -- excuse me.  I'm sorry.  He

5  placed his hands down by pants and he

6  grabbed my shirt out and he was rubbing

7  on my body.  And I was pushing him, get

8  -- get off me, get -- get off me.  And

9  he start rubbing on my stomach and he

10  moved up to my breast area and -- excuse

11  me.  Somebody have some tissue, please?

12  I'm sorry.

13

14          (Mr. Walker handed the witness a

15           box of Kleenex.)

16

17          A.    Thanks.  We -- he grabbed

18  my -- and I kept pushing him off of me.

19  And he said you feel good.  He layed his

20  hands -- head on my shoulder.  And I

21  just kept pushing and then the elevator

22  door opened up and he said I just had a

23  nice lunch and I looked at him.  I said

## FREEDOM COURT REPORTING

Page 64

1    where did you go.  He was like I had to

2    take some jeans by back to I think it

3    was Looking Good or Weil's.  And I

4    walked to my desk and my coworker, she

5    looked at me, and she asked me what was

6    wrong.  And I -- and I walked to the

7    breakroom and I told her.  And she told

8    me to report it immediately.  Can I --

9    can I step outside, please?

10            MS. JACOBS:  Sure.  Can take

11   a break.

12            MS. VIDEOGRAPHER:  Off the

13   record.  The time is 10:46.

14

15        (A brief recess was taken.)

16

17            MS. VIDEOGRAPHER:  Back on

18   the record.  We commence Tape 2.  The

19   time is 10:53.

20        Q.    (By Ms. Jacobs)  Ms. Jacobs,

21   we were talking about the incident that

22   occurred in February of 2005.  And if

23   I'm correct, it was February 10th, does

## FREEDOM COURT REPORTING

1    that sound the right date?

2          A.    Yes.

3          Q.    What time was it when you

4    were coming back to lunch

5    approximately?

6          A.    1:41.

7          Q.    1:41?

8          A.    Uh-huh (affirmative

9    response).

10          Q.    How do you know it was

11    1:41?

12          A.    'Cause I was on the phone

13    with my friend because we just left from

14    lunch.

15          Q.    Who were you on the phone

16    with?

17          A.    Brian Woodgett.

18          Q.    Were you on the phone with

19    him when you were on the elevator as

20    well?

21          A.    No.  I got off the elevator.

22    I told him I said, look, I'm about to

23    get on the elevator.  I'll talk to you

## FREEDOM COURT REPORTING

Page 66

1 later.

2        Q.    Was anybody else on the

3 elevator with you?

4        A.    No.

5        Q.    Did the elevator stop at any

6 other floor besides go from the basement

7 to the sixth floor?

8        A.    No.

9        Q.    How long were you on the

10 elevator with Mr. Williams?

11        A.    I don't know how long, but I

12 know from the basement to the sixth

13 floor, 45 minutes -- 45 seconds.  I'm

14 sorry.

15        Q.    That's a really slow

16 elevator if it's 45 minutes.  About 45

17 seconds?

18        A.    45 seconds to a minute.

19        Q.    Had you ever been on the

20 elevator before with Mr. Williams?

21        A.    Probably have but with other

22 people, not alone.

23        Q.    You've never been on the

**FREEDOM COURT REPORTING**

Page 67

1    elevator with him alone?

2         A.    No.

3         Q.    What about the time you said

4    he made the statement about the woman

5    who got off on the fourth floor?

6         A.    Oh, that was -- I'm sorry.

7    That was from fourth floor to -- fifth

8    floor to sixth floor, yeah.

9         Q.    Was that the only other time

10   you were alone with him?

11        A.    Yes.

12        Q.    Now, you stated that he put

13   his hands down your pants and grabbed

14   your shirt out --

15        A.    Yes.

16        Q.    -- correct?  What were you

17   wearing that day?

18        A.    Some slacks and a blouse.

19        Q.    And you said that he rubbed

20   your stomach; correct?

21        A.    Yes, he did rub my

22   stomach.

23        Q.    Okay.  And then you said

**FREEDOM COURT REPORTING**

Page 68

1    that he rubbed your breast area.  Did he

2    actually touch your breast or just

3    rub --

4         A.    The bra area.  Right here

5    (indicated).

6         Q.    The bra.  Underneath the

7    bra?

8         A.    No.  He actually touched the

9    bra, the breast.

10        Q.    Okay.  Did you yell or

11   scream at him while you were on the --

12        A.    Yes.

13        Q.    -- elevator?

14        A.    Yes.

15        Q.    What did you say?

16        A.    Say get off me.  Get the "F"

17   off of me.

18        Q.    And what his response?

19        A.    He just kept grabbing and

20   pulling me tighter and stated I felt

21   good.  He -- he wanted me to warm him

22   up.  He was cold.

23        Q.    What was your relationship

## FREEDOM COURT REPORTING

1    with Mr. Williams prior to this?

2        A.    Just see him in passing,

3    speaking hey, how you doing,

4    camaraderie, just how you doing, good

5    day, bless day, keep going.

6        Q.    So friendly?

7        A.    Cordial.

8        Q.    Okay.  Had you heard anybody

9    else make any complaints about

10   Mr. Williams?

11       A.    No.

12       Q.    Except for that one time

13   when y'all were talking about the lady

14   getting off the elevator, had he ever

15   made a statement to you that you

16   consider offensive?

17       A.    Not that I recall.

18       Q.    Or had you ever heard him

19   say something to anybody else that you

20   thought could have been offensive?

21       A.    I don't -- wasn't in

22   communication around him that I could

23   hear anything.  He works on a different

## FREEDOM COURT REPORTING

Page 70

1  side of the floor.

2      Q.    So no, you hadn't heard him

3  say anything?

4      A.    No.

5      Q.    When the elevator doors

6  opened, could you tell me how -- what

7  they open into, what's the elevator

8  lobby area look like on the sixth

9  floor?

10     A.    As soon as you walk out, you

11  could see it's two elevators on each

12  side.

13     Q.    So there's four elevators

14  total?

15     A.    Four total.

16     Q.    Okay.  And it opens up -- is

17  the elevator lobby open?

18     A.    Is it open?

19     Q.    How do you get to your work

20  space from the elevator?

21     A.    Okay.  I'm sorry.  It's a

22  secure area.  We have a door on this

23  side and a door on that side

**FREEDOM COURT REPORTING**

Page 71

1    (indicated).  So four elevators, two on

2    each side, you step out, you go left or

3    you go right.

4         Q.    Okay.  And you say it's

5    secure so do you have to use a badge --

6         A.    Yes.

7         Q.    -- to get through those

8    doors?  Did you both go, you and Mr.

9    Williams, go through the same door --

10        A.    No.

11        Q.    -- after you got off?

12        A.    No.

13        Q.    Okay.

14        A.    We went -- I went left.  He

15   went right.

16        Q.    Now, you said that when he

17   was getting off y'all continued to have

18   a conversation about what he had done

19   over lunch?

20        A.    Actually, he was -- was --

21   you hear the bing of the elevator --

22        Q.    Uh-huh (affirmative

23   response).

## FREEDOM COURT REPORTING

Page 72

1      A.     -- he -- he let go.  He
2  released me.
3      Q.     Okay.  And then what
4  happened?
5      A.     And he was like wow, I had a
6  good lunch.  I had a great lunch.  And
7  he -- made some statement he had to
8  return some items to -- some jeans he
9  just purchased.  And I was like for
10  real.  I said where.  And he said --
11  made a statement Weil's or Looking Good.
12  And I just was basically flabbergasted.
13  'Cause I just walked out the elevator
14  like what did just happen.
15      Q.     So you didn't get off the
16  elevator yelling and screaming?
17      A.     No.
18      Q.     And you actually asked him
19  where he had to return his jeans?
20      A.     Yes.
21      Q.     Now, you mentioned that you
22  went back to your work area and a
23  coworker asked you what was wrong, who

**FREEDOM COURT REPORTING**

Page 73

1    was that?

2         A.    Twana Anthony.

3         Q.    What did you tell her?

4         A.    I -- I stated I said come

5    here for a sec.  No.  She looked at me

6    and she said -- she said what's wrong

7    with you.  I said -- and I had my hand

8    in my mouth like (indicated), she like

9    what's wrong.  I said something just

10   happened to me.  And she was like what.

11   And she said, you know, we went to the

12   breakroom.  She motioned for to go to

13   the breakroom.  We walked to the

14   breakroom and I was standing there and I

15   told her what happened.  And she was

16   like, and she said you need to report

17   that now.

18        Q.    Were you crying at the

19   time?

20        A.    I was shocked.

21        Q.    So no?

22        A.    I was -- no.

23        Q.    Who all is on your team

**FREEDOM COURT REPORTING**

Page 74

1    besides Ms. Anthony?

2         A.    Brenda Cheatham, Tara Relf,

3    Ava Collier at the time -- at that time?

4         Q.    Uh-huh (affirmative

5    response).

6         A.    Barbara Cline, Sandra

7    Williams on that particular side.  Rita

8    Arenya, Susan Lang, Michael Brown,

9    Sheldon Payne, Wanda Davis, Katherine

10   Howser, Danny Spears, Shawn Nevels.

11        Q.    And that was back in

12   February of '05?

13        A.    Yes.

14        Q.    Who all was present when you

15   returned from lunch that day, do you

16   recall?

17        A.    Tara, Brenda, and Twana.

18        Q.    What's your -- what's it set

19   up like, your team area?

20        A.    We have -- it's eight in the

21   area, eight people in the area, so four

22   on each side, cubicle area.

23        Q.    You told me a lot more than

## FREEDOM COURT REPORTING

Page 75

1  eight people.

2      A.    You asked who was on the

3  team.

4      Q.    Okay.  I apologize.  Who

5  within that eight area?

6      A.    Who sits in that area?

7      Q.    Who sits in that area with

8  you?

9      A.    Okay.  Tara Relf, Brenda

10  Cheatham, Twana Anthony, Barbara Cline,

11  Ava Collier, Sandra Williams.  And I

12  think Annie Kent.  Yes, Annie Kent

13  was.

14      Q.    Where are the other team

15  members located?

16      A.    On the other side.  It's

17  just like only eight can sit on that

18  side, then you have another on the other

19  side of the cubicles.

20      Q.    Okay.  Can you see them?

21      A.    No.

22      Q.    So after you told Twana

23  Anthony what happened, what did you

## FREEDOM COURT REPORTING

1    do?

2         A.    I sat down and immediately

3    told Tara what happened.

4         Q.    Okay.  What did Tara say?

5         A.    She stated to me, she said

6    that she was going to mention something

7    to Jeff, his supervisor.  I think it was

8    Sandra Hindon at the time.

9         Q.    Okay.  Anything else?

10        A.    I -- she stated to me, she

11   said I e-mailed Jeff at the time and

12   stated to him what he did was

13   inappropriate and disrespectful.

