## FREEDOM COURT REPORTING

Page 21

1  Q. What time period?
2  A. Wait a minute. It's a year,
3  year and a half, 18 months.
4  Q. What time period,
5  approximately?
6  A. From April of '95 up until
7  March of '96.
8  Q. That was where?
9  A. C Con. It was in
10 Huntsville.
11 Q. Huntsville. Prior to that,
12 where were you employed?
13 A. I wasn't employed.
14 Q. You were going to school?
15 A. Yes. Well, just had a
16 baby.
17 Q. Have you been terminated
18 from any position?
19 A. No.
20 Q. Any warnings or disciplinary
21 actions?
22 A. No.
23 Q. Prior to the charge that you

Page 22

1  filed in this case, have you filed a
2  charge of discrimination before?
3  A. No.
4  Q. You said you started in
5  August of 1997 with EDS?
6  A. Uh-huh (affirmative
7  response). Yes.
8  Q. How did you find out about
9  the position?
10 A. A friend of mine that
11 attended church with me.
12 Q. Who is that?
13 A. Shonda Robinson.
14 Q. Was she employed by EDS?
15 A. Yes.
16 Q. She currently employed by
17 EDS?
18 A. No.
19 Q. Did you have to interview
20 for the position?
21 A. Yes.
22 Q. Who did you interview
23 with?

Page 23

1  A. Shelton Hamilton, Brook; I
2  don't recall her last name.
3  Q. Anyone else?
4  A. No.
5  Q. Who offered you the
6  position?
7  A. They did.
8  Q. Both?
9  A. Yes.
10 Q. And what was the position
11 when you first started?
12 A. Customer service rep.
13 Q. And have you remained in
14 that position since you've been at EDS
15 or that title?
16 A. That title, yes.
17 Q. When you first started, what
18 area were you in?
19 A. On the phone.
20 Q. So you were what I
21 would call --
22 A. Customer service, yes.
23 Q. -- call center?

Page 24

1  A. Yes.
2  Q. Could you tell me a little
3  bit about what EDS does at the
4  Montgomery facility?
5  A. This -- this particular
6  contract we consolidate student loans.
7  Q. And is that what it did back
8  in '97?
9  A. Yes.
10 Q. And so when you started, you
11 were on the phones talking --
12 A. Correct.
13 Q. -- customer service?
14 A. Yes, ma'am.
15 Q. How long did you do that?
16 A. Four months.
17 Q. Who did you report to?
18 A. Robert Martin.
19 Q. Could you spell his last
20 name?
21 A. M-A-R-T-I-N.
22 Q. After four months, what did
23 you do?

6 (Pages 21 to 24)

**FREEDOM COURT REPORTING**

Page 61

1  in management?
2    A.   Open door policy, anybody.
3  And Brenda Cheatham, if I'm not
4  mistaken, she's also -- she has the
5  title of team lead.
6    Q.   Besides that one incident
7  prior to February of 2005, have
8  Mr. Williams said anything that you
9  consider to be offensive in nature to
10 you?
11   A.   No.
12   Q.   Had he ever touched you
13 prior to the February 2005 incident?
14   A.   No.
15   Q.   And you said -- what was the
16 conversation with Ms. Cheatham when you
17 told her what had happened?
18   A.   I came to her desk and I was
19 like something just -- weird just
20 happened. And she was like what. I
21 said Jeff made a statement to me in the
22 breakroom and she was like what was it
23 and that's when I told her.