14        Q.    Had you already e-mailed

15   Jeff when you spoke with Tara?

16        A.    Yes.  She told me to go

17   ahead and e-mail Jeff.

18        Q.    Okay.  So I'm trying to

19   figure out the time line.  Did you talk

20   to Tara before --

21        A.    I talked to Tara first.

22        Q.    Okay.  And did she ask you

23   what you wanted to do?

## FREEDOM COURT REPORTING

Page 77

1    A.    Tara stated she -- she said

2  what are you going to do.  She said I'm

3  going to talk to his supervisor and I

4  said -- I said, well, okay.  And she

5  said, well, e-mail him and let him know

6  what he did, you know, you didn't

7  appreciate it.  And that's what I did.

8    Q.    So you're saying that Tara

9  told you to e-mail?

10    A.    Yes.

11        MS. JACOBS:  Okay.  I don't

12  have enough copies.  Let me show it to

13  him first.  I'm sorry.

14

15      (Defendants' Exhibit No. 4 was

16        marked for identification.)

17

18    Q.    (By Ms. Jacobs)  Handed

19  what's been marked as Exhibit No. 4.  Do

20  you recognize that?

21    A.    Yes.

22    Q.    This is the e-mail from you

23  to Mr. Williams?

## FREEDOM COURT REPORTING

Page 78

1        A.    Yes.

2        Q.    It's dated February 10,

3   2005?

4        A.    Yes.

5        Q.    Time is 1:52 p.m.?

6        A.    Correct.

7        Q.    So that's after you spoke

8   with Twana Anthony?

9        A.    Yes.

10       Q.    And after you spoke with Ms.

11  Relf?

12       A.    Yes.

13       Q.    Okay.  And could you read

14  what you wrote to Jeff, please?

15       A.    Jeff, what just happened in

16  the elevator, please don't let this --

17  that happen again.  That was very

18  inappropriate and disrespectful.  No

19  need to apologize in the few -- future.

20  Let's just keep things on a business

21  level.

22       Q.    Okay.  So you didn't put

23  anything in the e-mail about him rubbing

**FREEDOM COURT REPORTING**

1    your stomach or touching your breast or

2    putting his hands down your pants?

3         A.    Correct.

4         Q.    When you spoke to Ms. Relf,

5    did she tell you what to put in the

6    e-mail?

7         A.    No.

8         Q.    Did Mr. Williams respond?

9         A.    Yes.

10        Q.    How?

11        A.    He stated that he was only

12   kidding around, no disrespect meant or

13   something along that line.

14        Q.    Okay.  But did he do that in

15   person or did he respond via e-mail?

16        A.    E-mail and he walked over in

17   person.

18        Q.    What did he do first?

19        A.    E-mail.

20

21        (Defendants' Exhibit No. 5 was

22          marked for identification.)

23

## FREEDOM COURT REPORTING

Page 80

1    Q.    Handed what's been marked as

2    Exhibit No. 5.  Is that the e-mail

3    response you received from Mr. Williams?

4    A.    Yes.

5    Q.    Dated February 10, 2005?

6    A.    Yes.

7    Q.    And the time is 2:09 p.m.?

8    A.    Correct.

9    Q.    Okay.  And he says, I

10    understand.  Just joking around with

11    you.  No disrespect meant; correct?

12    A.    Yes.

13    Q.    Was there anything

14    inappropriate that you thought was about

15    this response?

16    A.    No.

17    Q.    And then you said that he

18    also spoke with you personally?

19    A.    Yeah.  He came over to my

20    desk.

21    Q.    When was that?

22    A.    Right after he sent this

23    e-mail.  About five, ten minutes after

**FREEDOM COURT REPORTING**

Page 81

1   he sent this e-mail.

2       Q.    Was there anybody around at

3   the time?

4       A.    Yes.  Tara, Twana and Brenda

5   was around.

6       Q.    And what did Mr. Williams

7   say to you at that time?

8       A.    He came from -- down the

9   aisle, came behind me, hovered over me

10  and said something in my ear.  And I

11  just slumped down and I just nodded.  I

12  wasn't listening to what he was saying.

13  I was just -- wanted him to get away.

14      Q.    You don't remember at all

15  what he said to you?

16      A.    I really don't.  I just

17  wanted him away.  I just --

18      Q.    And how did he talk to

19  you?

20      A.    He was -- I was sitting at

21  my desk.  He came over, had both hands

22  over like this over my desk area

23  (indicated).  And I was under here like

**FREEDOM COURT REPORTING**

Page 82

1   that.

2           Q.      Around you?

3           A.      Around me (indicated).

4           Q.      Did anybody besides you see

5   this?

6           A.      Tara and -- Tara had to have

7   seen it.  She sits right across from me.

8           Q.      Did you say anything to

9   Mr. Williams at that time?

10          A.      No, I just nodded.

11          Q.      Had you ever engaged in any

12  conduct at EDS that was offensive or

13  sexual in nature?

14          A.      No.

15          Q.      You've never talked about

16  sex with your coworkers?

17          A.      No.

18          Q.      Never talked about your

19  relationships with coworkers?

20          A.      As -- what, sexual

21  relationships?

22          Q.      Sure.

23          A.      Implied or just flat out?

# FREEDOM COURT REPORTING

1    Q.    Either?

2    A.    No.   They may implied, but

3  they implied, but no.

4    Q.    Okay.  You ever touch a male

5  coworker on his butt?

6    A.    No.

7    Q.    Have you ever been

8  disciplined or warned for inappropriate

9  conduct at EDS?

10    A.    No.

11    Q.    Have you received any

12  disciplines or warnings at EDS?

13    A.    No.  Let me ask you a

14  question, Ms. Jacobs.

15    Q.    Sure.

16    A.    State the question you just

17  asked you said any disciplinary, is

18  it -- Jarvis made a statement way after

19  this incident about something that I

20  so-called have done four years prior to

21  this, is that what you're asking?

22    Q.    I'm asking at any time have

23  you been disciplined whether it's a

## FREEDOM COURT REPORTING

Page 84

1    verbal --

2         A.    -- was no discipline.

3         Q.    -- or written warning?

4         A.    It was no discipline.  No,

5    was nothing disciplined.  She mentioned

6    something but there was no

7    disciplinary.

8         Q.    What did she mention?

9         A.    She stated that Ms. Liebman

10   investigated and said that I so-called

11   touched someone on the behind and that

12   was after the incident -- well, it was

13   February of this year actually.  And she

14   stated that -- Leslie stated that the

15   young fellow had stated that I did it.

16   And I said that same fellow you're

17   referring to contacted me and basically

18   he said you guys are fishing or

19   something.

20        Q.    So you've never touched

21   him?

22        A.    No.

23        Q.    And you've never talked

**FREEDOM COURT REPORTING**

Page 85

1    about having sex with men in front of

2    your coworkers --

3              A.    No.

4              Q.    -- or with your coworkers?

5              A.    No.

6              Q.    Or talked about men's body

7    parts in front of your coworkers?

8              A.    No.

9              Q.    How good somebody looks, how

10   much you'd like to have sex with

11   somebody even implying it?

12             A.    Implying it, I can't go off

13   what someone else's implied or what

14   their thought process, no, I can't.

15             Q.    But you never meant to imply

16   it?

17             A.    I've never implied it.

18             Q.    Now, Ms. Relf in addition to

19   talking to Mr. Williams' supervisor

20   reported it to human resources or the

21   employee relations department;

22   correct?

23             A.    I don't know.

## FREEDOM COURT REPORTING

Page 86

1     Q.    Well, at some point in time,

2  you were advised that an investigation

3  was taking place and asked to write a

4  statement, weren't you?

5     A.    I contacted human

6  resource.

7     Q.    Who did you contact?

8     A.    Leslie Liebman.

9     Q.    When did you contact

10  Leslie?

11     A.    I think it was that day, a

12  couple days later.

13     Q.    How did you contact her?

14     A.    Via e-mail.

15     Q.    What'd she say?

16     A.    I e-mailed her and she

17  e-mailed me back.

18     Q.    Okay.  What was the e-mail

19  correspondence about?

20     A.    Basically, I was telling her

21  about the incident.  I was told to get

22  in touch with her and I told her about

23  the incident in the elevator.  Then she

### FREEDOM COURT REPORTING

1    informed me that she wanted me to put it

2    in writing.  I put it in writing and she

3    stated she was going to get back with me

4    in a couple weeks, which she never

5    done.

6         Q.    Who told you to contact

7    Leslie?

8         A.    I'm not sure was it Tara or

9    Brenda.  But I want to say Brenda but

10   I'm not sure because she told me I need

11   to escalate it.

12        Q.    How did you know to contact

13   Leslie?

14        A.    Info center, looked it up.

15        Q.    Her name's on the info

16   center?

17        A.    Well, I think it's -- it's

18   human resource, her name is on it,

19   yes.

20        Q.    Had you ever spoken to her

21   before?

22        A.    Prior to this?

23        Q.    Uh-huh (affirmative

## FREEDOM COURT REPORTING

Page 88

1    response).

2         A.    No.

3         Q.    And you said that she asked

4    you to write a statement?

5         A.    Yes.

6

7         (Defendants' Exhibit No. 6 was

8          marked for identification.)

9

10        Q.    You've been handed Exhibit

11   No. 6.  Do you recognize this

12   document?

13        A.    Yes.

14        Q.    Is this the statement you

15   wrote?

16        A.    Yes.

17        Q.    So you actually sat down and

18   typed this statement?

19        A.    Yes.

20        Q.    Did you do that at work or

21   at home?

22        A.    At work.

23        Q.    Okay.  And it's dated

## FREEDOM COURT REPORTING

Page 89

1    February 23, 2005?

2           A.     Correct.

3           Q.     Is that the date you wrote

4    it?

5           A.     That's the date I typed

6    it.

7           Q.     And that was at the request

8    of Leslie Liebman?

9           A.     Yes, 'cause I spoken with

10   her via e-mail prior to that.

11          Q.     This was a little over a

12   week after the incident had occurred?

13          A.     I -- I -- this is the

14   statement she e-mailed me back to write

15   to her.  We had a conversation prior to

16   that before she had this statement.

17          Q.     Okay.  So you had a

18   conversation with her?

19          A.     Right.

20          Q.     Over e-mail or telephone?

21          A.     E-mail.

22          Q.     Okay.  And she said please

23   give me a statement?

**FREEDOM COURT REPORTING**

Page 90

1      A.    Well, this day she e-mailed

2  me and told me to type this statement up

3  exactly what happened.

4      Q.    Okay.  So on February 23rd

5  she says please --

6      A.    Yes.

7      Q.    -- write me a statement?

8      A.    Yes.

9      Q.    Okay.  She didn't actually

10  write this statement, did she?

11      A.    No.  I wrote this statement.

12  She requested that day for this

13  statement.

14      Q.    Did she do that over the

15  phone or via e-mail?