Page 62

1    Q.   And what was her response?
2    A.   She was like, oh, you know,
3  just shrug it off. I'm like oh. If he
4  say anything else to you, just basically
5  let me know.
6    Q.   All right. Let's talk about
7  Mr. Williams, what you claim happened in
8  February of 2005. Could you tell me
9  what happened?
10   A.   Okay. I was coming back
11 from lunch and he was coming back from
12 lunch as well. We walked into the
13 ground floor where the elevators are and
14 I felt something brush against my -- my
15 behind. And I thought he just walked in
16 too close to me. The elevator door
17 opened. I stepped on first. He came in
18 from behind -- came in behind me. I
19 turned around. I hit the sixth floor
20 button. As soon as the door closed,
21 he -- he immediately grabbed me 'cause
22 it was cold that February, that
23 particular, he grabbed me. And he was

Page 63

1  like, oh, it's cold outside. And he was
2  like, oh, I need you to warm me up.
3  Then he put his hands down my pants. He
4  put his -- excuse me. I'm sorry. He
5  placed his hands down by pants and he
6  grabbed my shirt out and he was rubbing
7  on my body. And I was pushing him, get
8  -- get off me, get -- get off me. And
9  he start rubbing on my stomach and he
10 moved up to my breast area and -- excuse
11 me. Somebody have some tissue, please?
12 I'm sorry.
13
14   (Mr. Walker handed the witness a
15   box of Kleenex.)
16
17   A.   Thanks. We -- he grabbed
18 my -- and I kept pushing him off of me.
19 And he said you feel good. He layed his
20 hands -- head on my shoulder. And I
21 just kept pushing and then the elevator
22 door opened up and he said I just had a
23 nice lunch and I looked at him. I said

Page 64

1  where did you go. He was like I had to
2  take some jeans by back to I think it
3  was Looking Good or Weil's. And I
4  walked to my desk and my coworker, she
5  looked at me, and she asked me what was
6  wrong. And I -- and I walked to the
7  breakroom and I told her. And she told
8  me to report it immediately. Can I --
9  can I step outside, please?
10     MS. JACOBS:   Sure. Can take
11 a break.
12     MS. VIDEOGRAPHER:   Off the
13 record. The time is 10:46.
14
15   (A brief recess was taken.)
16
17     MS. VIDEOGRAPHER:   Back on
18 the record. We commence Tape 2. The
19 time is 10:53.
20   Q.   (By Ms. Jacobs) Ms. Jacobs,
21 we were talking about the incident that
22 occurred in February of 2005. And if
23 I'm correct, it was February 10th, does

16 (Pages 61 to 64)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 85

1  about having sex with men in front of
2  your coworkers --
3      A.  No.
4      Q.  -- or with your coworkers?
5      A.  No.
6      Q.  Or talked about men's body
7  parts in front of your coworkers?
8      A.  No.
9      Q.  How good somebody looks, how
10 much you'd like to have sex with
11 somebody even implying it?
12     A.  Implying it, I can't go off
13 what someone else's implied or what
14 their thought process, no, I can't.
15     Q.  But you never meant to imply
16 it?
17     A.  I've never implied it.
18     Q.  Now, Ms. Relf in addition to
19 talking to Mr. Williams' supervisor
20 reported it to human resources or the
21 employee relations department;
22 correct?
23     A.  I don't know.

Page 86

1      Q.  Well, at some point in time,
2  you were advised that an investigation
3  was taking place and asked to write a
4  statement, weren't you?
5      A.  I contacted human
6  resource.
7      Q.  Who did you contact?
8      A.  Leslie Liebman.
9      Q.  When did you contact
10 Leslie?
11     A.  I think it was that day, a
12 couple days later.
13     Q.  How did you contact her?
14     A.  Via e-mail.
15     Q.  What'd she say?
16     A.  I e-mailed her and she
17 e-mailed me back.
18     Q.  Okay. What was the e-mail
19 correspondence about?
20     A.  Basically, I was telling her
21 about the incident. I was told to get
22 in touch with her and I told her about
23 the incident in the elevator. Then she