16      A.    Via e-mail.

17      Q.    And this was a little over a

18  week after the incident?

19      A.    Yes, that she requested

20  this, yes.

21      Q.    Okay.  And you wrote it?

22      A.    Yes.

23      Q.    Was the events still fresh

## FREEDOM COURT REPORTING

Page 91

1    in your mind?

2         A.    Yes.

3         Q.    You tried to be truthful?

4         A.    I tried to put as much

5    detail like as I can remember.

6         Q.    So everything you could

7    remember you put in this statement?

8         A.    Yes.

9         Q.    Do you know if Ms. Liebman

10   talked to anybody else?

11        A.    No.

12        Q.    You don't know if she talked

13   to anybody else in your office?

14        A.    No.

15        Q.    Or if she spoke with

16   Mr. Williams?

17        A.    No.

18        Q.    Did you e-mail this to

19   her?

20        A.    Yes.

21        Q.    In this statement, you said

22   that you've gone to the doctor and she

23   gave you something to help you sleep.

# FREEDOM COURT REPORTING

Page 92

1  Who was that?

2          A.      Rachel McKinney.

3          Q.      Where does she work?

4          A.      The Jackson building.

5          Q.      Is she with a practice, is

6  she a doctor?

7          A.      PCP, primary.

8          Q.      When did you see her?

9          A.      I saw her on the 12th or

10  13th.

11          Q.      What she give you?

12          A.      She gave me some ibuprofen

13  and some Ambiens.

14          Q.      Did she actually give you a

15  prescription or just --

16          A.      She gave me a

17  prescription.

18          Q.      What was the ibuprofen for?

19          A.      Pain.

20          Q.      Pain how?

21          A.      When I pushed him off of

22  me.

23          Q.      After you gave her this

## FREEDOM COURT REPORTING

Page 93

1    statement, did you speak with Ms.

2    Liebman again either by phone, in

3    person, or --

4          A.    Yes.

5          Q.    -- by e-mail?

6          A.    Yes.

7          Q.    When?

8          A.    After this statement here?

9          Q.    Yes.

10         A.    Okay.  It was March, couple

11   times -- several times in March.  I

12   think another time in like June.  It may

13   have been in May, May or June.

14         Q.    So you spoke with Leslie

15   Liebman several times in March?

16         A.    Yes.  Via e-mail and phone

17   conversation.

18         Q.    What was your conversations

19   with Ms. Liebman at those times?

20         A.    She called me, stated she

21   need to speak with me.  Asked me what a

22   good time would it be for her to call

23   me, she called me back.  And she asked

## FREEDOM COURT REPORTING

Page 94

1    me was I on a secure line.  I stated to

2    her no.  And she told me to go to a room

3    that is secure and gave me a number to

4    call her back.  I called her back.

5    Someone walked into the conference room

6    with me because I was afraid to walk

7    around the office by myself and called

8    Leslie back.

9         Q.    And what was the

10   conversation?

11        A.    Oh, I'm sorry.  The

12   conversation was about she asked me what

13   had happened.  And she said she -- at

14   that time, she stated to me that she'd

15   spoken with Jeff and he stated that he

16   gave me a hug.  And I stated to her he

17   didn't just give me a hug.  He -- he

18   actually grabbed me and assaulted me.

19   She said, well, he stated that he just

20   gave you a hug.  Since there was nobody

21   else in the elevator, she told me that

22   there's things set up -- well, I stated

23   to her that I'm seeing a therapist at

## FREEDOM COURT REPORTING

Page 95

1  the time.  And she said, well, that's

2  good.  And she said EDS pays for certain

3  number of visits and she said, well,

4  that just something you have to deal

5  with.  I said excuse me.  And she said

6  you just have to deal with the

7  situation.  You got things in place, so

8  just deal with it.  And I was just so

9  shaken up that actually the person that

10  walked into the conference room with me

11  just had to really -- I was shaking.

12  She had to walk me out.  It's like try

13  to calm me down.  She said wait a

14  minute, calm down, just calm down.  And

15  I just started shaking.  And she walked

16  me back to my area.  And at that time,

17  she -- she told Tara I was really upset

18  and I probably need to go home and I

19  left.  Tara walked me to the elevator

20  and walked me out from there.

21       Q.    Ashley who?

22       A.    Sorry?

23       Q.    What's Ashley's last name?

**FREEDOM COURT REPORTING**

Page 96

1    A.    Actually.  I said

2    actually.

3    Q.    No.  The person who was in

4    the conference room?

5    A.    Brenda Cheatham.

6    Q.    Oh, sorry.  Did she hear the

7    phone conversation?

8    A.    Yes.

9    Q.    Was it on speakerphone?

10    A.    Yes.

11    Q.    And at that time, Ms.

12    Liebman had said that she had spoken

13    with Jeff?

14    A.    Yes.

15    Q.    Who had denied your

16    allegations and said he just gave you a

17    hug?

18    A.    Yes.

19    Q.    And said that there weren't

20    any witnesses; correct?

21    A.    Correct.

22    Q.    And you'd agree there wasn't

23    any witnesses; correct?

# FREEDOM COURT REPORTING

Page 97

1    A.    Yes.

2    Q.    It was just you on the

3  elevator with Mr. Williams?

4    A.    Right.

5    Q.    No one saw what happened?

6    A.    Right.

7    Q.    Okay.  And so you told her

8  you were seeing a therapist and she said

9  that was good?

10    A.    Yes.

11    Q.    And that EDS would pay for a

12  certain number of visits?

13    A.    She said EDS has things in

14  place for that.

15    Q.    Okay.

16    A.    Basically.

17    Q.    Did you discuss with her

18  about what those things were?

19    A.    No.

20    Q.    Okay.  Did you ever look

21  into what those things were?

22    A.    Yes.

23    Q.    And what types of things

## FREEDOM COURT REPORTING

Page 98

1  does EDS have in place?

2      A.    They -- I think they pay for

3  like six visits and you pay for the

4  rest.

5      Q.    And did you have EDS pay for

6  the first six visits?

7      A.    I think I paid for the

8  initial first two, and then she was

9  like, no, just go ahead and let them do

10  it.  Tara was like, you know, she was

11  looking into the paperwork for me to do

12  it.

13      Q.    Okay.  And did that

14  happen?

15      A.    Yes.

16      Q.    So EDS paid for a certain

17  number of visits?

18      A.    Yes.  My insurance paid for

19  it and they paid for the copay.

20      Q.    Okay.  So your medical

21  insurance paid for the visits and

22  then --

23      A.    I'm not really sure how the

## FREEDOM COURT REPORTING

1    billing went.  I'm -- I'm not too clear

2    on that one.

3         Q.    Okay.

4         A.    But I know I paid most of

5    the bill.

6         Q.    Right.  So there's medical

7    insurance and then for some of the

8    visits EDS would have paid you back for

9    the copay?

10        A.    No, they didn't pay me back

11   for the copay.  They was --

12        Q.    Then what did they pay

13   for?

14        A.    I'm -- I'm not sure what

15   they paid for, but they paid for I think

16   six visits, copays.

17        Q.    Who were those visits to?

18        A.    Vonceil Smith.

19        Q.    Who is that?

20        A.    A psychiatrist.

21        Q.    How'd you find Dr. Smith?

22        A.    From a book.

23        Q.    Had you ever been to Dr.

## FREEDOM COURT REPORTING

Page 100

1   Smith before?

2          A.     No.

3          Q.     Nobody recommended Dr.

4   Smith?

5          A.     No.

6          Q.     How long did you see Dr.

7   Smith?

8          A.     From March until like

9   November '05.

10          Q.     How often did you see Dr.

11   Smith?

12          A.     Initially once a week, then

13   she went to twice a month, then back to

14   once every week.

15          Q.     And you stopped seeing her

16   in November of '05?

17          A.     Yes.

18          Q.     Why?

19          A.     Couldn't afford it

20   anymore.

21          Q.     Insurance stopped paying for

22   it?

23          A.     Oh, insurance been -- been

## FREEDOM COURT REPORTING

Page 101

1  stop paying for it.

2         Q.    Do you know what, if

3  anything, happened to Mr. Williams if he

4  was disciplined in any way, counseled in

5  any way?

6         A.    I don't know.  I got --

7  didn't get a -- I just had no dealings

8  with what was going on with him.  I was

9  trying to deal with me.

10        Q.    After February of 2005, did

11 Mr. Williams ever touch you again?

12        A.    No.

13        Q.    So he's never tried to

14 attack you, touch you, hug you, anything

15 since February of 2005?

16        A.    Intimidate.

17        Q.    I'm not asking about

18 intimidate.  I'm asking has he ever

19 touched you?

20        A.    No.

21        Q.    Okay.  Has he ever spoken to

22 you?

23        A.    No.

## FREEDOM COURT REPORTING

Page 102

1    Q.    So he hasn't spoken to you

2  or touched you but he's intimidated

3  you?

4    A.    Yes.

5    Q.    How?

6    A.    He was walking back and

7  forth through my area like 20, 25 times

8  a day.  He'll stop at the water fountain

9  right in front of my desk and stare at

10  me.  He'll stop -- and at the time,

11  Annie Kent was sitting right in my area.

12  He'd stand there and look back at me and

13  stare at me and just roll his eyes at

14  me.

15    Q.    Anybody else see this?

16    A.    When I see him, I slump

17  down.  Tara saw a lot of it.

18    Q.    How often did this occur?

19    A.    Oh, quite often.  Up until

20  yesterday, actually.

21    Q.    Yesterday it occurred?

22    A.    Yes.

23    Q.    What happened yesterday?

**FREEDOM COURT REPORTING**

Page 103

1    A.    I was sitting at my desk,

2   and where I sit, I sit like right in

3   front of the door when people walk in

4   and out.  And every time somebody walk

5   pass, we have a habit, we all would look

6   and see who's passing by.  And everybody

7   was gone to lunch and I was the only one

8   sitting back there.  And like I said,

9   didn't know who it was but if somebody

10  walked pass me immediately just look up.

11  And when I looked up, he looked at me

12  and he rolled his eyes at me and I just

13  slumped back down in my chair.

14    Q.    He works for EDS still?

15    A.    Yes.

16    Q.    And he works on the same

17  floor as you?

18    A.    Yes.

19    Q.    So periodically you're going

20  to have to see him; correct?

21    A.    Well, not -- well, I didn't

22  have to see him 'cause there's two

23  sides.

## FREEDOM COURT REPORTING

Page 104

1    Q.    Okay.  But it -- your --

2    from what I understand, you've got

3    cubicles.  And if he walks pass and you

4    pop up, you're going to see him?

5    A.    He was --

6    Q.    I'm not asking about

7    yesterday.  I'm just asking in general.

8    A.    I'm saying in general I

9    don't have to see him because like I

10   stated to Jarvis at the time, there's a

11   restroom on the other side of the

12   building.