Page 87

1  informed me that she wanted me to put it
2  in writing. I put it in writing and she
3  stated she was going to get back with me
4  in a couple weeks, which she never
5  done.
6      Q.  Who told you to contact
7  Leslie?
8      A.  I'm not sure was it Tara or
9  Brenda. But I want to say Brenda but
10 I'm not sure because she told me I need
11 to escalate it.
12     Q.  How did you know to contact
13 Leslie?
14     A.  Info center, looked it up.
15     Q.  Her name's on the info
16 center?
17     A.  Well, I think it's -- it's
18 human resource, her name is on it,
19 yes.
20     Q.  Had you ever spoken to her
21 before?
22     A.  Prior to this?
23     Q.  Uh-huh (affirmative

Page 88

1  response).
2      A.  No.
3      Q.  And you said that she asked
4  you to write a statement?
5      A.  Yes.
6
7      (Defendants' Exhibit No. 6 was
8       marked for identification.)
9
10     Q.  You've been handed Exhibit
11 No. 6. Do you recognize this
12 document?
13     A.  Yes.
14     Q.  Is this the statement you
15 wrote?
16     A.  Yes.
17     Q.  So you actually sat down and
18 typed this statement?
19     A.  Yes.
20     Q.  Did you do that at work or
21 at home?
22     A.  At work.
23     Q.  Okay. And it's dated

22 (Pages 85 to 88)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 97

1  A. Yes.
2  Q. It was just you on the
3  elevator with Mr. Williams?
4  A. Right.
5  Q. No one saw what happened?
6  A. Right.
7  Q. Okay. And so you told her
8  you were seeing a therapist and she said
9  that was good?
10  A. Yes.
11  Q. And that EDS would pay for a
12  certain number of visits?
13  A. She said EDS has things in
14  place for that.
15  Q. Okay.
16  A. Basically.
17  Q. Did you discuss with her
18  about what those things were?
19  A. No.
20  Q. Okay. Did you ever look
21  into what those things were?
22  A. Yes.
23  Q. And what types of things

Page 98

1  does EDS have in place?
2  A. They -- I think they pay for
3  like six visits and you pay for the
4  rest.
5  Q. And did you have EDS pay for
6  the first six visits?
7  A. I think I paid for the
8  initial first two, and then she was
9  like, no, just go ahead and let them do
10  it. Tara was like, you know, she was
11  looking into the paperwork for me to do
12  it.
13  Q. Okay. And did that
14  happen?
15  A. Yes.
16  Q. So EDS paid for a certain
17  number of visits?
18  A. Yes. My insurance paid for
19  it and they paid for the copay.
20  Q. Okay. So your medical
21  insurance paid for the visits and
22  then --
23  A. I'm not really sure how the

Page 99

1  billing went. I'm -- I'm not too clear
2  on that one.
3  Q. Okay.
4  A. But I know I paid most of
5  the bill.
6  Q. Right. So there's medical
7  insurance and then for some of the
8  visits EDS would have paid you back for
9  the copay?
10  A. No, they didn't pay me back
11  for the copay. They was --
12  Q. Then what did they pay
13  for?
14  A. I'm -- I'm not sure what
15  they paid for, but they paid for I think
16  six visits, copays.
17  Q. Who were those visits to?
18  A. Vonceil Smith.
19  Q. Who is that?
20  A. A psychiatrist.
21  Q. How'd you find Dr. Smith?
22  A. From a book.
23  Q. Had you ever been to Dr.

Page 100

1  Smith before?
2  A. No.
3  Q. Nobody recommended Dr.
4  Smith?
5  A. No.
6  Q. How long did you see Dr.
7  Smith?
8  A. From March until like
9  November '05.
10  Q. How often did you see Dr.
11  Smith?
12  A. Initially once a week, then
13  she went to twice a month, then back to
14  once every week.
15  Q. And you stopped seeing her
16  in November of '05?
17  A. Yes.
18  Q. Why?
19  A. Couldn't afford it
20  anymore.
21  Q. Insurance stopped paying for
22  it?
23  A. Oh, insurance been -- been

25 (Pages 97 to 100)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

**Page 101**

1 stop paying for it.
2     Q.   Do you know what, if
3 anything, happened to Mr. Williams if he
4 was disciplined in any way, counseled in
5 any way?
6     A.   I don't know. I got --
7 didn't get a -- I just had no dealings
8 with what was going on with him. I was
9 trying to deal with me.
10    Q.   After February of 2005, did
11 Mr. Williams ever touch you again?
12    A.   No.
13    Q.   So he's never tried to
14 attack you, touch you, hug you, anything
15 since February of 2005?
16    A.   Intimidate.
17    Q.   I'm not asking about
18 intimidate. I'm asking has he ever
19 touched you?
20    A.   No.
21    Q.   Okay. Has he ever spoken to
22 you?
23    A.   No.