13   Q.    Okay.

14   A.    A men's restroom.  There's

15   an entrance to the breakroom on the

16   other side that he can go but he comes

17   by that area.

18   Q.    Is it shorter to go by your

19   office?

20   A.    It's the same amount of

21   distance.

22   Q.    Okay.  You say he goes by

23   and stands by Annie Kent's desk?

1    A.    At the time.  Annie Kent's

2   no longer on the team.

3    Q.    So when did that happen?

4    A.    That -- well, I don't -- I

5   can't recall.  He's -- right by Leslie.

6   He just stand in front of Annie Kent's a

7   lot after the incident for a while

8   afterward.  I don't -- can't say how

9   long.  But I know all the time I see him

10  slump down and stand there.  And I

11  reported that incident.

12    Q.    Was he friends with Annie

13  Kent?

14    A.    Well, I don't how -- what

15  their relationship is.

16    Q.    Did he ever talk to Annie

17  Kent before February 2005?

18    A.    Yes.

19    Q.    Go stand at her desk before

20  February of 2005?

21    A.    Not that often.

22    Q.    How often did he after

23  February of 2005 did he go --

## FREEDOM COURT REPORTING

1    A.    I'll --

2    Q.    -- stand at Annie's desk?

3    A.    I'll tell you he'll stand

4  anywhere between 10, 15 minutes at a

5  time.

6    Q.    But how often every day --

7    A.    -- there, two or three

8  minutes, speak to her and keep going.

9    Q.    How often would he do this

10 though?

11   A.    After or before?

12   Q.    Let's go before.

13   A.    Before, probably once a

14 day.

15   Q.    And after?

16   A.    About four, five times a

17 day.

18   Q.    So Ms. Kent could testify

19 that --

20   A.    Yes.

21   Q.    -- he would have stood at

22 her desk more after February of 2005?

23   A.    Yes.

## FREEDOM COURT REPORTING

Page 107

1      Q.      Anyone else would have seen

2  him do this?

3      A.      Twana, Brenda, Ava Collier;

4  she used to sit across from Annie so.

5      Q.      And you said you -- you

6  reported this when?

7      A.      Each time reported to

8  Tara.

9      Q.      Did you ever speak with

10  Leslie about it, report it to human

11  resources?

12      A.      Yes.

13      Q.      When?

14      A.      An e-mail around the -- I

15  don't recall the date, but I -- I know

16  I -- I sent it to her in e-mail.

17      Q.      And did Ms. Liebman talk to

18  you about it?

19      A.      No.

20      Q.      Did she try to talk to you

21  about it?

22      A.      No.

23      Q.      So no one from EDS tried to

**FREEDOM COURT REPORTING**

Page 108

1  talk to you about it?

2      A.    About him coming in the

3  area, no.

4      Q.    Did they try to talk to you

5  about any of the allegations you made

6  that he was intimidating you?

7      A.    Leslie made the statement

8  that if he comes to me or something let

9  her -- oh, no, no.  She didn't say him.

10  She said if anybody else bothers me, let

11  her know.  It wasn't that incident.

12      Q.    When did she tell you

13  that?

14      A.    I don't recall, but it's in

15  e-mail.

16      Q.    Was it after the February

17  incident?

18      A.    Yes.

19      Q.    Before you reported him

20  intimidating you to her?

21      A.    I don't recall.

22

23      (Defendants' Exhibit No. 7 was

**FREEDOM COURT REPORTING**

1                marked for identification.)

2

3        Q.     Hand you what's been marked

4    as Exhibit No. 7.

5        A.     Uh-huh (affirmative

6    response).

7        Q.     Do you recognize that?

8        A.     Yes.

9        Q.     What is it?

10       A.     Confidentiality agreement.

11       Q.     Well, if you start at the

12   third page, it looks like it's an e-mail

13   strain between you and Ms. Liebman.

14       A.     I'm sorry?

15       Q.     It looks like an e-mail --

16       A.     Oh.

17       Q.     -- train between you and Ms.

18   Liebman; is that correct?

19       A.     Correct.

20       Q.     And the first e-mail is from

21   you to Ms. Liebman on June 13, 2005?

22       A.     Uh-huh (affirmative

23   response).

## FREEDOM COURT REPORTING

Page 110

1       Q.      Is this when you reported to

2   her the intimidation you believe

3   Mr. Williams was doing?

4       A.      Uh-huh (affirmative

5   response).

6       Q.      Is that a yes?

7       A.      Yes.  I'm sorry.

8       Q.      This is when you reported it

9   to Ms. Liebman?

10      A.      Yes.

11      Q.      Okay.  In addition you ask

12  for a copy of the investigation that

13  she'd given you the details but never

14  formally in writing; correct?

15      A.      Correct.

16      Q.      Okay.  So she had told you

17  what the results of the investigation

18  was verbally, just hadn't put it down in

19  writing for you; correct?

20      A.      Yes.  Yes.

21      Q.      Okay.  Now, in this e-mail

22  you say, I was informed that the reason

23  was stated to you was that I was crazy

**FREEDOM COURT REPORTING**

1    and paranoid and that's the reason why

2    the investigation was handled in this

3    manner, no action still?

4         A.    I'm sorry.  Where are you

5    at?  Okay.

6         Q.    I'm on --

7         A.    I see it.

8         Q.    -- June 13th e-mail from

9    you.

10        A.    Correct.

11        Q.    What did you mean by that?

12        A.    I was informed by the reason

13    was stated I was informed by another

14    employee that people -- that they wasn't

15    taking me serious.

16        Q.    Who told you that?

17        A.    Debra Adkins.

18        Q.    How did she know this?

19        A.    She work closely with

20    management.

21        Q.    Was she in management?

22        A.    I think she is.  I don't

23    know her official title but she worked

# FREEDOM COURT REPORTING

Page 112

1  very closely with management.

2      Q.    Did she say who thought you

3  were crazy and paranoid?

4      A.    No.  We was on break one day

5  and she just made the statement, talked

6  about who was -- I don't know what the

7  conversation led up to it.  But she

8  said, oh, that's not going anywhere

9  'cause, you know, they think you crazy

10  and paranoid.

11      Q.    Okay.  Did she say who

12  thought you were --

13      A.    No.

14      Q.    -- crazy and paranoid?

15      A.    No.

16      Q.    So you have no idea what she

17  was talking about --

18      A.    No.

19      Q.    -- or who she was talking

20  about?

21      A.    I just -- I just make the

22  assumption it was Jarvis because Jarvis

23  was the only one who knew about this

## FREEDOM COURT REPORTING

1    that I know about this -- that knew

2    about this besides Leslie.

3         Q.    But that's your

4    assumption?

5         A.    Yes.

6         Q.    Debra didn't say Jarvis

7    thinks you're crazy?

8         A.    No.

9         Q.    Now, you say no action taken

10   still.  What do you mean by that?

11        A.    Because I haven't heard from

12   Leslie about this incident.

13        Q.    About what incident?

14        A.    About the elevator or the

15   investigation.

16        Q.    But in the previous

17   sentence, you state you've given me, and

18   you and I just talked about, she gave

19   you the results just not in writing?

20        A.    She didn't -- she didn't

21   give me the results from the

22   investigation.  This was -- she was

23   telling me it was still ongoing

## FREEDOM COURT REPORTING

Page 114

1    investigation.  I was asking her for

2    a -- basically up-to-date on the

3    investigation.

4         Q.    Okay.  Well, it says that --

5         A.    That -- okay.

6         Q.    -- can you give me the

7    details again.  You never formally gave

8    them to me in writing.  What details had

9    she given you previously if not the

10   results?

11        A.    The -- the ones over the

12   conference -- on the conversation over

13   the phone when she said he just gave you

14   a hug.

15        Q.    Oh --

16        A.    I just assumed --

17        Q.    -- and there were no

18   witnesses?

19        A.    I just assumed, I just

20   assumed that was the end of the

21   investigation.

22        Q.    Okay.

23        A.    At that time.

## FREEDOM COURT REPORTING

1      Q.     Do you know if it was the

2  end of the investigation?

3      A.     No, it wasn't 'cause she

4  called me February this year.

5      Q.     February of this year?

6      A.     Yes.

7      Q.     What did she want February

8  of this year?

9      A.     She basically told me the

10  investigation was closed, that I had no

11  merits on my allegation.

12      Q.     Which investigation was she

13  talking about?

14      A.     The elevator incident.

15      Q.     She wasn't talking about the

16  intimidation incident?

17      A.     No.

18      Q.     Do you know if she

19  investigated the intimidation

20  allegations you made?

21      A.     I don't know.

22      Q.     Did you ever speak with Ms.

23  Liebman about those allegations --

**FREEDOM COURT REPORTING**

1        A.      No.

2        Q.      -- the intimidation

3   allegation?

4        A.      No.

5        Q.      This e-mail, the June 13th

6   one to Ms. Liebman also says that he --

7   I assume you meant to say he is close

8   with a manager here?

9        A.      Right.

10       Q.      And I recently found out

11  that's the reason it was stated to you

12  to discredit me.  What manager -- I

13  assume you're talking about

14  Mr. Williams?

15       A.      Yes.

16       Q.      What manager is he close

17  to?

18       A.      Jarvis.

19       Q.      Who told you he was close

20  with him or her, pardon me?

21       A.      I don't recall who it was

22  exactly at the time he told me was.  But

23  they stated they're -- go to church,

**FREEDOM COURT REPORTING**

Page 117

1  bible study, and they're always praying

2  together.  And I just went off of that,

3  I guess.

4      Q.    And you have no idea who

5  told you this?

6      A.    I can't recall was it Lula,

7  girl name Lula who told me or it's a

8  girl named Felicia at the time.

9      Q.    And who are they?

10     A.    They're actually CSR.

11     Q.    Customer service reps?

12     A.    Yes.  I'm sorry.

13     Q.    You never personally saw

14  Jarvis and -- Jarvis Robinson and

15  Mr. Williams interacting at church or

16  bible study?

17     A.    No.

18     Q.    So all you know is what --

19     A.    Hearsay.

20     Q.    -- somebody told you?  It's

21  hearsay.

22     A.    Correct.

23     Q.    And so another customer

**FREEDOM COURT REPORTING**

Page 118

1   service rep said he's close to Jarvis

2   and that's why they didn't take you

3   seriously?

4          A.     Correct.

5          Q.     And that was either Lula or

6   Felicia?

7          A.     Right.

8          Q.     Anybody else tell you

9   that?

10         A.     No.

11         Q.     Now, when you send this to

12  Ms. Liebman, the next e-mail in this

13  chain is the same day from her saying

14  that she'll call you tomorrow?

15         A.     Uh-huh (affirmative

16  response).

17         Q.     Which would have been a

18  Tuesday; correct?

19         A.     Correct.

20         Q.     And you respond and tell her

21  when you're at work?