**Page 102**

1     Q.   So he hasn't spoken to you
2 or touched you but he's intimidated
3 you?
4     A.   Yes.
5     Q.   How?
6     A.   He was walking back and
7 forth through my area like 20, 25 times
8 a day. He'll stop at the water fountain
9 right in front of my desk and stare at
10 me. He'll stop -- and at the time,
11 Annie Kent was sitting right in my area.
12 He'd stand there and look back at me and
13 stare at me and just roll his eyes at
14 me.
15    Q.   Anybody else see this?
16    A.   When I see him, I slump
17 down. Tara saw a lot of it.
18    Q.   How often did this occur?
19    A.   Oh, quite often. Up until
20 yesterday, actually.
21    Q.   Yesterday it occurred?
22    A.   Yes.
23    Q.   What happened yesterday?

**Page 103**

1     A.   I was sitting at my desk,
2 and where I sit, I sit like right in
3 front of the door when people walk in
4 and out. And every time somebody walk
5 pass, we have a habit, we all would look
6 and see who's passing by. And everybody
7 was gone to lunch and I was the only one
8 sitting back there. And like I said,
9 didn't know who it was but if somebody
10 walked pass me immediately just look up.
11 And when I looked up, he looked at me
12 and he rolled his eyes at me and I just
13 slumped back down in my chair.
14    Q.   He works for EDS still?
15    A.   Yes.
16    Q.   And he works on the same
17 floor as you?
18    A.   Yes.
19    Q.   So periodically you're going
20 to have to see him; correct?
21    A.   Well, not -- well, I didn't
22 have to see him 'cause there's two
23 sides.

**Page 104**

1     Q.   Okay. But it -- your --
2 from what I understand, you've got
3 cubicles. And if he walks pass and you
4 pop up, you're going to see him?
5     A.   He was --
6     Q.   I'm not asking about
7 yesterday. I'm just asking in general.
8     A.   I'm saying in general I
9 don't have to see him because like I
10 stated to Jarvis at the time, there's a
11 restroom on the other side of the
12 building.
13    Q.   Okay.
14    A.   A men's restroom. There's
15 an entrance to the breakroom on the
16 other side that he can go but he comes
17 by that area.
18    Q.   Is it shorter to go by your
19 office?
20    A.   It's the same amount of
21 distance.
22    Q.   Okay. You say he goes by
23 and stands by Annie Kent's desk?

26 (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1  A. At the time. Annie Kent's
2  no longer on the team.
3  Q. So when did that happen?
4  A. That -- well, I don't -- I
5  can't recall. He's -- right by Leslie.
6  He just stand in front of Annie Kent's a
7  lot after the incident for a while
8  afterward. I don't -- can't say how
9  long. But I know all the time I see him
10 slump down and stand there. And I
11 reported that incident.
12 Q. Was he friends with Annie
13 Kent?
14 A. Well, I don't how -- what
15 their relationship is.
16 Q. Did he ever talk to Annie
17 Kent before February 2005?
18 A. Yes.
19 Q. Go stand at her desk before
20 February of 2005?
21 A. Not that often.
22 Q. How often did he after
23 February of 2005 did he go --

Page 106

1  A. I'll --
2  Q. -- stand at Annie's desk?
3  A. I'll tell you he'll stand
4  anywhere between 10, 15 minutes at a
5  time.
6  Q. But how often every day --
7  A. -- there, two or three
8  minutes, speak to her and keep going.
9  Q. How often would he do this
10 though?
11 A. After or before?
12 Q. Let's go before.
13 A. Before, probably once a
14 day.
15 Q. And after?
16 A. About four, five times a
17 day.
18 Q. So Ms. Kent could testify
19 that --
20 A. Yes.
21 Q. -- he would have stood at
22 her desk more after February of 2005?
23 A. Yes.