22         A.     Correct.

23         Q.     And then the next e-mail is

**FREEDOM COURT REPORTING**

Page 119

1   a June 15, 2005 from Ms. Liebman to you

2   basically saying she tried to call you;

3   correct?

4        A.    Okay.  Yes.

5        Q.    Is that true?

6        A.    Yes.

7        Q.    Okay.  And then said that

8   she was going to be leaving and wouldn't

9   be back until the following Monday?

10       A.    Correct.

11       Q.    And said she'd call you on

12   Monday?

13       A.    Uh-huh (affirmative

14   response).  Correct.

15       Q.    Then it looks like you sent

16   her an e-mail on June 21st?

17       A.    Correct.

18       Q.    Asking when she's going to

19   get back to you?

20       A.    Correct.

21       Q.    And you received an e-mail

22   back from her June 27th; correct?

23       A.    Correct.

### FREEDOM COURT REPORTING

Page 120

1      Q.    Basically, saying she's been

2  out of the office for looks like over a

3  week sick; correct?

4      A.    Correct.

5      Q.    And then trying to find out

6  a time when she can speak with you?

7      A.    Correct.

8      Q.    And you say that will be

9  fine?

10     A.    Correct.

11     Q.    Now, the next thing is

12  this -- there appears to be a

13  confidentiality agreement forwarded to

14  you?

15     A.    Correct.

16     Q.    And did you ever sign

17  that?

18     A.    No.

19     Q.    Why not?

20     A.    'Cause I was advised by my

21  attorney not to.

22     Q.    Okay.  And did Ms. Liebman

23  tell you why she wanted you to sign a

**FREEDOM COURT REPORTING**

Page 121

1    confidentiality agreement?

2          A.    I don't think I spoke with

3    her.  My attorney contacted her.

4          Q.    Okay.  So you were already

5    represented by counsel by this time?

6          A.    At that time, correct.

7          Q.    Okay.  And did you ever

8    speak with Ms. Liebman regarding the

9    allegations of intimidation after

10   this?

11         A.    I don't recall, no.

12         Q.    Do you know if she tried to

13   get in contact with you?

14         A.    About -- no, I don't know.

15         Q.    Did you refuse to speak with

16   her?

17         A.    No.  We actually had a

18   conversation in Jarvis' office I think

19   after this incident.

20         Q.    Okay.  Tell me about that.

21         A.    Told you previously that she

22   made the statement about me faking and

23   wanting some money to pay off some

## FREEDOM COURT REPORTING

1  bills.  And at that time, I told her,

2  you know, contact my attorney.  I don't

3  want to have any more conversations

4  without my attorney present.

5       Q.    So after that you refused to

6  speak to her without an attorney

7  present?

8       A.    Correct.

9       Q.    Do you recall when that

10  happened?

11       A.    I want to say November '05.

12  I -- I'm not sure.  I'm not really sure

13  on that date.

14       Q.    Have you reported any other

15  harassment since this intimidation issue

16  arose?

17       A.    With Mr. Williams?

18       Q.    Yes?

19       A.    No.

20       Q.    About anybody else?

21       A.    Yes.

22       Q.    Whom?

23       A.    Jamal Spencer.

**FREEDOM COURT REPORTING**

1     Q.    When did that happen?

2     A.    Might have been a month and

3  a half, two months ago.

4     Q.    Who's Jamal?

5     A.    He's our tech guy, tech

6  support, tech support.

7     Q.    What happened with him?

8     A.    I called into the tech desk

9  because I couldn't log into, I don't

10  know, one of my databases.  And he

11  was -- to the e-mail server and he made

12  the statement -- made a statement

13  towards me like are you sure -- he was

14  basically saying are you sure you

15  rebooted or basically talked to me like

16  I was a child.  Said, well, Jamal, I

17  know about computers a little bit.  I'm

18  just wondering is the server down.  I

19  don't know the conversation.  And he

20  said -- I said I'm not a child.  I said,

21  you know, you don't have to talk to me

22  in that manner.  And he said, I just --

23  I just want to make sure.

# FREEDOM COURT REPORTING

Page 124

1    Then he came over to my desk

2  and he said -- asked me did I get onto

3  the server.  I said no.  I contacted COE

4  and they stated that the server's down.

5  And he said, well, I didn't mean any --

6  to talk to you as if you was a child.

7  He said your behind's too big for me to

8  confuse you with being a child, on a

9  child level.  And I was like whoa.  And

10  he apologized to Mrs. Anthony who sits

11  in front me.  What -- she didn't hear

12  him 'cause she had her music on.  And he

13  made the statement, he said, you know,

14  you know, people get all riled up when

15  people make statements like that and go

16  report you.  At that time, I told my

17  manager Scott.

18    Q.    Scott Arnt?

19    A.    Right.

20    Q.    What did Scott do?

21    A.    He just e-mailed me back and

22  said the situation's handled.

23    Q.    Do you know how?

## FREEDOM COURT REPORTING

Page 125

1          A.    No.

2          Q.    Has Mr. Spencer said

3    anything inappropriate to you since?

4          A.    No.

5          Q.    Is that the first time he

6    ever said anything to --

7          A.    Yes.

8          Q.    -- you inappropriately?

9          A.    Yes.

10          Q.    Do you know how the

11    situation was handled?

12          A.    No.

13          Q.    Has Mr. Spencer tried to

14    intimidate you since?

15          A.    No.

16          Q.    Do you think that was

17    handled properly?

18          A.    Yes.

19          Q.    What about the situation

20    with Mr. Williams, the February 10th

21    elevator incident, do you think that was

22    handled properly?

23          A.    No.

## FREEDOM COURT REPORTING

1      Q.     Why not?

2      A.     'Cause he violated me.  He

3  actually put his hands on me.  He messed

4  with my -- filed that incident, just

5  my -- it wasn't handled properly because

6  he wasn't properly trained.

7      Q.     Why do you say that?

8      A.     Because EDS has these

9  policies in place.  EDS doesn't follow

10  through and ensure that these policies

11  are acted upon.

12      Q.     Do you know what training

13  Mr. Williams received?

14      A.     He received -- everybody

15  cross the board has to take these sexual

16  harassment courses.  And you had to

17  certify these courses.

18      Q.     Okay.

19      A.     You have to say that you've

20  taken these courses.

21      Q.     Okay.

22      A.     Each year.

23      Q.     So how was he not properly

## FREEDOM COURT REPORTING

Page 127

1    trained?

2           A.      Okay.   I'm sorry.

3           Q.      I understand what you say he

4    did to you.

5           A.      Right.

6           Q.      How would training any --

7    what different training would have

8    prevented that?

9           A.      I think a thorough

10   background check into Mr. Williams' past

11   prior to EDS hiring him and seeing if

12   there ever been a pattern with this

13   before.   EDS apparently didn't do a

14   thorough background check on this for

15   the type of training that they need to

16   have with each employee.

17          Q.      Do you know what kind of

18   background check EDS did on

19   Mr. Williams?

20          A.      Apparently, just the

21   background check they do with every

22   individual.   No, I don't know what they

23   did on Mr. Williams but I --

## FREEDOM COURT REPORTING

1    Q.    What type of background

2  check do they perform on other

3  employees?

4    A.    They do fingerprints.  They

5  do credit report.  They do the history

6  of any type of allegation or so forth.

7  That's what I'm -- I'm familiar with

8  what they've done.

9    Q.    And do you know if they did

10  that with Mr. Williams?

11    A.    No, I don't.

12    Q.    Okay.  Do you know there's

13  anything in Mr. Williams' background

14  that they would have found had they done

15  some new and different or better

16  check?

17    A.    Other than hearsay?

18    Q.    Oh, what do you know about

19  hearsay?

20    A.    Military.  He had military

21  allegations against him, hearsay.

22    Q.    Who did you hear that

23  from?

**FREEDOM COURT REPORTING**

1      A.     Lula Savage.

2      Q.     What did she say where those

3   allegations --

4      A.     She stated that someone else

5   in the military in his reserve unit

6   filed some allegation charges against

7   him as well.

8      Q.     What type of charges?

9      A.     Sexual harassment.

10      Q.     How did Lulu know this?

11      A.     Lula.

12      Q.     Lula.  Pardon me.

13      A.     That's okay.  Hearsay.

14      Q.     So she has no --

15      A.     I don't know where she heard

16   it from.

17      Q.     She wasn't in the military

18   with Mr. Williams?

19      A.     No.  I think someone else

20   that she knew probably knew him.  Like I

21   said, it's hearsay.

22      Q.     And do you know if the

23   background check would have --

## FREEDOM COURT REPORTING

Page 130

1          A.      Red flagged it, should

2    have.

3          Q.      Why -- have you performed a

4    background check before?

5          A.      No.

6          Q.      Personally?

7          A.      No.

8          Q.      Do you know what a

9    background check entails and what

10   information is actually provided?

11         A.      No.

12         Q.      Okay. So you have no

13   personal knowledge of whether a

14   background check of the type you think

15   should have occurred would have

16   presented this information. Do you

17   think -- do you know if the military

18   would have provided this information had

19   EDS asked?

20         A.      I don't know.

21         Q.      And this is assuming it

22   occurred. Do you know if it was public

23   or private information that the military

**FREEDOM COURT REPORTING**

1     had?

2          A.     I don't know.

3          Q.     Besides the hearsay from

4     Lula, any other information from

5     Mr. Williams' background that you think

6     would have come to light had a new,

7     different, better background check?

8          A.     I don't know.

9          Q.     So that's the only thing you

10    know of in the background that possibly,

11    if it's true, EDS could have found out

12    about?

13         A.     Other than hearsay?

14         Q.     No.  I want to know

15    everything you know?

16         A.     Okay.  Well, another

17    hearsay, this comes from a girl named

18    Rita McCray, stated that Mr. Williams

19    was actually -- like another lady up

20    there, a young lady up there, Angelina

21    Edwards and that they somehow dated, may

22    or may not dated.  And he was at the

23    time stalking her at her apartment

## FREEDOM COURT REPORTING

Page 132

1  complex.   That's another hearsay.

2      Q.    And that's from Rita?

3      A.    Rita McCray.

4      Q.    Does she work for EDS?

5      A.    Yes.

6      Q.    And Angelina Edwards did as

7  well?

8      A.    Yes.   She's still employed

9  there.

10      Q.    Have you ever spoken to Ms.

11  Edwards?

12      A.    No.   I spoken with her but

13  to ask her, but I never did follow

14  through with it.

15      Q.    You did or you didn't --

16      A.    I did not.   I spoke with her

17  but I didn't speak with her about

18  this -- that.

19      Q.    And it's your understanding

20  from Ms. McCray that they were dating?

21      A.    No.   That she wouldn't go

22  out with him.   I don't know the

23  relationship.   Like I say, it's hearsay.

**FREEDOM COURT REPORTING**

Page 133

1  They --

2          Q.     Okay.

3          A.     -- may or may not have

4  dated.  I don't know.  But I know that

5  the hearsay is that he actually stalked

6  her in her apartment.