Page 107

1  Q. Anyone else would have seen
2  him do this?
3  A. Twana, Brenda, Ava Collier;
4  she used to sit across from Annie so.
5  Q. And you said you -- you
6  reported this when?
7  A. Each time reported to
8  Tara.
9  Q. Did you ever speak with
10 Leslie about it, report it to human
11 resources?
12 A. Yes.
13 Q. When?
14 A. An e-mail around the -- I
15 don't recall the date, but I -- I know
16 I -- I sent it to her in e-mail.
17 Q. And did Ms. Liebman talk to
18 you about it?
19 A. No.
20 Q. Did she try to talk to you
21 about it?
22 A. No.
23 Q. So no one from EDS tried to

Page 108

1  talk to you about it?
2  A. About him coming in the
3  area, no.
4  Q. Did they try to talk to you
5  about any of the allegations you made
6  that he was intimidating you?
7  A. Leslie made the statement
8  that if he comes to me or something let
9  her -- oh, no, no. She didn't say him.
10 She said if anybody else bothers me, let
11 her know. It wasn't that incident.
12 Q. When did she tell you
13 that?
14 A. I don't recall, but it's in
15 e-mail.
16 Q. Was it after the February
17 incident?
18 A. Yes.
19 Q. Before you reported him
20 intimidating you to her?
21 A. I don't recall.
22
23    (Defendants' Exhibit No. 7 was

27 (Pages 105 to 108)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 189

1  therapy or something they was telling
2  me. Dr. Barrington's office, she stated
3  she was going to -- I need to file a
4  workman's comp claim on it. I didn't
5  know. I was -- I just paying it.
6      Q.  And EDS didn't try to stop
7  you from filing a worker's comp claim,
8  did they?
9      A.  Not that I'm aware.
10     Q.  In fact you went to your
11 supervisor Tara Relf and she helped you
12 fill out the forms?
13     A.  No. She just told me where
14 to go to get it.
15     Q.  Okay. Did she have to fill
16 anything out?
17     A.  I think she did. I don't
18 know.
19     Q.  What happened with that?
20     A.  They denied it because they
21 stated that it was on the elevator,
22 something.
23     Q.  Okay. Did you appeal the

Page 190

1  denial?
2      A.  No. I didn't -- didn't know
3  I could.
4      Q.  And do you know who made the
5  decision?
6      A.  No.
7      Q.  Okay. Is it your
8  understanding that EDS has a third party
9  administrator for its worker's comp?
10     A.  No, I didn't.
11     Q.  Okay. How did you find out,
12 who told you that your worker's comp had
13 been denied?
14     A.  They sent a letter.
15     Q.  Who's they?
16     A.  Someone out of Georgia from
17 the workman's comp.
18     Q.  Okay. It wasn't from EDS?
19     A.  I'm not sure.
20     Q.  Do you have that
21 documentation?
22     A.  I don't know. I may. I
23 don't think I have it on me, but I have

Page 191

1  it. I'll give it to my attorney. He'll
2  get it to you.
3      Q.  Who all have you seen as a
4  result of what you claim to have
5  happened at EDS? And by seen, I mean
6  doctors or counselors.
7      A.  Vonceil Smith, Paul Miller.
8  You said for the incident or just
9  purely --
10     Q.  First as a result of the
11 incident.
12     A.  Okay. Dr. Barrington,
13 McKinney, physical therapy at A -- AOS
14 which is Dr. Barrington's office, a
15 chiropractor. I think it's Peavy.
16     Q.  What's his name again?
17     A.  Dr. Peavy. P-E-A-V-Y. I
18 think that's it.
19     Q.  Okay. We've talked about
20 Ms. Smith. She's a psychiatrist?
21     A.  Psychiatrist.
22     Q.  And you stopped seeing her
23 in November?