7          Q.     Do you know if Ms. Edwards

8  or Ms. McCray reported this to EDS?

9          A.     I don't know.

10         Q.     Do you have any information

11  that EDS had knowledge of this alleged

12  incident?

13         A.     I don't know.

14         Q.     And a background check

15  wouldn't have got that; correct, it

16  happened while they were at EDS?

17         A.     I don't know.

18         Q.     You don't know?

19         A.     I don't know.

20         Q.     Does EDS perform background

21  checks on its current employees?

22         A.     I don't know.

23         Q.     Okay.  Anything else in

## FREEDOM COURT REPORTING

1    Mr. Williams' past or whether you know

2    it by hearsay or personally that EDS --

3    you think EDS should have been aware of

4    or could have been aware of?

5         A.    No.

6              MS. JACOBS:  Can we take a

7    short break?

8              MR. WALKER:  Uh-huh

9    (affirmative response).

10             MS. VIDEOGRAPHER:  Off the

11   record.  The time is 11:43.

12

13        (A brief recess was taken.)

14

15             MS. VIDEOGRAPHER:  Back on

16   the record.  We commence Tape 3.  The

17   time is 11:53.

18        Q.    (By Ms. Jacobs)  Ms. Jacobs,

19   now you had mentioned that Mr. Williams

20   had intimidated you as early or as late,

21   as early -- as late as yesterday?

22        A.    Uh-huh (affirmative

23   response).

## FREEDOM COURT REPORTING

1    Q.    And previously we had talked

2    about that after the incident that you

3    felt he was staring at you and walking

4    in the area pretty much constantly.  Has

5    his intimidation for lack of a better

6    word leveled off some?  I mean, is he

7    still in your area 20 times, 25 times a

8    day or has it lessened?

9        A.    It lessened because Annie

10   Kent is no longer in that area.

11       Q.    Okay.  So Annie's no

12   longer --

13       A.    In that -- on that team.

14       Q.    Is she still with EDS?

15       A.    Yes.

16       Q.    But she moved?

17       A.    Yes.

18       Q.    And so he's not there

19   talking to her?

20       A.    No.

21       Q.    Does he come talk to anybody

22   else on a regular basis in your area?

23       A.    No.  He comes and talks to

## FREEDOM COURT REPORTING

Page 136

1    Tara periodically.

2         Q.    What does he talk to Tara

3    about?

4         A.    I don't know.

5         Q.    Do you know if that's EDS

6    related --

7         A.    I don't --

8         Q.    -- or personal?

9         A.    -- I don't know.

10        Q.    How often does he come talk

11   to Tara?

12        A.    Not as often.

13        Q.    When did Annie move?

14        A.    I don't recall.

15        Q.    Had -- last month or has it

16   been longer?

17        A.    It might have been two,

18   three months.

19        Q.    Ago?

20        A.    Yes.

21        Q.    So sometime this year?

22        A.    Yes.

23        Q.    But you'll still see him

# FREEDOM COURT REPORTING

1    walk by to go the breakroom or to the

2    restroom?

3         A.    Yes.

4         Q.    Has he done anything else to

5    try to intimidate you in your opinion

6    besides what we've already talked

7    about?

8         A.    Followed me out in the

9    parking lot.

10        Q.    How often does that

11   happen?

12        A.    Prior to or after?

13        Q.    Prior to February '05, did

14   he ever follow you out in the parking

15   lot?

16        A.    No.

17        Q.    So he never happened to

18   leave the parking lot after prior to

19   February of '05?

20        A.    I don't know.

21        Q.    Would you have noticed if he

22   did --

23        A.    Yes.

# FREEDOM COURT REPORTING

1        Q.      -- prior to February of '05?

2        A.      Yes.

3        Q.      Why?

4        A.      Because I take a look at my

5   surroundings, keep familiarity of my

6   surroundings.

7        Q.      Okay.  And after February of

8   '05?

9        A.      Often.

10        Q.      How often?

11        A.      Often.  Three, four times a

12   week.  Depends on what shift he was

13   on.

14        Q.      Are y'all on the same

15   shift?

16        A.      Well, I'm on a straight

17   shift.  He wasn't at the time.

18        Q.      So he would follow you out

19   of the parking lot only if he was

20   working the same shift as you?

21        A.      Yes.  That's -- that's the

22   only time I notice because I'm never

23   there that late.

**FREEDOM COURT REPORTING**

Page 139

1      Q.    Okay.  Did he ever try to

2  follow you home?

3      A.    No.  Once I noticed him

4  behind me, I took a different route.

5      Q.    And he didn't follow you?

6      A.    No.

7      Q.    Did he every try to hit your

8  car?

9      A.    No.

10     Q.    Say anything to you?

11     A.    No.

12     Q.    He just followed you out of

13  the parking lot?

14     A.    Yes.

15     Q.    What was intimidating about

16  that?

17     A.    An incident when I saw him

18  get on the elevator.  We was about to

19  get on the elevator together.  I went

20  back and sat down at my desk, waited

21  five, ten minutes, and I just assumed he

22  would be out of the parking lot by then.

23  Got to my car, drive out and he pulls

## FREEDOM COURT REPORTING

1  out behind me and he has a smirk on his

2  face when I looked in my rearview mirror

3  so I turned off.

4      Q.    So you just assumed because

5  you had waited a few minutes he would be

6  out of the parking lot?

7      A.    That one incident, yes.

8      Q.    That one incident.  Do you

9  know if he stopped and talked to

10  anybody?

11     A.    I don't know.

12     Q.    He was on the phone?

13     A.    I don't know.

14     Q.    Okay.  And so you start to

15  leave the parking lot and he pulls in

16  behind you and you say he had a smirk on

17  his face?

18     A.    He pulls out behind me not

19  in.

20     Q.    Right.

21     A.    Yeah.

22     Q.    Okay.  Maybe I'm

23  misunderstanding this.  You pull out and

## FREEDOM COURT REPORTING

Page 141

1    he pulls out behind you?

2         A.    Yes.

3         Q.    Okay.  What's the parking

4    lot like?  Maybe I need to know what the

5    parking lot is.

6         A.    It's right up here

7    (indicated).  You can park under the

8    building.

9         Q.    Okay.

10        A.    And you can park in an open

11   parking lot.

12        Q.    Where were you parked?

13        A.    Under the building.

14        Q.    Where was he parked?

15        A.    He was parked under the

16   building.

17        Q.    Near you?

18        A.    It had to have been near me

19   because he pulled out behind me.

20        Q.    Okay.

21        A.    And --

22        Q.    And you just assumed he was

23   waiting for you?

## FREEDOM COURT REPORTING

Page 142

1      A.     On that incident.   Another

2  incident was intimidation.   I just

3  coming back from a break and somebody

4  was sitting in a truck and start blowing

5  and blew at me and -- and just waved.

6  And I looked and it was tinted windows.

7  And I looked and I -- I noticed it

8  was -- was him.   He had -- I guess he

9  had just purchased a second vehicle.

10     Q.     So he honked the horn and

11 waved at you and that was

12 intimidation?

13     A.     Yeah.

14           MS. VIDEOGRAPHER:   Ms.

15 Jacobs, can you put your mic on?

16           MS. JACOBS:   I'm sorry.

17           MS. VIDEOGRAPHER:   It's

18 okay.  I had it up.  I could hear you

19 but -- thank you.

20     Q.     (By Ms. Jacobs)  But you

21 said since February of '05 he's never

22 tried to speak to you?

23     A.     No.

## FREEDOM COURT REPORTING

Page 143

1        Q.    And he's never touched

2    you?

3        A.    No.

4        Q.    Has he ever called you at

5    home?

6        A.    No.

7        MS. JACOBS:  Can we go off

8    the record for just a second?

9        MR. WALKER:  Sure.

10       MS. VIDEOGRAPHER:  Off the

11   record.  The time is 11:58.

12

13       (A discussion was held off the

14       record.)

15

16       MS. VIDEOGRAPHER:  Back on

17   the record.  The time is 11:58.

18       Q.    (By Ms. Jacobs)  Now, since

19   February of 2005, you haven't been

20   demoted, have you?

21       A.    No.

22       Q.    You still work at EDS;

23   correct?

**FREEDOM COURT REPORTING**

Page 144

1          A.     Yes.

2          Q.     In the same position?

3          A.     Yes.

4          Q.     You haven't lost any

5     salary?

6          A.     No.

7          Q.     Changed your salary --

8          A.     No.

9          Q.     -- to where it's less?

10         A.     No.

11         Q.     Do you recall when you first

12    contacted an attorney about this case?

13         A.     Do I recall?

14         Q.     Yeah.  How soon after the

15    incident did you contact an attorney?

16         A.     Might have been a month,

17    month and a half.

18         Q.     Why did you contact an

19    attorney at that time?

20         A.     I don't recall the reason

21    behind it.

22         Q.     How did you find your

23    attorney?

## FREEDOM COURT REPORTING

1      A.      Just basically knew him,

2  just from being with him.

3      Q.      How?

4      A.      Just knew him from different

5  scenes, scenery.

6              MR. WALKER:  If you don't

7  mind, I can tell you how.  The YMCA.

8      Q.      Okay.  And you filed a

9  charge of discrimination with the EEOC;

10 correct?

11     A.      Correct.

12     Q.      How soon after the

13 incident?

14     A.      June -- March, June.

15

16         (Defendants' Exhibit No. 8 was

17          marked for identification.)

18

19     Q.      Hand you what's been marked

20 Exhibit No. 8.  Do you recognize that?

21     A.      Yes.

22     Q.      Is that the charge of

23 discrimination you filed with the

## FREEDOM COURT REPORTING

Page 146

1   EEOC?

2           A.     Yes.

3           Q.     And it's dated what?

4           A.     March 8.

5           Q.     2005?

6           A.     Yes.

7           Q.     And is that your signature

8   above the date?

9           A.     Yes.

10          Q.     So you signed it on March 8,

11  2005?

12          A.     Yes.

13          Q.     So less than a month after

14  the incident occurred?

15          A.     Yes.

16          Q.     And did you write what is in

17  the -- the typewritten part that's the

18  particulars are?

19          A.     Yes.

20          Q.     You actually personally

21  typed that in?

22          A.     No.

23          Q.     Who typed that in?

1      A.    My attorney.

2      Q.    Okay.  Did you tell the

3 attorney what to put in there?

4      A.    Yes.

5      Q.    How?  You just talk to him

6 about it?

7      A.    Yes.

8      Q.    Were you with him when he

9 did it?

10      A.    Yes.

11      Q.    Now, the details in this are

12 different than the written statement

13 that you provided to EDS, aren't they?