Page 192

1      A.  Yes.
2      Q.  And what medication did she
3  give you?
4      A.  She actually can't
5  prescribe. Another doctor in there
6  prescribe some -- the cloc -- start with
7  a "C" and Lexapro. He put me on some
8  Zoloft that was too strong. Ambien.
9      Q.  Okay. Did you see this
10 other doctor?
11     A.  Yes.
12     Q.  What was his name?
13     A.  I can't recall his name.
14     Q.  How often did you see him?
15     A.  I think I saw him a total of
16 three times.
17     Q.  Were they counseling
18 sessions as well or was it --
19     A.  Yes.
20     Q.  -- just --
21     A.  Counseling.
22     Q.  Have you seen him since
23 November of '05?

48 (Pages 189 to 192)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 185

1 deprived of sleep?
2    A.  Oh, yes.
3    Q.  For how long?
4    A.  Oh, I know it had to been up
5 until -- still off and on now, but
6 constantly like seven, eight months,
7 nine months tops.
8    Q.  And you got Ambien?
9    A.  Yes.
10    Q.  Did you ever take Ambien
11 before this?
12    A.  No.
13    Q.  Any other thing, the
14 emotional distress, anything that has
15 happened that you claim to be the
16 emotional stress that you suffered?
17    A.  No.
18    Q.  Just anxiety, panic attacks,
19 paranoia, humiliation, deprived of
20 sleep. You said you're not comfortable
21 in the work environment?
22    A.  Right. Shoulder pain.
23    Q.  The shoulder pain?

Page 186

1    A.  Yes.
2    Q.  When did you see a doctor
3 about that?
4    A.  Actually, initially saw
5 Rachel McKinney back in February of last
6 year. She sent me to a neurologist.
7    Q.  To a neurologist?
8    A.  Yes.
9    Q.  Okay.
10    A.  On -- on the 17th of
11 February of '05.
12    Q.  And who was that?
13    A.  Paul Miller.
14    Q.  And what did he do?
15    A.  He did a ECG or E something
16 on that.
17    Q.  And what did he find,
18 anything?
19    A.  I think he found something.
20 He gave me something. Some
21 anti-inflammatory and he told me to come
22 back in six months. And I came back in
23 six months and pains was still there.

Page 187

1 And he said he has to schedule an MRI.
2    Q.  Have you had an MRI?
3    A.  Yes. Two.
4    Q.  And?
5    A.  And I don't know --
6    Q.  You don't know the
7 results?
8    A.  Yeah, I know the results. I
9 don't know the terminology that they
10 used.
11    Q.  In layman's terms.
12    A.  Layman's terms, something is
13 torn in between that. It was swelling.
14    Q.  Had you done anything
15 between February of '05 and when was the
16 MRI?
17    A.  The MRI I had November. I
18 had two. I don't recall the dates. But
19 I had --
20    Q.  So November of '05?
21    A.  And -- no. January this
22 year, '06, and I think it was one last
23 year.

Page 188

1    Q.  Okay.
2    A.  X-ray, MRI, one of the
3 two.
4    Q.  And it's your contention it
5 happened because of what was on the
6 elevator?
7    A.  Because I pulled -- tore
8 cartilage or ligament or something. It
9 was swelling. Said releasing fluids in
10 there.
11    Q.  And you hadn't done anything
12 between --
13    A.  No.
14    Q.  -- the visits that would
15 cause that?
16    A.  No.
17    Q.  Okay. And my understanding
18 is you filed a worker's comp claim --
19    A.  Yes.
20    Q.  -- about a year after the
21 incident?
22    A.  Yes. I didn't know about it
23 when I was going through physical