14      A.    Yes.

15      Q.    Why?

16      A.    I didn't -- what you asked

17 me, that some of the stuff was in there

18 detail, I don't --

19      Q.    Okay.  Well, for example, in

20 this statement that you gave to the EEOC

21 a month later after the incident, you

22 actually say, He began rubbing my breast

23 and then he began putting his hands in

## FREEDOM COURT REPORTING

Page 148

1 my pants, do you see that?  It's in the

2 first paragraph towards the end.

3      A.    I don't have my glasses.

4 I'm sorry.  Okay.

5      Q.    You see that in this

6 statement, He began rubbing my breast

7 and then he began putting his hand in my

8 pants; correct?

9      A.    Correct.

10      Q.    That's in Exhibit 8 to the

11 EEOC?

12      A.    Supposed to have been the

13 other way around.

14      Q.    Pardon me?

15      A.    Supposed to been the other

16 way around.  He first began -- put his

17 hands down my pants.

18      Q.    Uh-huh (affirmative

19 response).

20      A.    And pulled it out and was

21 rubbing my stomach and breast.

22      Q.    Okay.  But that's not --

23 this statement wasn't in your written

**FREEDOM COURT REPORTING**

Page 149

1    statement to EDS, was it?

2         A.    This statement was.

3         Q.    All right.  Let's look at

4    that exhibit and you can show me where

5    it is in that statement.  It's Exhibit

6    No. 6.

7         A.    Right here (indicated).  He

8    proceed to --

9         Q.    Read it.

10        A.    He proceeded to take my

11   blouse out of my pants and began to rub

12   my stomach, my bare stomach.  Said he

13   wants to warm me up.

14        Q.    Okay.

15        A.    Okay.  That part --

16        Q.    That is different, isn't it,

17   from he began rubbing my breast?

18        A.    Yes.

19        Q.    And then he began putting

20   his hand in my pants.

21        A.    That past part happened

22   first.  That was the first thing he did,

23   he put his hands down my pants.

## FREEDOM COURT REPORTING

Page 150

1    Q.    And that's not anywhere in

2  this statement to EDS either, is it?

3    A.    That he put his hands down

4  my pants?

5    Q.    Yes.

6    A.    He proceeded to take my

7  blouse out my pants.

8    Q.    Okay.  But nowhere does it

9  say he put his hands down your pants,

10  does it?

11    A.    Oh, I see what -- I didn't

12  put that in that statement.

13    Q.    Okay.  And nowhere in the

14  statement to EDS do you say that he

15  began rubbing your breast?

16    A.    No.

17    Q.    That was not in the

18  statement to EDS?

19    A.    It was not the statement to

20  EDS.

21    Q.    Why was it not in the

22  statement to EDS --

23    A.    I guess I --

**FREEDOM COURT REPORTING**

Page 151

1    Q.    -- but in the statement to

2    the EEOC?

3    A.    I just neglected to put it

4    in there.

5    Q.    You forgot when you wrote

6    the written statement to EDS?

7    A.    No.  I was so traumatized

8    that when I was typing certain things I

9    guess in my mind when you type I meant

10   to put it and I'm typing and didn't

11   reread it before I sent it.

12   Q.    Did you ever tell anybody at

13   EDS that he had rubbed your breast?

14   A.     I think I told Twana.  I'm

15   not -- she's the only one I think was

16   told about the incident, what

17   happened.

18   Q.    You didn't tell Leslie or

19   Tara specifically that he rubbed your

20   breast?

21   A.    I'm not sure.  I think I

22   told Tara, but I'm not sure if I told

23   Leslie.

## FREEDOM COURT REPORTING

1      Q.     You think you told Tara?

2      A.     Yes.

3      Q.     Okay.  You're not sure if

4  Leslie, who was investigating it the

5  human resources person, whether he

6  rubbed your breast or not?

7      A.     I don't think I -- I didn't

8  put it in there, no.

9      Q.     Besides Twana and Tara, who

10 you might have told, anybody else at EDS

11 that you would have told that he rubbed

12 your breast?

13     A.     No, I can't recall.

14     Q.     Now, I -- I just want to

15 make sure I understand every incident of

16 sexual harassment that you think

17 occurred.  We have talked about the

18 elevator incident; correct?  And I

19 understand that's an incident that you

20 believe was sexual harassment.

21     A.     Okay.

22     Q.     Were there any other -- and

23 we talked about Jamal Spencer.

## FREEDOM COURT REPORTING

1      A.      Okay.

2      Q.      Right?

3      A.      Yes.

4      Q.      And that's not in any way

5  part of this lawsuit, is it?

6      A.      No.

7      Q.      I think you told me you

8  thought they handled that appropriately?

9      A.      Yeah.

10      Q.      Any other instances of

11  sexual harassment?

12      A.      No.

13      Q.      We've talked about them

14  all?

15      A.      Yes.

16      Q.      Okay.  By Mr. Williams or

17  anybody else at EDS?

18      A.      Yes.

19      Q.      As far as you know?

20      A.      Yes.

21      Q.      I want to talk to you a

22  little bit about why you believe EDS was

23  negligent in hiring Mr. Williams.  And

## FREEDOM COURT REPORTING

Page 154

1    we've talked a little bit about it I

2    think but I want to make sure I

3    understand exactly why you think they

4    were negligent in hiring and training

5    him.  Is it simply the -- you don't

6    believe that they performed an adequate

7    background check or is there something

8    else that you think they're negligent

9    for for hiring him?

10        A.    For hiring, no, I can't

11   think of anything.

12        Q.    So hiring is just the

13   background check?

14        A.    Yes.

15        Q.    Anything else you can think

16   of?  Any other fact that you think EDS

17   was negligent in hiring Mr. Williams?

18        A.    As far as hiring him?

19        Q.    Yes.

20        A.    Initially bringing him on?

21        Q.    Correct.

22        A.    I don't know that process

23   what they've done as far as hiring him

## FREEDOM COURT REPORTING

Page 155

1    goes, what information he did that --

2    did that.  I don't know.

3          Q.    What about training or

4    supervision of Mr. Williams, what do you

5    believe -- why do you believe EDS was

6    negligent in training or supervising

7    Mr. Williams?

8          A.    Mainly that the training

9    that EDS has -- has given to

10   Mr. Williams wasn't good enough or

11   sufficient enough because the incident

12   did happen.

13         Q.    Is that the only reason why

14   you think -- is that what you're basing

15   the negligent training on is if they had

16   trained him properly that incident

17   wouldn't have happened?

18         A.    I think if they supervised

19   him and took the allegation seriously, I

20   think the outcome would have been

21   different.

22         Q.    Why do you think they didn't

23   take the allegation seriously?

**FREEDOM COURT REPORTING**

1    A.    I really believe that EDS

2  actually during this investigation just

3  basically I want to say pacify me into

4  doing a step-by-step process or acting

5  as if they took it seriously.  I don't

6  think they took it seriously.  I really

7  just -- I really feel they hadn't taken

8  it serious because he's still employed

9  there.  An allegation --

10    Q.    So you think that he

11  shouldn't be employed there?

12    A.    No, I don't think he should

13  have.

14    Q.    You think they should have

15  terminated him --

16    A.    Yes, I do.

17    Q.    -- based on your allegation?

18    A.    Yes, I do.

19    Q.    Even though there were no

20  witnesses?

21    A.    Okay.

22    Q.    True?

23    A.    True.

## FREEDOM COURT REPORTING

1    Q.    And even though he denied

2   your allegations?

3    A.    Okay.

4    Q.    Okay.  So I'm just asking,

5   you think even though there were no

6   witnesses and even though he denied the

7   allegations, he should have been

8   terminated?

9    A.    Yes, I do.

10    Q.    Nothing short of termination

11   would have been good enough?

12    A.    Nothing short of

13   termination, not of that magnitude.

14    Q.    Anything else you can -- I'm

15   just going to make sure I understand.

16   So the negligent training and

17   supervision is had they trained him,

18   Mr. Williams, properly, the incident

19   never would have occurred; correct?

20    A.    Correct.

21    Q.    And the negligent

22   supervision and training also entails

23   they didn't take it seriously because

**FREEDOM COURT REPORTING**

Page 158

1  he's -- did not get terminated --

2       A.    Yes.

3       Q.    -- correct?  Okay.  Anything

4  else, any other facts that would support

5  your claim that EDS was negligent in

6  either training or supervising

7  Mr. Williams?

8       A.    I guess the best way to

9  describe that is that the training that

10  Mr. Williams received from EDS wasn't

11  taken serious by Mr. Williams.  And if

12  by them having this training courses,

13  when someone brings cert --

14  some allegation towards someone they

15  need to take the severity of it and look

16  deep into the allegation instead of just

17  assuming or just taking his word over my

18  word.

19       Q.    So you feel they took

20  Mr. Williams' word over your word?

21       A.    I don't think they -- the

22  investigation was done fairly.  I don't

23  think the investigation was done

**FREEDOM COURT REPORTING**

Page 159

1    thoroughly.

2          Q.    Why?

3          A.    Why?

4          Q.    What -- what --

5          A.    He's still employed.  He's

6    still there to --

7          Q.    So it wasn't thorough and it

8    wasn't proper because he's still there.

9    So if they'd done a proper

10   investigation, you believe he would have

11   been terminated?

12         A.    I don't know.  I can't

13   answer that.

14         Q.    What -- what -- what more of

15   an investigation could EDS had done in

16   that instance?  You've admitted there's

17   no witnesses so they can't really

18   interview any witnesses to find out what

19   you're saying is true or what

20   Mr. Williams is saying is true;

21   correct?

22         A.    Correct.

23         Q.    Okay.  So what in

## FREEDOM COURT REPORTING

Page 160

1    addition -- what additional

2    investigation do you believe was

3    necessary and what would have -- have

4    revealed to change the results?

5         A.    I don't know what could have

6    been revealed, but I wasn't given any

7    information about it.

8         Q.    What do you mean?

9         A.    I wasn't given any --

10        Q.    They didn't tell you exactly

11   what they did on the investigation,

12   exactly what discipline.  You wanted to

13   know exactly what they did?

14        A.    I mean, I didn't have to

15   know exactly what was -- I don't know

16   any of the details, but the way they

17   handled it, the way they handled me was

18   they brushed it under the rug, so to

19   speak.

20        Q.    How did they brush it under

21   the rug?

22        A.    They -- they -- they didn't

23   take it seriously.

## FREEDOM COURT REPORTING

1    Q.    How did they not take it

2  seriously?

3    A.    It's hard to explain.  The

4  way I was treated after the incident.

5    Q.    By whom?

6    A.    Management.

7    Q.    Who?

8    A.    It was just -- it's hard to

9  explain.  It's really hard to explain.

10    Q.    I need you to explain it

11  because you're saying that they didn't

12  take it seriously.  So I need to know in

13  your mind how did they not take it

14  seriously.  Did management treat you

15  differently?

16    A.    Training was -- the training

17  that Mr. Williams got on this wasn't

18  proper training.

19    Q.    What training is that?

20    A.    Sexual harassment.  This

21  right here (indicated) has been the same

22  since I've been here, same code of

23  business conduct.  We had to sign

### FREEDOM COURT REPORTING

1    something.  We need -- EDS needs to do

2    some more thorough training, some

3    on-hands training, some one-on-one

4    training about this.  And people have --

5    need to be accountable for their action

6    and what they've done.  I'm --

7         Q.    You don't believe

8    Mr. Williams was held accountable?

9         A.    No, I don't think he was

10   held accountable.

11        Q.    Because he wasn't

12   terminated?

13        A.    No -- it's not even his

14   intimidation, his whole how he was

15   walking around, how he was acting.  He

16   was -- just felt like he had the need to

17   intimidate me.  I'm like okay, you

18   already done what you did.  And you

19   still walk around here like you crazy.

20   I mean, it just the way he -- he made me

21   feel behind that.

22        Q.    Okay.  I understand that.

23   And I understand you're talking about

## FREEDOM COURT REPORTING

1   Mr. Williams.  I'm talking about EDS.

2       A.    EDS -- EDS whole attitude

3   is -- okay.  Jarvis Robinson.  Prior to

4   this, oh, I didn't know what was going

5   on.  I didn't know -- how you operation

6   manager and you don't know what is going

7   on in your center.

8       Q.    Did she not know that the

9   incident had happened or did she not

10  know --

11      A.    She stated to me she didn't

12  even -- she stated to me that she didn't

13  know the incident happened.  Then she

14  stated to me on another occasion she

15  thought it was dealt with.  That was

16  it.

17      Q.    Well, did you report the

18  incident to Jarvis?

19      A.    I reported to Tara.  Tara

20  supposed to -- or did report it to

21  Jarvis.

22      Q.    How do you know Tara

23  reported --

# FREEDOM COURT REPORTING

Page 164

1      A.      Tara told me.

2      Q.      Do you know what EDS' policy

3  is with respect to this type of

4  complaint investigation whether it's to

5  be kept confidential?

6      A.      It's supposed to be between

7  the parties or confidential across the

8  board, I don't know.

9      Q.      That they have a policy that

10 when there is a complaint in an

11 investigation that the investigation and

12 the complaint are to be kept

13 confidential as much as possible to

14 protect --

15     A.      From the parties?

16     Q.      From the parties, from --

17     A.      I didn't know that.

18     Q.      -- people who don't have a

19 need to know.

20     A.      From the parties, I didn't

21 know that.

22     Q.      Okay.  What about from

23 random people?

## FREEDOM COURT REPORTING

1    A.    I knew about that.

2    Q.    So that there is a policy

3 that the complaint and investigation are

4 to be kept confidential from just

5 anybody?

6    A.    I don't know the complaint.

7 I know the confidentiality.

8    Q.    What do you know about the

9 confidentiality?

10    A.    Confidentiality is I -- I

11 tell Tara.  Tara tells Jarvis and Jarvis

12 do whatever she does with it.

13    Q.    Okay.

14    A.    And what I mean by that is,

15 she escalates it.

16    Q.    Okay.  And it -- now, by the

17 time Tara -- do you know when Tara told

18 Jarvis?

19    A.    No.

20    Q.    So by the time Tara had told

21 Jarvis, you may have already reported it

22 to Leslie Liebman; correct?

23    A.    I don't know.

## FREEDOM COURT REPORTING

Page 166

1      Q.    It could have happened --

2      A.    Could.

3      Q.    -- that way?

4      A.    Could.

5      Q.    Okay.  And if Leslie Liebman

6  was already -- had already been

7  contacted and was already conducting an

8  investigation, would that be

9  appropriate?

10     A.    No.

11     Q.    Leslie Liebman, the human

12  resources person, shouldn't be the one

13  conducting the investigation?

14     A.    Oh, she -- she should be

15  investigate it, but --

16     Q.    Do you think she should be

17  reporting everything she does to Ms.

18  Robinson?

19     A.    She did, yes.

20     Q.    You know she did?

21     A.    No.  No.  Take it back.

22  Take that back.  She actually -- I don't

23  know what Leslie did.  I think she

### FREEDOM COURT REPORTING

1    should have.

2         Q.    You think she should have

3    reported it to Ms. Robinson?

4         A.    Yeah.

5         Q.    Why?

6         A.    'Cause she's the operation

7    manager.

8         Q.    Okay.  But you don't know if

9    that's EDS' policy?

10        A.    No.

11        Q.    Okay.  Now, you -- I want to

12   go back to EDS not taking it seriously

13   and you said something about the way

14   management treated you.  Could you tell

15   me what you meant by that?  Has Tara

16   treated you any differently?

17        A.    I don't know.  I don't

18   know.

19        Q.    You'd be the only one that

20   would know.

21        A.    No.  I -- I -- it was a lot

22   going on, I don't know, in my head, my

23   mind.  Everything was -- I don't know.

## FREEDOM COURT REPORTING

Page 168

1    Q.    As you sit here today, is

2    Tara today treating you any

3    differently?

4    A.    No.

5    Q.    What about Jarvis

6    Robinson?

7    A.    Yes.

8    Q.    How is she treating you

9    differently?

10   A.    She's -- prior to that, she

11   was nice, friendly, whatever, hello, how

12   you doing.  Now it's more she looks at

13   me, just don't say anything.  I'm not

14   the type that needs that, but she's

15   just -- her whole attitude is -- is

16   totally different.

17   Q.    You have to tell me what her

18   attitude is.  I can't get in your

19   mind --

20   A.    Her attitude is -- is

21   nasty.

22   Q.    How is she nasty to you?

23   A.    Well, nonchalant nasty.

**FREEDOM COURT REPORTING**

Page 169

1    Just --

2        Q.    So she doesn't speak to you

3    as much?

4        A.    Right.

5        Q.    She hasn't said anything

6    inappropriate to you, has she?

7        A.    No.

8        Q.    And she hasn't yelled at you

9    or been rude to you outright, has she?

10       A.    No.

11       Q.    Okay.  Just she doesn't

12   speak to you as often as she did

13   before?

14       A.    Right.

15       Q.    Anyone else in management

16   that you feel is treating you

17   differently?

18       A.    No.

19       Q.    Now, in your complaint --

20   let's go ahead and mark it.

21

22       (Defendants' Exhibit No. 9 was

23          marked for identification.)

# FREEDOM COURT REPORTING

1

2      Q.    Hand you what's been marked

3  as Exhibit No. 9.  And if you'd look on

4  Page 3, Paragraph 11, it states that you

5  were subjected to sexually suggested

6  remarks and derogatory comments as well

7  as improper physical contacts by

8  defendant Jeff Williams and others.  Did

9  anybody besides Mr. Williams physically

10  contact you inappropriately at EDS?

11      A.    No.

12      Q.    So it's just Jeff

13  Williams --

14      A.    Yes.

15      Q.    -- that you contend touched

16  you inappropriately?

17      A.    Yes.

18      Q.    Okay.  And you stated that

19  the sexually suggested remarks and

20  derogatory comments, have we talked

21  about all those?

22      A.    Yes.

23      Q.    There's none other that you

**FREEDOM COURT REPORTING**

1    can think of?

2         A.    No.

3         Q.    That anybody else made --

4         A.    I can't --

5         Q.    -- derogatory comments or

6    sexually suggestive comments to you?

7         A.    No, I can't think of any.

8         Q.    Okay.  And we've talked in

9    Count 2 which is -- starts at Paragraph

10   20, we've been talking about how you

11   believe EDS was negligent in hiring,

12   training and supervising Mr. Williams;

13   correct?

14        A.    Yes.

15        Q.    Okay.  And I think I

16   understand the hiring and the training.

17   I want to talk specifically about the

18   supervising.  How do you think EDS was

19   negligent in actually supervising Mr.

20   Williams?

21        A.    There was -- I think they

22   was negligent because -- ask that

23   question again.  I'm sorry.

## FREEDOM COURT REPORTING

Page 172

1      Q.    Sure.   We've talked about

2    why you believe EDS was negligent in

3    hiring Mr. Williams and training him.

4    And now I just want to know supervising,

5    is it any different than what you've

6    already told me?  How could they have

7    supervised him better?  How were they

8    negligent in supervising Mr. Williams is

9    what I'm asking.

10      A.    Rephrase that.

11      Q.    Sure.   Part of your claim

12    against EDS is that they were negligent

13    in supervising Mr. Williams.  I want to

14    know how they were negligent.

15      A.    When they initially hired

16    him, we talked about that.

17      Q.    Right.   Okay.

18      A.    Okay.

19      Q.    Anything else?

20      A.    No.

21      Q.    Okay.   The next cause of

22    action you have is wanton hiring and

23    training and supervision.   Anything

## FREEDOM COURT REPORTING

Page 173

1    different than what we've already talked

2    about that would support that claim or

3    that cause of action?

4            A.      Which is wantonness?

5            Q.      It's a legal term.  Are

6    there any other -- have you not -- are

7    there any additional facts that you

8    think would support this cause of action

9    as opposed to the one we've already

10   talked about?

11           A.      Wanton, what is --

12           Q.      The just simple negligent?

13           A.      -- the wanton?

14           Q.      I'm not your lawyer.  This

15   is your complaint.

16           A.      Okay.  No, we've discussed

17   it.

18           Q.      Okay.  There's nothing

19   additional, no additional facts?

20           A.      No.

21           Q.      Okay.  Now, the next cause

22   of action is outrage and you allege that

23   defendant's conduct was extreme and

**FREEDOM COURT REPORTING**

Page 174

1    outrageous.  I want to know what conduct

2    of EDS specifically was extreme and

3    outrageous?

4          A.    EDS?

5          Q.    Yes.

6          A.    The way they handled the

7    situation.

8          Q.    And you're talking about the

9    elevator incident specifically?

10         A.    Even -- even after the

11   elevator incident, yes.

12         Q.    And how do you think they

13   handled that, what was wrong with how

14   they handled that?

15         A.    How they handled that.

16         Q.    Is it because he's not

17   fired?

18         A.    No.  The investigation

19   process.

20         Q.    What part of the

21   investigation process?

22         A.    I don't know what went on in

23   the investigation so I can't tell you

**FREEDOM COURT REPORTING**

Page 175

1  what part of it.

2      Q.    Okay.  So it's simply

3  because you don't know --

4      A.    Exactly.

5      Q.    -- what's happened?

6      A.    What's the outcome other

7  than --

8      Q.    Well, you were told what the

9  outcome was, weren't you?

10     A.    I was -- only thing I was

11 told was we didn't find anything.

12     Q.    Right.  That it was

13 unsubstantiated?

14     A.    Right.

15     Q.    That there was no witnesses

16 and you said one thing and he said

17 something else; correct?

18     A.    Basically, last statement

19 was we didn't find any supporting.

20     Q.    Right.

21     A.    That's all.

22     Q.    Okay.  Anything else -- any

23 other conduct by EDS that you thought